UNITED STATES COURT OF APPEALS FOR THE SECOND CIRCUIT

Thurgood Marshall U.S. Courthouse  40 Foley Square, New York, NY 10007 Telephone: 212-857-8500

MOTION INFORMATION STATEMENT

Docket Number(s): 24-2026

Caption [use short title]

Motion for: Initial Hearing en banc

Vt. Federation of Sportsmen's Clubs, Inc.

v.

Matthew Birmingham, et al.

Set forth below precise, complete statement of relief sought:

Motion for an order that this case be heard

en banc as an initial matter pursuant to Fed. R. App. P. 40 (g).

| MOVING PARTY: Vt. Fed. Sportsmen's Clubs, Inc. et al. | OPPOSING PARTY: Birmingham, et al. |
|---|---|
| ☑ Plaintiff  ☐ Defendant | |
| ☑ Appellant/Petitioner  ☐ Appellee/Respondent | |

MOVING ATTORNEY: Matthew Hardin    OPPOSING ATTORNEY: Bridget Asay

[name of attorney, with firm, address, phone number and e-mail]

| Hardin Law Office | Stris & Maher LLP |
|---|---|
| 101 Rainbow Drive #11506 Livingston, TX 77399 | 15 East State St, Ste 2, Montpelier, VT 05602 |
| (202) 802-1948 MatthewDHardin@gmail.com | (802) 858-4285 BAsay@stris.com |

Court- Judge/ Agency appealed from: U.S. District Court for the District of Vermont, Judge William K. Sessions

Please check appropriate boxes:

Has movant notified opposing counsel (required by Local Rule 27.1):
☑ Yes  ☐ No (explain): _____

Opposing counsel's position on motion:
☐ Unopposed ☑ Opposed ☐ Don't Know
Does opposing counsel intend to file a response:
☑ Yes ☐ No ☐ Don't Know

**FOR EMERGENCY MOTIONS, MOTIONS FOR STAYS AND INJUCTIONS PENDING APPEAL:**

Has this request for relief been made below?  ☐ Yes ☐ No
Has this relief been previously sought in this court?  ☐ Yes ☐ No

Requested return date and explanation of emergency: n/a

Is the oral argument on motion requested?  ☑ Yes  ☐ No (requests for oral argument will not necessarily be granted)

Has the appeal argument date been set?  ☐ Yes  ☑ No  If yes, enter date: _____

Signature of Moving Attorney:

_Matthew D. Hardin_ Date: Nov. 10, 2025    Service : ☑ Electronic  ☐ Other [Attach proof of service]

Form T-1080 (rev. 10-23)

NOT YET SCHEDULED FOR ORAL ARGUMENT

# United States Court of Appeals for the Second Circuit

No. 24-2026

VERMONT FEDERATION OF SPORTSMEN'S CLUBS, INC., et al.

*Appellant,*

v.

MATTHEW BIRMINGHAM, *et al.,*

*Appellees.*

Appeal from the U.S. District Court for the District of Vermont.

**MOTION FOR INITIAL HEARING *EN BANC***

Brady C. Toensing
DiGenova & Toensing, LLP
1775 Eye Street NW, Suite 1150
Washington, DC 20006
Brady@digtoe.com
202-297-4245

*Attorneys for Appellants*

Matthew D. Hardin
HARDIN LAW OFFICE
101 Rainbow Drive #11506
Livingston, TX 77399
Matt@MatthewHardin.com
202-802-1958

*Attorney for Appellants*

NOW COME the Appellants, by and through their undersigned counsel, and move that this case be heard *en banc* as an initial matter pursuant to Fed. R. App. P. 40 (g).

Pursuant to Local Rule 27.1 (b): (1) opposing counsel were notified of this Motion on November 2, 2025; (2) opposing counsel opposes the relief requested; and (3) opposing counsel intends to respond.

In support of this Motion, Appellants state as follows:

## Introduction

This appeal challenges two Vermont firearms restrictions. The first is Vermont's purposeless, blanket waiting period that prevents any eligible purchaser from acquiring a firearm without waiting a minimum of 72-hours after a background check has been passed. The second is Vermont's ban on magazines capable of carrying more than ten rounds of ammunition (for long guns) or fifteen rounds (for handguns).

Under *N.Y. State Rifle & Pistol Ass'n v. Bruen*, 597 U.S. 1 (2022) and *United States v. Rahimi*, 602 U.S. 680 (2024), neither of Vermont's statutes are constitutional. But Appellants' opening brief is necessarily primarily focused on the waiting period law, because a panel of this Court recently handed down *National Assoc. for Gun Rights v. Lamont*, 153 F.4th 213 (2d Cir. 2025). In that published and binding opinion, the panel upheld

Connecticut's so-called "Assault Weapons" ban, which operates similarly to Vermont's magazine ban and prohibits magazines with a capacity of greater than ten rounds.

The challengers in *Lamont* elected not to seek *en banc* review, but have filed a petition for certiorari with the Supreme Court. *National Assoc. for Gun Rights v. Lamont*, Docket No. 25-42. That petition will not be considered until early 2026, at the earliest,[1] but even a denial of certiorari will not resolve the merits. *Doe v. Mills*, 142 S. Ct. 17, 18 (2021) (Barrett, J., concurring) (explaining that the Supreme Court's exercise of certiorari jurisdiction is always discretionary, and its discretion is heightened in preliminary injunction posture). *Lamont* was in error both as to Second Amendment protections and as to the proper standard of review for preliminary injunctions. Without *en banc* review, there is no effective way to correct *Lamont*'s errors. Bound to follow *Lamont*, subsequent panels will only metastasize its harm.

Recently, other circuits have recognized that *en banc* review is appropriate in Second Amendment cases, specifically in the context of magazine bans. *Assoc. of N.J. Rifle & Pistol Clubs, Inc. (ANJRPC) v.*

---

[1] Connecticut's request to extend the time for a response was granted, such that the petition will not be fully briefed until the end of December 2025.

Attorney General New Jersey (Case Nos. 24-2415, 24-2450, 24-2506) (relating to NJ's magazine ban, heard en banc on Oct. 15, 2025), *Duncan v. Bonta*, 83 F.4th 803, 805 (9th Cir. 2023) (*en banc* review as to California's magazine ban). This Court should do the same.

## Standard of Review

*En banc* review should be granted when "(1) *en banc* consideration is necessary to secure or maintain uniformity of the court's decisions; or (2) the proceeding involves a question of exceptional importance." *United States v. Taylor*, 752 F.3d 254, 255 (2d Cir. 2014) (Cabranes, J., dissenting, citing former Local Rule 35). A case need only meet one of these criteria.

Whether a case is of exceptional importance, "rests on the precedential impact that a determination of this Court is likely to have on the future course of the law and hence on the lives of countless others." *Galella v. Onassis*, 487 F.2d 986, 1004 (2d Cir. 1973). It is important to "act as a full court in ruling upon substantial questions of unusual importance…" *Id.* at 1005 (Timbers, J, dissenting).

But even if a case is not individually important, *en banc* review is a tool that should be deployed when a panel decision is "inconsistent" with a prior panel opinion or when "appropriate to settle the law of the Circuit." *United States v. Grimm*, 763 F.3d 221, 222 (2d Cir. 2014) (Lynch, J., dissenting).

# Argument

The panel opinion that currently forecloses relief as to Vermont's magazine ban is inconsistent with binding Supreme Court precedents as to the proper interpretation of the Second Amendment. This case is also exceptionally important, and presents an opportunity to clarify the standard of review in preliminary injunction cases, which *Lamont* threw into doubt. Lastly, other circuits have granted *en banc* review in like cases.

## 1. No panel will be able to grant relief as to Vermont's magazine ban, because *Lamont* controls.

Absent an *en banc* hearing, Appellants cannot obtain relief on their magazine ban challenge. *Union of Needletrades v. INS*, 336 F.3d 200, 210 (2d Cir. 2003) ("one panel of this Court cannot overrule a prior decision of another panel," unless "there has been an intervening Supreme Court decision that casts doubt on [the panel's] controlling precedent."). *Lamont* upheld, at the preliminary injunction stage, Connecticut's ban on magazines capable of carrying "more than ten rounds of ammunition." *Lamont*, 153 F.4th at 226; Conn Gen. Stat. §§ 53-202w(a)(1), (b). Vermont enacted a substantively similar magazine ban. 13 V.S.A. § 4021. *Lamont* will control any panel opinion.

## 2. *Lamont* is wrong on the Second Amendment, and this exceptionally important case gives the full Court an opportunity to correct the panel's errors.

### a)    *Lamont* is wrong and should be corrected.

Criticizing a Ninth Circuit opinion upholding a magazine ban, Judge Lawrence Vandyke summarized it this way: "the majority's test boils down to something like this: the Second Amendment presumptively protects only the jankiest version of a firearm and a little bit of ammunition (2.2 rounds?)." *Duncan v. Bonta*, 133 F.4th 852, 918 (9th Cir. 2025). That same criticism applies to *Lamont*.

As explained in Appellants' opening brief below, JA at A71-A72, *Bruen* created a two-part test. 597 U.S. at 22 *et seq*. The first part asks whether the plain text of the Second Amendment "covers an individual's conduct." *Id*. at 17. If so, then "the Constitution presumptively protects that conduct" and the challenged regulation is unconstitutional unless, under the second part, the government can prove the regulation "is consistent with this Nation's historical tradition of firearm regulation." *Id*. at 34. Only if the government carries this significant burden "may a court conclude that the individual's conduct falls outside the Second Amendment's 'unqualified command'" *Id*.

Here, the District Court erred both with respect to whether Vermont's magazine ban implicates the plain text of the Second Amendment (it does),

and whether the State carried its burden to show that its magazine ban was consistent with the relevant historical tradition of firearms regulation (it did not). The District Court's errors preceded *Lamont*, and even *Lamont* did not agree with the District Court on the first step of the analysis. *Lamont*, 153 F.4th at 235 (calling this an area in which "uncertainty abounds" and therefore assuming without deciding that the plain text of the Second Amendment applies to magazine capacity restrictions). But the second step is dispositive, and *Lamont* echoed the errors of the District Court below when it found that there is a relevant historical tradition that justifies modern magazine bans. *Id.* at 235-236. Taking this case up *en banc* will allow this Court to correct its own errors and resolve the "uncertainty" expressed in *Lamont* as well as the errors of the District Court.

*(i) The Second Amendment protects firearm magazines.*

The District Court held that the plain text of the Second Amendment is not implicated by Vermont's magazine ban. SPA at 18-19. As relevant here, the District Court held that so-called "large capacity magazines" were not "in common use" for self-defense. *Id.* at 17. It went on to claim that the popularity of weapons chosen or purchased for self-defense was irrelevant, because the real question for purposes of a "common use" analysis was how often weapons are deployed or fired in self-defense. *Id.* at 24 *et seq*. That is

7

error, as Appellants argued below. JA at 1012. After all, if the test was what weaponry Americans fire as opposed to what weapons they choose to purchase, keep, and bear for the unfortunate but real possibility that a need for self-defense arises, the *per curiam* opinion in *Caetano* makes no sense. *Caetano v. Massachusetts*, 577 U.S. 411, 136 S. Ct. 1027 (2016) (Second Amendment applies to stun guns, despite no evidence of how often stun guns deployed).

Even *Lamont* did not go quite as far as the District Court. *Lamont*, 153 F.4th 235 ("we will simply assume without deciding that the desired firearms and magazines are... presumptively entitled to constitutional protection."). But because the District Court held that magazines are not entitled to Second Amendment protections, and because *Lamont* held open the question while assuming constitutional protection, this case presents the full court with an opportunity to hold, and thereby clarify, that standard capacity magazines are presumptively entitled to constitutional protection.

*(ii) Lamont and the District Court erred in the "Common Use" analysis, and failed to grapple with the conjunctive test for "Dangerous and Unusual" weaponry.*

The District Court also held that "[t]his nation's history and tradition of gun regulation justifies Vermont's" magazine ban. SPA at 40. Here, the

District Court's opinion was later supported by *Lamont*, but *Lamont* itself is wrong.

The District Court below conducted a second "common use" analysis for *Bruen*'s step two, after purporting to conduct its first "common use" analysis at step one. SPA at 24, 42. The District Court held that even a firearm which is in "common use" can be regulated, so long as the "regulation is consistent with the nation's historical tradition …" App. at 42. That holding was error. *Heller* asks only whether a weapon (the banned magazines) is in common use for lawful purposes. JA at 1017. If so, they cannot be banned because they do not fall within "the historical tradition" of restricting "dangerous *and* unusual weapons." *District of Columbia v. Heller*, 554 U.S. 570, 627 (2008) (*emphasis added*).

Unfortunately, *Lamont* echoed the District Court's error and does not permit another panel to come to the contrary (but correct) conclusion, which is why Appellants seek *en banc* review. Specifically, *Lamont* collapsed *Bruen*'s "dangerous and unusual" test into an "unusually dangerous" test. *Lamont*, 153 F.4th at 233-234. Citing the declaration of a linguist rather than traditional principles of legal interpretation, *Lamont* held that the "conjunctive and disjunctive formulations ["dangerous and unusual" vs. "dangerous or unusual"] were traditionally understood" to mean the same

thing. *Id.* at 234. The Framer's choice of a specific formulation was therefore rendered irrelevant.

*Lamont*'s reimagination of "dangerous and unusual" into "unusually dangerous" flies in the face of the plain text of the Constitution and the Supreme Court's own precedents, which call for an analysis of whether a weapon is "dangerous *and* unusual." It also contradicts binding neutral interpretive principles because it is well-settled that "[t]he ordinary meaning of 'and,' … is conjunctive. *United States v. Palomares*, 52 F.4th 640, 643 (5th Cir. 2022), citing Antonin Scalia & Bryan A. Garner, *Reading Law: The Interpretation of Legal Texts,* 116-25 (2012). "Or," by contrast, is disjunctive. *Conjunctive/disjunctive canon*, BLACK'S LAW DICTIONARY (10th ed. 2014).

Even if the full Court were to follow *Lamont*'s lead and hold that "dangerous and unusual" is somehow disjunctive, it would not follow that the panel's *ad hoc* amalgamation of "unusually dangerous" is the true meaning of the disjunctive phrase. *United States v. Harris*, 838 F.3d 98, 105 (2d Cir. 2016) (interpretive canons "ordinarily suggest that terms connected by a disjunctive be given separate meanings"); *Reiter v. Sonotone Corp.*, 442 U.S. 330, 339 (1979) ("Canons of construction ordinarily suggest that terms connected by a disjunctive be given separate meanings…"). *En banc* review is needed to correct the confusion wrought by *Lamont*.

*(iii) History and tradition do not justify Vermont's magazine ban and show Lamont was wrongly decided.*

The District Court analogized Vermont's magazine ban to three historical types of laws: those restricting Bowie knives, those restricting gunpowder storage, and those penalizing the common law offense of affray. SPA at 44-50. While *Lamont* echoed the District Court's findings as to Bowie knives and common law affray, it did not mention gunpowder as a relevant comparator law. According to *Lamont*, there was a historical tradition of "prevent[ing] the use of… especially dangerous variants of otherwise lawful types of weapons in further acts of mass homicide and terror." 153 F.4th at 246.

Both the District Court and *Lamont* were wrong to point to restrictions on Bowie knives and affray as justifying a modern ban on magazines. Appellants briefed the history of Bowie knife regulation at length below. JA at 1032 *et seq*. In short, Vermont presented evidence that only three states actually prohibited all forms of carry of Bowie knives—Arkansas, Texas, and West Virginia. JA at 1033. Two of those laws came from states whose laws were also rejected as outliers by *Bruen*. *Id.*, citing *Bruen*, 597 U.S. at 65. And even those outlier state laws did not ban all possession of Bowie knives, while Vermont's law bars all possession of banned magazines even at home for self-defense. *Id.* at 1034.

Both the how and the why of Bowie knife restrictions are far different from the how and the why of modern magazine bans. First, the "how" of Bowie knife restrictions was limited in scope. Such laws targeted only public conduct (carrying weapons outside the home in certain enumerated circumstances), not all conduct by all people. These laws were understood to violate the right to bear arms for self-defense unless they could be given a narrow construction. *Nunn v. Georgia*, 1 Ga. 243 (1846); *cf. Heller*, 554 U.S. at 612, 626, 629 (singling out *Nunn* as "particularly instructive" for the Second Amendment's meaning). And the laws were quite narrow, either applying to those who were otherwise committing a crime or ventured into a particular location. Hearing Tr. at 67 *et seq.*, June 3, 2024. And the "why" of the carry laws was to regulate public conduct, not all conduct. These laws were particularly aimed at intent (using a knife in a crime), or sensitive locations (like polling locations on election day), or drunks (who have limited control of their faculties). *Id.*

The District Court and *Lamont* were also wrong to rely on England's and North Carolina's prohibitions on "affray" as an analog for modern magazine bans. First, this Court has been proven wrong in terms of its assertions that colonial North Carolina had an affray law in the first instance. *Antonyuk v. James*, 120 F.4th 941, 1019 (2d Cir. 2024), made a significant

error insofar as it recognized certain statutes as being in effect in post-Revolutionary North Carolina, notwithstanding that the courts of that state have expressly held to the contrary. *Id.*, *citing Collection of Statutes of the Parliament of England in Force in the State of North Carolina*, pp. 60-61, ch. 3 (F. Martin Ed. 1792), *contra. State v. Huntley*, 25 N.C. 418 (1843), *see also* Stephen Habrook, *Second Amendment Roundup: Antonyuk's and Koons' Historical Feet of Clay*, the Volokh Conspiracy, https://tinyurl.com/4prrezed (last visited Oct. 9, 2025) ("this 'statute's' six references to 'the King,' supposedly enacted sixteen years after independence was declared, should have been a dead giveaway that North Carolina enacted no such law.").

There was no prohibition on affray in effect in the State of North Carolina in the Founding Era, and the reference in the statute to "the king" rather gives away the game that the supposed North Carolina statute was not a postrevolutionary enactment that sheds any light on the interpretation of the newly-adopted Second Amendment. *Id.* But even if this Court were inclined to find that a ban on going armed to the terror of the people was an offense that existed in colonial North Carolina, such a law would not be analogous to a modern magazine ban because its "how" and why" are far different. Prohibitions on terrorizing people with a weapon are not weapons

13

bans, they are prohibitions on the (criminal) use of a weapon. Modern magazine bans prohibit those weapons generally, not only when they are being misused by criminals. The "how" is thus far different.

The "why" is also far different: affray statutes sought to prevent communities from being terrorized or subjugated by marauders. Magazine bans purport to prevent crime or, in this case "community violence" more generally. JA at 86. Of course, this "community violence" justification could also be generically claimed for any gun control law. This is not a case in which Vermont seeks to free its citizens from any sort of mob violence or intimidation, but a case in which it seeks to prevent its citizens from possessing what are inarguably the most common firearms chosen for self-defense (those capable of firing more than 10 or 15 rounds without reloading). SPA at 84-85.

Similarly, gunpowder storage regulations, referred to by the District Court but not by the *Lamont* panel, also provide no succor for the State. Gunpowder storage laws were enacted sporadically for the purpose of preventing fires. JA at 1037-1039; *Heller*, 554 U.S. at 632 (calling them "fire-safety laws"). In Colonial and post-revolutionary America, the far more common governmental action was to affirmatively require the purchase and storage of arms and ammunition, rather than to prevent such purchases. JA

at 1038. The how and the why of gunpowder regulations are thus also far different from modern regulations. Gunpowder was regulated only in terms of where it could be stored, not generally in terms of banning its possession. And the "why" was not punitive or to prevent crime, but solely aimed at preventing danger arising from the flammability of powder in urban environments. *Id.*

**b)**     **This case is exceptionally important.**

Vermont's laws prohibit the acquisition of firearms that are in common use, instead limiting citizens to firearms that are, as Judge Vandyke put it, "the jankiest version." *Duncan*, 133 F.4th at 918 (Vandyke, J., dissenting). Vermont's law also prohibits Vermonters from replacing firearms they already own and core components of those same firearms, which undisputed testimony shows will, as with all things mechanical, degrade and need replacement. Hearing Tr. at 14:10 et seq., 63:14 et seq., May 23, 2024. Although the law does not expressly confiscate weapons purchased before it was enacted, it operates in a way that makes those weapons impossible to repair or replace. *Id.* Testimony also showed these were the most popular firearms and components in Vermont. *Id.* at 17:22-25 and 68:4.

The Supreme Court has admonished inferior courts, including this one, for failing to follow its precedents and properly analyze Second Amendment

rights. The Second Amendment "is not 'a second-class right subject to an entirely different body of rules than the other Bill of Rights guarantees.'" *Bruen*, 597 U.S. at 70, *quoting McDonald v. City of Chicago*, 561 U.S. 742, 780, (2010). "Lower court judges may sometimes disagree with [the Supreme] Court's decisions, but they are never free to defy them." *Nat'l Insts. of Health v. Am. Pub. Health Ass'n*, 145 S. Ct. 2658, 2663 (2025) (Gorsuch, J., concurring). Yet *Lamont* subjects the Second Amendment to different rules, expressly permitting statistics-based interest-balancing, which is contrary to the Supreme Court's holding in *Bruen. Lamont*, 153 F.4th at 249, ("statistically significant decrease in per capita rates of deaths and casualties … weigh heavily in the balance"). That mistake alone makes *Lamont* an important case to correct.

### 3. *Lamont* calls into question, or overrules *sub silentio*, this Court's precedents on the standard for entry of a preliminary injunction.

This Court previously held that the deprivation of a constitutional right is a *per se* irreparable injury. *Mitchell v. Cuomo*, 748 F.2d 805, 806 (2d Cir. 1984) ("When an alleged deprivation of a constitutional right is involved, most courts hold that no further showing of irreparable injury is necessary."), citing 11 C. Wright & A. Miller, *Federal Practice and Procedure*, § 2948, 440 (1973); *Jolly v. Coughlin*, 76 F.3d 468, 482 (2d Cir. 1996) (there is a

"presumption of irreparable injury that flows from a violation of constitutional rights."); *Brewer v. W. Irondequoit Cent. Sch. Dist.*, 212 F.3d 738, 744 (2d Cir. 2000) (irreparable harm presumed from deprivations of Fourth and Eighth Amendment rights). The law was clear, settled, and correct.

Then came *Lamont*, which appears to have flipped the script and threatens to undermine decades of Circuit precedent. Despite the Supreme Court's admonition that the Second Amendment should be treated the same as every other guarantee in the Bill of Rights, *Bruen*, 597 U.S. at 70, *citing and quoting McDonald*, 561 U.S. at 780, and despite the fact that it has been well-established in the Second Circuit since at least 1996 that constitutional injuries are irreparable, *Lamont* indicated that presumption only applied in First Amendment cases. *Lamont*, 153 F.4th at 248 (presumptive irreparable harm does not apply "outside the First Amendment context" and will not be "extend[ed]" to Second Amendment cases.).

While *Lamont* cited *Brewer*, it made no attempt to explain why First, Fourth and Eighth Amendment violations constitute irreparable harm, but Second Amendment violations do not. Indeed, *Brewer* might even be seen as overruled *sub silentio* by *Lamont*. *Lamont* not only unsettled the law of this Circuit, but also created a dangerous precedent in which the harm

17

caused by violations of fundamental rights protected by the Bill of Rights, other than certain violations of the First Amendment, may not be presumed to be irreparable and are therefore unlikely to be resolved on a preliminary injunction.

*Lamont*'s improper reasoning also led it to bless statistical analysis for purposes of conducting a balancing of the equities, despite the Supreme Court's formal abrogation of this Court's prior efforts at interest balancing in the Second Amendment context. *Bruen*, 597 U.S. at 72 (Alito, J, concurring) ("What is the relevance of statistics about the use of guns to commit suicide?"); *See McDonald*, 561 U.S. at 790 (*quoting Heller*, 554 U.S. at 636) ("The enshrinement of constitutional rights necessarily takes certain policy choices off the table.'"). *Lamont* should be overturned before its errors infect the rest of this Court's preliminary injunction jurisprudence.

## 4. Other circuit courts have recognized the need for *en banc* review to clarify the law in this area.

With respect to magazine bans, two circuit courts have already granted *en banc* review. *Assoc. of N.J. Rifle & Pistol Clubs, Inc. (ANJRPC) v. Attorney General New Jersey (*3d Cir., *Case Nos. 24-2415, 24-2450, 24-2506) (*relating to NJ's magazine ban, heard *en banc* on Oct. 15, 2025) and *Duncan v. Bonta*, 83 F.4th 803, 805 (9th Cir. 2023) (*en banc* review as to California's magazine ban). Even where *en banc* review has been denied in

Second Amendment cases, it has been over vigorous dissents. *Lara v. Comm'r Pa. State Police*, 130 F.4th 65, 67 (3d Cir. 2025) (Krause, J., dissenting), *United States v. Jackson*, 121 F.4th 656, 656 (8th Cir. 2024) (Stras, J., dissenting).

## Conclusion

Because *Lamont* was an erroneous precedent that prevents any panel from awarding Appellants complete relief in this case, and because it unsettles the law in this Circuit, this Court should hear this matter *en banc* pursuant to Fed. R. App. Procedure 40 (g).

Respectfully submitted this the 10th day of November 2025,

/s/ Brady C. Toensing
Brady C. Toensing
DIGENOVA & TOENSING, LLP
1775 Eye Street NW, Suite 1150
Washington, DC 20006
Brady@digtoe.com
202-297-4245

/s/ Matthew D. Hardin
Matthew D. Hardin
HARDIN LAW OFFICE
101 Rainbow Drive #11506
Livingston, TX 77399
Matt@MatthewHardin.com
202-802-1958

*Attorneys for Appellants*

*Attorney for Appellants*

## CERTIFICATE UNDER CIRCUIT RULE 29 (b)

Pursuant to Circuit Rule 27.1 (d), undersigned counsel certifies that the defense opposes this motion and intends to file an opposition.

/s/ Matthew Hardin
Matthew Hardin

## DISCLOSURE STATEMENT

Undersigned counsel certifies pursuant to Fed. R. App. 26.1 that the Vermont Federation of Sportsmen's Clubs, Inc. is a nonprofit corporation and issues no stock. It has no parent corporation. All subsidiary corporations are also nonprofit sportsmen's clubs in Vermont, none of which issue stock. Powderhorn Outdoor Sports Center, Inc. is a Vermont Corporation solely owned by William Cleary, and has no publicly traded stock. JPC, Inc. is a Vermont Corporation solely owned by John Cioffi, Jr., and has no publicly traded stock. All other parties to this action are natural persons.

/s/ Matthew Hardin
Matthew Hardin

## CERTIFICATE OF COMPLIANCE

Undersigned counsel certifies that:

1. This document complies with the type-volume limit of Fed. R. App. P. 27 (d) because, excluding the parts of the document exempted by the rules, this document contains 3838 words, and

2. This document complies with the typeface requirements and the type-style requirements because this document has been prepared in a proportionally spaced typeface using Microsoft Word in 14-point Georgia font.

/s/ Matthew Hardin
Matthew Hardin