# 24-2026-cv

## United States Court of Appeals

*for the*

### Second Circuit

---

VERMONT FEDERATION OF SPORTSMEN'S CLUBS, POWDERHORN OUTDOOR SPORTS CENTER, INC., JPC, INC., DBA Black Dog Shooting Supplies, PAUL DAME, MARSHA J. THOMPSON,

*Plaintiff-Appellants,*

– v. –

MATTHEW BIRMINGHAM, Director of the Vermont State Police, in his official and personal capacities, CHARITY CLARK, Attorney General of the State of Vermont, in her official and personal capacities, SARAH GEORGE, State's Attorney for Chittenden County, in her official and personal capacities,

*Defendants-Appellees.*

---

ON APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF VERMONT (BURLINGTON) IN NO. 2:23-CV-710,
HONORABLE WILLIAM K. SESSIONS, III, JUDGE

## BRIEF AND SPECIAL APPENDIX
## FOR PLAINTIFF-APPELLANTS

---

BRADY C. TOENSING
DIGENOVA & TOENSING
1775 Eye Street, NW, Suite 1150
Washington, DC 20006
(202) 297-4245

MATTHEW HARDIN
HARDIN LAW OFFICE
101 Rainbow Drive, Suite 11506
Livingston, Texas 77399
(202) 802-1948

*Attorneys for Plaintiff-Appellants*

 (800) 4-APPEAL • (332239)

# Table of Contents

**Page**

Table of Authorities ........................................................................ iii

Jurisdictional Statement .................................................................. 1

Statement of Issues ......................................................................... 1

Statement of Case ........................................................................... 2

    Nature of case and relevant procedural history. .................................. 2

    Statement of facts .................................................................... 3

Summary of Argument ...................................................................... 8

Standard of Review .......................................................................... 12

Argument ....................................................................................... 13

    1.    The Appellants are likely to prevail on their challenge to
Vermont's 72-hour waiting period ............................................ 13

        A.    Conduct covered by the plain text of the Second
Amendment is presumptively protected and
requires the State to prove that historical laws are
relevant analogues to overcome that presumption .......... 13

        B.    The plain text of the Second Amendment protects
the right to acquire firearms ........................................... 17

        C.    Vermont's waiting period is aimed at curtailing
consumer conduct not retailer conduct so it is not
a commercial regulation ................................................... 20

        D.    The District Court mischaracterized Appellants'
claims to avoid applying the plain text of the
Second Amendment ......................................................... 24

        E.    There is no History and Tradition of Purposeless
Waiting Periods ............................................................... 28

            (1)    The District Court's historical analysis was
wrong ................................................................... 29

i

2.  Appellants are irreparably harmed and public interest
    weighs in favor of preventing these constitutional
    violations ................................................................ 38

    A.  Irreparable harm is presumed, but it has also been
        supported by abundant testimony ................................. 38

    B.  The public interest and balance of equities favor
        an injunction ...................................................... 41

Conclusion ................................................................ 44

# Table of Authorities

**Page(s)**

**Cases:**

*Agudath Israel of Am. v. Cuomo,*
  983 F.3d 620 (2d Cir. 2020) ...................................................... 41

*Airbnb, Inc. v. City of N.Y.,*
  373 F. Supp. 3d 467 (S.D.N.Y. 2019).......................................... 41

*Andrews v. State,*
  50 Tenn. (3 Heisk.) 165 (1871) ...........................................17, 25

*Antonyuk v. Chiumento,*
  89 F.4th 271 (2d Cir. 2023).................................... 8, 10, 25, 39

*Antonyuk v. James,*
  120 F.4th 941 (2d Cir. 2024) ....................................................15

*B & L Prods., Inc. v. Newsom,*
  104 F.4th 108 (9th Cir. 2024) ............................................... 22

*Beckwith v. Frey,*
  No. 1:24-cv-00384-LEW, 2025 U.S. Dist. LEXIS 44494
  (D. Me. Mar. 12, 2025) ............................................................ 9

*Beckwith v. Frey,*
  66 F.Supp.3d 123 (D. Me. 2025) ..................................... *passim*

*Bery v. City of New York,*
  97 F.3d 689 (2d Cir. 1996) ..................................................... 39

*Brewer v. West Irondequoit Cent. School Dist.,*
  212 F.3d 738 (2d Cir. 2000)....................................................40

*Briggs v. Bremby,*
  792 F.3d 239 (2d Cir. 2015) ................................................. 12

*Bronx Household of Faith v. Bd. of Educ.,*
  331 F.3d 342 (2d Cir. 2003) ................................................. 39

*Caetano v. Massachusetts,*
  577 U.S. 411 (2016)............................................................. 9, 27

*CBS v. Davis,*
  510 U.S. 1315 (1994) ............................................................. 19

*Cedeno v. Sasson,*
100 F.4th 386 (2d Cir. 2024) .................................................. 12

*Citizens United v. FEC,*
558 U.S. 310 (2010) ................................................................. 2

*City of L.A. v. Alameda Books,*
535 U.S. 425 (2002) .......................................................... 19, 23

*County of Riverside v. McLaughlin,*
500 U.S. 44 (1991) ................................................................. 26

*District of Columbia v. Heller,*
554 U.S. 570 (2008) ....................................................... *passim*

*Ent. Inc. v. City of N.Y.,*
2025 U.S. App. LEXIS 16643 (2d Cir. July 8, 2025) ................. 19

*Ex Parte Young,*
209 U.S. 123 (1908) ................................................................ 1

*Frey v. City of N.Y.,*
No. 23-365-cv, 2025 U.S. App. LEXIS 24303
(2d Cir. Sep. 19, 2025) ...................................................... 14, 16

*Gazzola v. Hochul,*
88 F.4th 186 (2d Cir. 2023) ........................................ 17, 24, 25

*Jolly v. Coughlin,*
76 F.3d 468 (2d Cir. 1996) ..................................................... 38

*Kev, Inc. v. Kitsap County,*
793 F.2d 1053 (9th Cir. 1986) ................................................ 23

*Konigsberg v. State Bar of Cal.,*
366 U.S. 36 (1961) ................................................................. 15

*Ligon v. City of N.Y.,*
925 F. Supp. 2d 478 (S.D.N.Y. 2013) ..................................... 41

*McDonald v. City of Chicago,*
561 U.S. 742 (2010) ........................................................ *passim*

*Mitchell v. Cuomo,*
748 F.2d 804 (2d Cir. 1984) ................................................... 38

*N.Y. State Rifle & Pistol Ass'n v. Bruen,*
597 U.S. 1 (2022) ............................................................ *passim*

iv

*National Association for Gun Rights v. Lamont,*
   153 F.4th 213 (2d Cir. 2025)............................................................ *passim*

*Nguyen v. Bonta,*
   140 F.4th 1237 (9th Cir. 2025) .................................................... 18, 29, 33

*Nken v. Holder,*
   556 U.S. 418 (2009) ............................................................................ 41

*Ocean State Tactical, LLC v. Rhode Island,*
   95 F.4th 38 (1st Cir. 2024) ................................................................. 37

*Ortega v. Grisham,*
   148 F.4th 1134 (10th Cir. 2025)..................................................... *passim*

*Schannette v. Doxey,*
   No. 2:12-CV-1416, 2015 U.S. Dist. LEXIS 16166
   (W.D. La. Feb. 10, 2015).................................................................... 19

*Shackelton v. J. Kaufman Iron Works,*
   689 F.2d 334 (2d Cir. 1982) ............................................................... 32

*Silvester v. Becerra,*
   138 S. Ct. 945 (2018) .................................................................... 30, 37

*Six Star Holdings, LLC v. City of Milwaukee,*
   821 F.3d 795 (7th Cir. 2016)................................................................. 2

*State Farm Mut. Auto. Ins. Co. v. Tri-Borough NY Med. Prac. P.C.,*
   120 F.4th 59 (2d Cir. 2024)................................................................ 12

*Sunward Elecs., Inc. v. McDonald,*
   362 F.3d 17 (2d Cir. 2004) ................................................................ 12

*Tunick v. Safir,*
   209 F.3d 67 (2d Cir. 2000) ................................................................ 39

*Turner Broad. Sys. v. FCC,*
   512 U.S. 622 (1994) ........................................................................... 23

*Union of Needletrades v. INS,*
   336 F.3d 200 (2d Cir. 2003) ...............................................................11

*United States v. Brutus,*
   505 F.3d 80 (2d Cir. 2007) ................................................................... 1

*United States v. Decastro,*
   682 F.3d 160 (2d Cir. 2012) ............................................................... 22

*United States v. Rahimi,*
  602 U.S. 680 (2024) ............................................................ 15, 16, 33, 34

*United States v. Sharpe,*
  470 U.S. 675 (1985) .................................................................... 26

*United States v. Vereen,*
  152 F.4th 89 (2d Cir. 2025) ......................................... *passim*

*Vt. Fed'n of Sportsmen's Clubs v. Birmingham,*
  741 F. Supp. 3d 172 (D. Vt. 2024) ............................................ 2

*Wyly v. Weiss,*
  697 F.3d 131 (2d Cir. 2012) ...................................................... 12

*Y.S. v. N.Y.C. Dep't of Educ.,* No. 1:21-cv-00711 (MKV), 2021 U.S. Dist.
  LEXIS 58361, at *7 (S.D.N.Y. Mar. 26, 2021) ......................... 41

*Zervos v. Verizon New York, Inc.,*
  252 F.3d 163 (2d Cir. 2001) ............................................... 12, 31

## Statutes & Other Authorities:

U.S. CONST., amend II ....................................................... 13

18 U.S.C. § 922 (a)(3) ...................................................... 22

18 U.S.C. § 922(g)(8)(C)(i) ................................................ 34

28 U.S.C. § 1292 ............................................................. 1

42 U.S.C. § 1983 ............................................................. 1

13 V.S.A. § 4019(b) .......................................................... 3

13 V.S.A. § 4019(b)(1) ...................................................... 21

13 V.S.A. § 4019(f) ......................................................... 21

13 V.S.A. § 4019a ............................................................ 3

18 V.S.A. § 5281 ............................................................ 38

25 M.R.S. § 2016(2) ......................................................... 37

C. Sunstein, On Analogical Reasoning,
  106 Harv. L. Rev. 741 (1993) .......................................... 27

David B. Kopel & Joseph G.S. Greenlee, *The "Sensitive Places" Doctrine: Locational Limits on the Right to Bear Arms*, 13 Charleston L. Rev. 205 (2018) .............................................................................. 28-29

## Jurisdictional Statement

The District Court had jurisdiction pursuant to 42 U.S.C. § 1983 and *Ex Parte Young*, 209 U.S. 123 (1908) because Appellants sought redress against state actors for constitutional injuries. JA at 12, 17-18. Appellants invoke this Court's jurisdiction as a matter of right pursuant to 28 U.S.C. § 1292, which empowers it to adjudicate appeals from the District Court's denial of preliminary injunctions. The underlying denial of Appellants' request for a preliminary injunction was filed on July 18, 2024. SPA at 1. Appellants timely filed their Notice of Appeal on July 29, 2024. JA at 1702.

## Statement of Issues

1. Whether a mandatory and purposeless three-day waiting period on firearms acquisition impermissibly infringes the Second Amendment right to acquire and possess firearms for self-defense and other lawful purposes.

2. Whether this Court's opinion in *National Association for Gun Rights v. Lamont*, 153 F.4th 213 (2d Cir. 2025), should be reconsidered and overruled.[1]

---

[1] This issue is preserved solely for this Court *en banc* or for Supreme Court review. Appellants concede that any panel of this Court will be "bound by the decisions of prior panels until such time as they are overruled either... *en banc* ... or by the Supreme Court." *United States v. Brutus*, 505 F.3d 80, 87 n.5 (2d Cir. 2007) (internal quotation marks and citation omitted).

1

## Statement of Case

**Nature of case and relevant procedural history.**

The underlying complaint was filed on December 18, 2023, JA at 12, and Appellants' Motion for a Preliminary Injunction barring enforcement of two Vermont laws – the waiting period for acquisition of a firearm and the per se ban on the acquisition or transfer of certain ammunition magazines – was filed shortly thereafter on December 20, 2023. JA at 62. The challenge was both facial and as-applied to the Plaintiff-Appellants.[2] JA at 44-48, 60.

Vermont District Court Judge William K. Sessions, III held evidentiary hearings on May 23 and June 10, 2024. JA at 9. Judge Sessions denied the motion for a preliminary injunction in its entirety on July 18, 2024. *Vt. Fed'n of Sportsmen's Clubs v. Birmingham*, 741 F. Supp. 3d 172 (D. Vt. 2024). This appeal of that denial was timely filed July 29, 2024. JA at 1702.

Proceedings in the District Court have been stayed pending this Court's resolution of this appeal. ECF No. 80. Proceedings in this Court were initially held in abeyance pending resolution of *Lamont*, 153 F.4th 213; DktEntry:

---

[2] The District Court erroneously characterized Appellants' claims as facial only. SPA at 16. That was error because Appellants pleaded specific applications of the statute and presented supportive evidence. JA at 18-20, Hearing Tr. At 40:4-7 and 81:12-82:4, May 23, 2025. But even if the District Court were correct that Appellants "failed to allege that the statute is unconstitutional as applied to their specific conduct," SPA at 16, that would not matter because "the distinction between facial and as-applied challenges informs only the choice of remedy, [and] not what must be pleaded in the complaint" *Six Star Holdings, LLC v. City of Milwaukee*, 821 F.3d 795, 803 (7th Cir. 2016), *citing See Citizens United v. FEC*, 558 U.S. 310, 331 (2010).

20.1. That stay was lifted, DktEntry: 22.1, and Appellants concede that any panel of this Court will now be bound by *Lamont* to affirm on the magazine ban. Appellants continue to pursue this appeal of Judge Sessions's denial of the motion to enjoin enforcement of Vermont's purposeless 72-hour waiting period, and reserve their rights relating to this denial as it relates to the magazine ban for purposes of *en banc* or Supreme Court review.

**Statement of facts.**

Appellants are Vermonters, licensed Vermont firearms dealers, and an association of Vermont sportsmen. They (or their members or customers) are fully eligible to purchase firearms, but are not able to do so without facing unconstitutional restrictions on their Second Amendment rights.

In 2023, Vermont imposed a waiting period of at least 72-hours between submission of a federal background check application after the purchase of a firearm and delivery of that firearm to the buyer, including those who pass the background check. 13 V.S.A. § 4019a. The law made it a misdemeanor crime to "transfer a firearm to another person until 72 hours … or seven business days have elapsed since [a licensed] dealer contacted NICS to initiate [a federal] background check, whichever occurs first." *Id.* Violation of this statute is punishable by imprisonment for up to a year and a fine of up to $500. 13 V.S.A. § 4019(b).

Vermont relies on NICS (National *Instant* [Background] Check System), which is the federal background check system. There is no separate state background check or licensing system. Hearing Tr. at 87 *et seq.*, June 23, 2024. NICS is a service of the Federal Bureau of Investigation. Hearing Tr. at 72:25 *et seq.*, May 23, 2025 (testimony of Bill Cleary), Hearing Tr. at 88:23-89:1, June 6, 2024 (testimony of Robert Spitzer). As the name indicates, the FBI responds to background check requests and verifies the eligibility of most firearms purchasers *instantly* or within minutes. *Id.* As particularly relevant here, Appellants testified that they are able to instantly pass a NICS check. JA at 84 (Paul Dame), 98 (Marsha Thompson), 101 (Bill Cleary), 105 (John Cioffi), 112 (Chris Bradley). So are the "overwhelming majority" of Vermonters. Hearing Tr. at 73:22, May 23, 2025. Nationally, in 2024, the NICS system's Immediate Determination Rate, which means a final status determination is within seconds to minutes, reached 92 percent. U.S. Department of Justice, FBI Criminal Justice Information Services Div., *NICS 2024 Operational Report*, at 6, https://tinyurl.com/7c6k5mvh (last visited November 3, 2025).

Despite that most Vermonters, including Appellants, receive *instant* or near instant approval, Vermont does not permit purchasers to take possession of a firearm even after they have passed the background check.

Hearing Tr. at 73:25, May 23, 2024. They are forced to wait even if they already own a gun (and even if they are trading one firearm for another), and regardless of whether they face an imminent threat. *Id.* at 76:18 *et seq.* Indeed, they are forced to wait even if they are lawfully carrying another gun *while* purchasing the new one. During this waiting period no governmental function or activity whatsoever occurs. JA at 83-86. The delay thus serves no purpose at all except to force citizens to wait to exercise their Second Amendment rights in violation of the Constitution. Law-abiding citizens who seek to purchase firearms for their immediate self- and home-defense and other lawful purposes are required by statute to wait at least three days before taking possession of a firearm, even though they are otherwise qualified to bear the firearm. The law restricts both private and retail sales.

The District Court held that all Vermonters can be denied access to a firearm for at least 72-hours after a background check is passed and all legal qualifications are satisfied. The District Court claimed that every citizen (regardless of any individualized showing) who buys a firearm is somehow "primed" to commit violence on themselves or others, likening the waiting period to restrictions on drunk people – "Like alcohol restrictions which disarmed the populace 'only while intoxicated or while at a tavern,' the waiting period restricts the right to purchase a firearm only while purchasers

are potentially primed to make impulsive decisions." SPA at 76, 81.[3] *Id.* at 76. On that basis, it refused to enter a preliminary injunction enjoining criminal enforcement of this law. As it stands today, no matter how acute the need or how qualified the purchaser, no one in Vermont can acquire a firearm without a minimum 72-hour waiting period during which absolutely no governmental activity occurs. The government has imposed delay solely for the sake of delay.

Appellants are: the Vermont Federation of Sportsmen's Clubs (VTFSC), a Vermont non-profit association that sues in its own right and as an organization that represents its members; Powderhorn Outdoor Sports Center, Inc. and JPC, Inc. (d/b/a Black Dog Shooting Supplies), federally-licensed Vermont firearms retailers that assert standing on behalf of themselves and their customers (through third party standing); Paul Dame, a law-abiding, Vermont citizen; and Marsha Thompson, also a law-abiding, Vermont citizen and firearms instructor. JA at 18 *et seq*. But for the challenged law and reasonable fear of prosecution and punishment by Appellees, Appellants would seek to do what this law prohibits – acquire and transfer firearms without having to wait at least 72-hours. *Id.* at 68. All

---

[3] Even if this interest-balancing logic were appropriate—and it is not under *Bruen*—it would have no application to those who already own a firearm. Yet the District Court made no effort to explain how the law could be constitutional as to those who already own a firearm.

individual Appellants are adult citizens who are legally eligible to own firearms and wish to acquire and use firearms for lawful purposes. *Id.* at 69.

Bill Cleary is the proprietor of Powderhorn Outdoor Sports Center, Inc., Hearing Tr. at 58:18 *et seq.*, May 23, 2024. Mr. Cleary testified that women who fear domestic violence (even those with court orders) must wait at least 72-hours to obtain a firearm. *Id.* at 74:7. Mr. Cleary cited as an example of how the law operates that he had to wait 72-hours to take possession of a shotgun he purchased from his own store, *id.* at 81:15, even though he has 1,600 firearms in stock, *id.* at 61:20, passed the background check, *id.* at 74-82, and routinely handles and has access to those firearms in his capacity as the store owner. *Id.* at 81:6-8. The waiting period also applies to customers who trade in a firearm for a replacement even though they owned a firearm before the transaction began and will own one when it is complete. *Id.* at 76:18 et seq. Mr. Cleary frequently allows his customers to trade one firearm for another. *Id.* That means at least some of those customers now are disarmed for at least 72-hours.

Chris Bradley is the President of the Vermont Federation of Sportsmen's Clubs, Inc. *Id.* at 4:20 *et seq.* Mr. Bradley testified that he cannot take possession of a new firearm without a 72-hour delay, even though he already owns firearms. *Id.* at 39:1 *et seq.* Mr. Bradley wants to

purchase more firearms, but cannot do so without facing the mandatory, purposeless waiting period. *Id.* at 38:8-15. These delays impact Mr. Bradley even though he is fully eligible to own firearms, and despite that (even if utility were relevant post-*Bruen*) there is no possible utility in a "waiting period" for individuals who already own firearms. *Id.* at 40:4-7. Mr. Bradley is not an outlier in this regard. Indeed, it is undisputed from the testimony below that Appellants meet the legal qualifications to buy a firearm, and that none is suicidal, violent, or otherwise "primed" to cause any harm with a newly-acquired firearm. JA at 92-112.

## Summary of Argument

The District Court's decision allowing Vermont's purposeless, blanket waiting period regime to continue contradicts Supreme Court precedents establishing that regulations that implicate Second Amendment rights must be analyzed with a view to the "history and tradition" of firearms regulation in America. *N.Y. State Rifle & Pistol Ass'n v. Bruen*, 597 U.S. 1, 22 (2022). It contradicts this Court's precedents holding that the Second Amendment protects the right to acquire a firearm, *United States v. Vereen*, 152 F.4th 89, 95 (2d Cir. 2025), and allowing delays only as necessary to serve an active governmental purpose. *See Antonyuk v. Chiumento*, 89 F.4th 271, 331 (2d Cir. 2023).

8

The opinion below also contradicts two recent decisions by sister courts striking down functionally identical state laws from Maine and New Mexico. *Ortega v. Grisham*, 148 F.4th 1134, 1153 (10th Cir. 2025), *Beckwith v. Frey*, No. 1:24-cv-00384-LEW, 2025 U.S. Dist. LEXIS 44494 (D. Me. Mar. 12, 2025).

The District Court attempted to justify Vermont's purposeless waiting period in part by pointing to the general advancement of technology since the Founding. SPA at 79-80. However, neither this Court nor the Supreme Court have ever held that the fact that modern weapons manufacturing and retail technology produce and deliver firearms quicker than occurred in the Founding Era is relevant in any Second Amendment analysis. Indeed, the Supreme Court has repeatedly found that the Second Amendment applies to modern weaponry, not just to implements of self-defense available at the founding. *District of Columbia v. Heller*, 554 U.S. 570, 582 (2008) ("Second Amendment extends … to all instruments that constitute bearable arms, even those that were not in existence at the time of the founding."); *Caetano v. Massachusetts*, 577 U.S. 411, 411-12 (2016) (*per curiam*) (finding that Massachusetts Supreme Court did not follow "precedent" and striking down ruling that stun guns not protected because they were "modern" inventions). The Supreme Court has also held that the Second Amendment protects

carrying firearms for self-defense in modern contexts. *See Bruen*, 597 U.S. at 3 (Second Amendment not limited to 18th Century conditions or arms). Binding precedent dictates that modern manufacturing and retail developments cannot be used to justify dilution of Second Amendment rights.

As part of its efforts to rescue the law, the District Court also pointed to longer, *de facto* waiting periods, which are occasionally necessary as part of other states' background check process. But the lengthier waiting periods approved by this Court and others have all been for the *purpose* of completing a background check, rather than to prevent firearms acquisition even after that check has been passed. *Antonyuk*, 89 F.4th at 271. Vermont does not conduct background checks or issue licenses; it cannot therefore claim the law's delay is incidental to any other regulatory or licensing requirement.

The District Court alternatively held that the history and tradition of firearms regulation justifies Vermont's waiting period, but it specifically cited only two historical laws (one from Colonial Virginia and one from Colonial Pennsylvania) prohibiting firing weaponry while intoxicated. SPA at 74-75. Neither law can reasonably be analogized to a *per se* ban on all

Vermonters – regardless of characteristics or sobriety – from possessing implements of self-defense for an arbitrary time.[4]

The Second Amendment protects the individual right to keep and bear arms for immediate self-defense. A mandatory, purposeless three-day waiting period on firearm purchases impermissibly delays the exercise of that right. Under *Bruen*, the government bears the burden of demonstrating that any modern restriction on acquiring or carrying arms is consistent with this Nation's historical tradition of firearm regulation. No such tradition exists for mandatory waiting periods. At the Founding and throughout the nineteenth century, law-abiding citizens were entitled to obtain common arms without government-imposed delay. Because this waiting period imposes a categorical, time-based denial of a fundamental constitutional right unsupported by history or tradition, it cannot stand under the framework mandated by *Bruen*.

---

[4] Vermont also criminalized the acquisition or transfer of firearms and magazines with a capacity of greater than 10 rounds (for shotguns and rifles) or 15 rounds (for handguns). Appellants challenge that restriction as well because it bans some of the most popular arms in America and is unsupported by any relevant history or tradition of regulation in the United States. Under current Second Circuit precedent, Appellants concede that aspect of their appeal cannot be granted absent an *en banc* hearing. *Nat'l Ass'n for Gun Rights v. Lamont*, 153 F.4th 213 (2d Cir. 2025) (holding at the preliminary injunction stage that Connecticut's magazine bans were permissible under the Second Amendment), *Union of Needletrades v. INS*, 336 F.3d 200, 210 (2d Cir. 2003) ("one panel of this Court cannot overrule a prior decision of another panel," unless "there has been an intervening Supreme Court decision that casts doubt on [the panel's] controlling precedent."). To preserve that issue, Appellants have simultaneously filed a motion for an initial hearing *en banc* and respectfully submit that *Lamont* should be overruled.

## Standard of Review

This Court reviews the denial of a preliminary injunction for abuse of discretion. *Sunward Elecs., Inc. v. McDonald*, 362 F.3d 17, 24 (2d Cir. 2004). "A district court 'abuses' or 'exceeds' the discretion accorded to it when (1) its decision rests on an error of law . . . or a clearly erroneous factual finding, or (2) its decision—though not necessarily the product of a legal error or a clearly erroneous factual finding—cannot be located within the range of permissible decisions." *Zervos v. Verizon New York, Inc.*, 252 F.3d 163, 169 (2d Cir. 2001) (footnote omitted). "Where allegations of error in a preliminary injunction involve questions of law... review is *de novo*." *Briggs v. Bremby*, 792 F.3d 239, 241 (2d Cir. 2015). Thus, this Court must review the District Court's decision to grant the preliminary injunction for abuse of discretion, but review its interpretation of the Second Amendment and all other legal conclusions *de novo*. See *Cedeno v. Sasson*, 100 F.4th 386, 393 (2d Cir. 2024) (FAA); *Wyly v. Weiss*, 697 F.3d 131, 137 (2d Cir. 2012), *State Farm Mut. Auto. Ins. Co. v. Tri-Borough NY Med. Prac. P.C.*, 120 F.4th 59, 79 (2d Cir. 2024).

# Argument

The judgment below should be reversed because all four preliminary injunction factors weigh against Vermont's unconstitutional law. Appellants will likely prevail on their constitutional challenges under the proper Second Amendment analysis, and the balance of the equities and public interest will necessarily favor an injunction and rule by the Constitution over compliance with an unconstitutional legislative enactment.

**1.  The Appellants are likely to prevail on their challenge to Vermont's 72-hour waiting period.**

**A.  Conduct covered by the plain text of the Second Amendment is presumptively protected and requires the State to prove that historical laws are relevant analogues to overcome that presumption.**

The Second Amendment guarantees that "the right of the people to keep and bear Arms, shall not be infringed." U.S. CONST., amend II. The phrase "to keep and bear Arms," according to *Heller* and its progeny, "guarantee[s] the *individual* right to possess and carry weapons in case of confrontation." *Heller*, 554 U.S. at 592 (emphasis added). Preserving the militia to guard against tyranny was not the Second Amendment's only purpose; "most undoubtedly thought it even more important for self-defense and hunting." *Id.* at 559; *McDonald v. City of Chicago*, 561 U.S. 742, 787 (2010) (*Heller* "stressed that the right was also valued because the possession of firearms was thought to be essential for self-defense" and "self-

13

defense was the central component of the right itself") (quotations omitted). As with other fundamental rights from the Bill of Rights, Second Amendment rights are guaranteed and apply to the states through the Fourteenth Amendment. *McDonald,* 561 U.S. at 750. The Second Amendment "is not 'a second-class right subject to an entirely different body of rules than the other Bill of Rights guarantees.'" *Bruen*, 597 U.S. at 70, *quoting McDonald,* 561 U.S. at 780.

For Second Amendment analysis, *Bruen* created a two-part test that is centered on the amendment's text and history. 597 U.S. at 17-21. The first part asks whether the plain text of the Second Amendment "covers an individual's conduct." *Id.* at 17. If so, then "the Constitution presumptively protects that conduct" and the challenged regulation is presumptively unconstitutional. Under the second part, the government can rebut the presumption of unconstitutionality only if it can prove that a challenged regulation "is consistent with this Nation's historical tradition of firearm regulation." *Id.*; *Frey v. City of N.Y.*, No. 23-365-cv, 2025 U.S. App. LEXIS 24303, at *1 (2d Cir. Sep. 19, 2025) (the "burden shifts to the government" if the Second Amendment applies). In other words, "the government must affirmatively prove that its firearms regulation is part of the historical tradition that delimits the outer bounds of the right to keep and bear arms." *Antonyuk v. James*, 120 F.4th 941, 964 (2d Cir. 2024) (internal quotations

omitted). Only if the government carries this significant burden "may a court conclude that the individual's conduct falls outside the Second Amendment's 'unqualified command'" *Bruen,* 597 U.S. at 17, *quoting Konigsberg v. State Bar of Cal.*, 366 U.S. 36, 50 n. 10 (1961).

When evaluating whether the government has carried its "affirmative" burden of showing a challenged regulation is analogous to a historical regulation, this Court "must ascertain whether the [challenged] new law is relevantly similar to laws that our tradition is understood to permit, applying faithfully the balance struck by the founding generation to modern circumstances." *United States v. Rahimi*, 602 U.S. 680, 692 (2024) (alteration adopted) (cleaned up). "Why and how the regulation burdens the [Second Amendment] right are central to this inquiry." *Id.* When analyzing historical laws, courts must look to how those laws worked, and why they were enacted. "[W]hether modern and historical regulations impose a comparable burden on the right of armed self-defense and whether that burden is comparably justified are central considerations when engaging in an analogical inquiry." *Bruen*, 597 U.S. at 29 (cleaned up).

The Supreme Court has instructed lower courts to look primarily to laws in existence at the founding of the Nation to conduct the required "how" and "why" analysis. Laws from "75 years after the ratification of the Second

Amendment… do not provide as much insight into its original meaning as earlier sources." *Heller*, 554 U.S. at 614. After all, "[t]he belated innovations of the mid- to late-19th-century courts come too late to provide insight into the meaning of the Constitution in 1787." *Bruen*, 597 U.S. at 36-37 (cleaned up). While this Court has held that it "can use 19th century evidence to discern our American tradition," it has limited itself to only do so where that evidence "does not conflict with Founding-era evidence." *Frey*, No. 23-365-cv, 2025 U.S. App. LEXIS 24303, at *45. And it must do so only in keeping with *Bruen*'s admonition to be skeptical of "belated innovations" from the 19th century. *Bruen*, 597 U.S. at 36-37.

"If laws at the founding regulated firearm use to address particular problems, that will be a strong indicator that contemporary laws imposing similar restrictions for similar reasons fall within a permissible category of regulations." *Rahimi*, 602 U.S. at 692. But "even when a law regulates arms-bearing for a permissible reason, though, it may [still violate the Second Amendment] if it does so to an extent beyond what was done at the founding." *Id.* State laws, rather than municipal or territorial laws, from the founding era, are what matters. *Bruen,* 597 U.S. at 69 (dismissing or heavily discounting territorial laws and Kansas municipal laws).

The mere "remote resemblance" between a historical law and a modern one is not enough. "[C]ourts should not uphold every modern law that remotely resembles a historical analogue, because doing so risk[s] endorsing outliers that our ancestors would never have accepted." *Id.* at 30. Courts may not conduct interest balancing after *Bruen*, and previous cases are abrogated to the extent they professed to do so. *Lamont*, 153 F.4th at 227.

**B.      The plain text of the Second Amendment protects the right to acquire firearms.**

"The right to keep arms, necessarily involves the right to purchase them…" *Gazzola v. Hochul*, 88 F.4th 186, 196 (2d Cir. 2023), *citing Andrews v. State*, 50 Tenn. (3 Heisk.) 165, 178 (1871). This Court has recognized that "regulations on the means of acquiring, transporting, and storing firearms… implicate the text of the Second Amendment if they meaningfully constrain the right to possess and carry arms." *United States v. Vereen*, 152 F.4th 89 (2d Cir. 2025). It is therefore settled law that the Second Amendment protects both the acquisition and possession of firearms. A law that forbids a purchaser from taking possession of a firearm for three days directly restrains that protected acquisition right and therefore falls within the Second Amendment's text.

Other courts agree, including specifically in the context of governmentally-imposed waiting periods. *Beckwith*, 766 F. Supp. 3d at 130

("Acquiring a firearm is a necessary step in the exercise of keeping and bearing a firearm. Any interpretation to the contrary requires the type of interpretative jui jitsu that would make Kafka blush."). *Ortega*, 148 F.4th at 1143. ("As paper or a computer is a necessary predicate to the right to print... acquiring, purchasing, and possessing firearms is a necessary predicate to keeping and bearing them.").

In *Vereen*, this Court held only that it was permissible for the government to ban "the use of anonymous out-of-state straw purchasers to conceal firearms transactions and circumvent lawful in-state regulations," and require firearm sales to be processed through a federal firearms licensee. 152 F.4th at 93. But this is not a case where citizens seek to purchase guns anonymously or to circumvent Vermont's background checks. Appellants are being denied the ability to acquire a firearm even at federally licensed retailers and even after passing a background check.

In any rational world, a law with the sole purpose of delaying the exercise of Second Amendment rights is covered by the plain text. As the District of Maine put it, a waiting period "is indiscriminate dispossession, plain and simple." *Frey*, 766 F. Supp. at 129. The Ninth Circuit agreed. *Nguyen v. Bonta*, 140 F.4th 1237, 1248 (9th Cir. 2025) ("Requiring a law-abiding citizen to apply or qualify for a license as a barrier to entry is a

different (and lesser) burden than prohibiting an individual from engaging in the regulated conduct all together for a 30-day period.").

This Court and the Supreme Court have made clear in the context of First Amendment jurisprudence that a complete ban on a constitutionally protected activity violates the Constitution, even if enacted in the name of some other governmental objective. *Ent. Inc. v. City of N.Y.*, 2025 U.S. App. LEXIS 16643, at *4 (2d Cir. July 8, 2025), *citing City of L.A. v. Alameda Books*, 535 U.S. 425, 434 (2002) (holding that adult entertainment is constitutionally protected and may not be outlawed entirely, despite that it may be subject to ordinary zoning laws). The fact that a complete ban on the exercise of a right is temporary does not make it constitutional. *See CBS v. Davis*, 510 U.S. 1315, 1315 (1994) (delay of a broadcast is a First Amendment harm); *Schannette v. Doxey*, No. 2:12-CV-1416, 2015 U.S. Dist. LEXIS 16166, at *7 (W.D. La. Feb. 10, 2015) (citing cases establishing that "[s]topping a motor vehicle and detaining its occupants, even for a moment, is a seizure for Fourth Amendment purposes."). Second Amendment rights are required to be protected to the same degree as these other fundamental rights. *Bruen*, 597 U.S. at 70 (cleaned up) (Second Amendment rights are not "second-class").

**C.** **Vermont's waiting period is aimed at curtailing consumer conduct not retailer conduct so it is not a commercial regulation.**

A waiting period is a generalized burden on acquisition that targets the purchaser's right to obtain and possess a firearm, not the seller's commercial activity. Only "longstanding... laws imposing conditions and qualifications on the commercial sale of arms," are presumptively valid. *Heller*, 554 U.S. at 627. Although it did not specify, the Supreme Court may have been referring to longstanding, well-known restrictions on the commercial sale of firearms, such as federal firearms manufacturing and dealer licensing, federal record keeping requirements, and zoning or safety requirements related to gun stores. These kinds of laws are "commercial regulations" because they regulate business activity rather than individual constitutional conduct (like acquiring a firearm for self-defense). Nothing in *Heller* or *Bruen* extends that presumption to categorical time delays on lawful purchasers.

Neutral or commercial regulations do not target the end-user, which is what Vermont's statute does. The waiting period is a modern restriction aimed at individuals who seek to acquire firearms, not at the retailers who have been deputized and conscripted by the law to block citizens from exercising their Second Amendment rights.

20

To construe the law as a "commercial" restriction requires a prodigious feat of legerdemain not only because it is a restriction aimed entirely at the citizens, but also because Vermont outlawed private transactions. Every firearm transferred in Vermont (except for law enforcement and immediate family transfers) must now be transferred through a licensed dealer, or the transferor is guilty of a misdemeanor. 13 V.S.A. §§ 4019 (b)(1), (f). The state has forced every transfer, including otherwise private transfers, to become commercial transfers, all while purporting to regulate only commercial transfers. A blanket ban on private sales, coupled with regulations targeted at customers of commercial establishments, is not what the Supreme Court envisioned when it held that restrictions on the commercial sale of arms were presumptively valid. *Heller*, 554 U.S. at 573.

*Ortega* and *Beckwith* rejected using this same fiction to conceal the curtailment of individual Second Amendment rights as mere commercial regulation. *Ortega*, 148 F.4th at 1148 ("A blanket waiting period is simply not of a kind with the conditions and qualifications imposed by other presumptively lawful measures."); *Beckwith*, 766 F. Supp. 3d at 130 ("Firearms have always been articles of commerce. There is nothing novel or nefarious about that basic reality that would warrant torturing the concepts

21

of keeping, bearing, or carrying to exclude from their meaning the acquisition or purchase of a firearm."). Indeed, as *Ortega* recognized, "[b]y New Mexico's logic… an outright ban on commercial sales would also be a condition or qualification on commercial sales, and presumptively lawful." *Ortega*, 148 F.4th at 1148. The same holds true in Vermont, which has effectively banned citizens from exercising *any* available avenue to exercise Second Amendment rights for at least three days.

Commercial regulations target commerce, not end users. This Court has recognized that legal maxim in the specific context of acquiring firearms. *Vereen*, 152 F.4th at 89. And *Vereen* cites *United States v. Decastro*, 682 F.3d 160, 164 (2d Cir. 2012), which held that a law was a valid commercial regulation because it "'only minimally affects the ability to acquire a firearm' and place[d] no restrictions on ownership and use."[5] *Vereen*, 152. F.4th at 89, *citing Decastro*, 682 F.3d at 164 and 18 U.S.C. § 922 (a)(3). It naturally follows that neither *Decastro* nor *Vereen* support the idea that it would be a commercial regulation to *completely prohibit* the ability to acquire a firearm, and therefore place a de facto 100% restriction on the ownership and use of that firearm for at least 72-hours.

---

[5] Similarly, the Ninth Circuit has noted the distinction between regulations that impact commerce and regulations that impact constitutional rights. *B & L Prods., Inc. v. Newsom*, 104 F.4th 108, 117 n.16 (9th Cir. 2024) (legislators were "primarily concerned with commerce…").

The Supreme Court has explained in the First Amendment context that courts must "ensure that an asserted rationale does not cloak an illegitimate governmental motive." *Alameda Books*, 535 U.S. 425, 458 n.3. And there is a difference between a law that is aimed at general economic improvement and has "only incidental effects on speech" and a law that targets speech directly. *Turner Broad. Sys. v. FCC*, 512 U.S. 622, 671 n.2 (1994). Indeed, one appellate court even expressly struck down a waiting period law that was characterized as a neutral and automatic business licensing regime. *Kev, Inc. v. Kitsap County*, 793 F.2d 1053, 1060 (9th Cir. 1986) (5-day waiting period between filing application for an exotic dancer's permit and granting a license unconstitutional under First Amendment).

Vermont's regulations primarily impact end users of firearms, which serves as an admission that Vermont prefers to regulate its citizens and is not concerned with commerce in and of itself. Vermont might tax all retail transactions, which would incidentally impact firearms sales, or it might require commercial zoning and a business license to engage in retail sales, which would impact firearms dealers and their customers in the same way it would impact other retail establishments. But what Vermont may not do is target the end users of firearms, while claiming that it is only regulating commerce and not constitutionally protected activity.

**D.**     **The District Court mischaracterized Appellants' claims to avoid applying the plain text of the Second Amendment.**

The District Court erred by mischaracterizing Appellants' claims. It began by asserting that the Founders were unaware of the dangers posed by "immediate acquisition of highly lethal firearms." SPA at 78. In doing so, it improperly reframed "the relevant conduct [as] acquiring a firearm through a commercial transaction *on-demand*" and then held *that* that conduct "is not covered by the plain text of the Second Amendment." SPA at 70. (emphasis added). It then compounded its errors by analyzing history writ large, rather than the history and tradition of firearms regulation in the United States, and by doing so at the first step of the *Bruen* analysis (does the plain text apply?) rather than the second step (is there a history and tradition to support a regulation?).

Appellants seek to acquire firearms. Vermont has outlawed acquiring firearms through private transactions. Thus, commercial transactions are the only option. And even if a commercial transaction were a choice rather than a necessity, courts such as *Gazzola*, 88 F.4th at 196 and *Vereen,* 152 F.4th at 89, make plain that laws restricting the acquisition of arms are subject to the Second Amendment and there is no carve out for firearms purchased in a commercial transaction. Indeed, the lead plaintiff in *Gazzola* was a firearms dealer, and this Court cited an almost 154-year-old Tennessee

case for the proposition that the acquisition of firearms was constitutionally protected. 88 F.4th at 196, *citing Andrews*, 50 Tenn. at 178. *Beckwith* similarly noted firearms have always been "articles of commerce." 766 F. Supp. 3d at 130.

Because this Court has already held that there is a constitutional right to acquire a firearm, and because the only way to acquire one in Vermont is through a commercial transaction, the real crux of the District Court's contrary holding was that the Appellants seek to exercise a right to acquire a firearm "on demand," with the words "on demand" doing most of the legwork. SPA at 70. But the District Court was both factually and legally incorrect to use the term "on demand."

First, Appellants do not seek to acquire a firearm "on demand." Instead, they seek to acquire a firearm once they have satisfied all legal qualifications to own that firearm. All Appellants offered testimony that they are willing to pass background checks and that they are aware of no disqualifying condition that would prevent them from firearms ownership. JA at 92 *et seq.*, Hearing Tr. at 36:11 *et seq.* and 81:16, May 23, 2024. Appellants repeatedly cited to *Antonyuk*, 89 F.4th at 331, in their briefing below, for the proposition that a delay could be acceptable *if that delay were*

*incidental to a background check*. JA at 1041 *et seq*. It is untrue to say that Appellants want a firearm to be handed over on demand.

Even assuming, *arguendo*, that the District Court was correct that Appellants sought to acquire a firearm "on demand," that would only put the exercise of Second Amendment rights on par with the exercise of other guarantees in the Bill of Rights, all of which can be exercised "on demand." *County of Riverside v. McLaughlin*, 500 U.S. 44, 47 (1991) ("Delay for delay's sake" is presumptively unconstitutional in the context of the Fourth Amendment.); *United States v. Sharpe*, 470 U.S. 675, 686 (1985) (relating to detention of an individual pursuant to a Terry stop, and tying the reasonableness of the delay to the need to accomplish governmental business). The Supreme Court has made clear that it will not tolerate the application of a "different body of rules than the other Bill of Rights guarantees" in the Second Amendment context. *McDonald*, 561 U.S. at 780.

Second, the District Court applied the *Bruen* test backwards or not at all when assessing its recast claim that Appellants were asking for firearms "on demand." SPA at 70. Holding that "[t]here is substantial evidence in the record highlighting that instant availability of a wide variety of guns would not have been anticipated at the founding," the District Court purported to conduct *Bruen*'s "history and tradition" analysis. SPA at 78. But the District

Court admitted, based on three "expert" declarations, that it was examining general social conditions, not firearm laws. The state's witnesses generally opined that firearms were not mass produced in the Colonial era, and that retail transactions were uncommon. That may or may not be so, and Vermont has cited no historical law that would have prevented the immediate acquisition of a firearm from a merchant or in trade rather than via custom order from a gunsmith. JA at 1044-46. Regardless, it is not the test: the Supreme Court says we should look to "relevantly similar" laws or regulations, not to relative levels of industrialization and business-to-consumer efficiency. *Bruen*, 597 U.S. at 28-29, *citing* C. Sunstein, On Analogical Reasoning, 106 Harv. L. Rev. 741, 773 (1993) ("determining whether a historical regulation is a proper analogue for a distinctly modern firearm regulation requires a determination of whether the *two regulations* are 'relevantly similar.'") (*emphasis added*). The District Court did not purport, at least at this stage of its analysis, to be examining any law or regulation at all. That was error.

Even indulging the District Court in its erroneous effort to look to generalized levels of industrial advancement since the Colonial era as some sort of proxy for determining the scope of the Second Amendment's plain text, the Supreme Court provides different answers than the District Court.

*Caetano* held that the Second Amendment applied to stun guns, despite that they were unknown and unimagined at the Founding. 577 U.S. at 411-412.. *Heller* expressly held that the Second Amendment protects modern firearms the same way the First Amendment protects modern communications. 554 U.S. at 582. The Founders likely never envisioned email, but that does not mean emails are not protected by the plain text of the First and Fourth Amendments. Neither does the fact that the Founders did not anticipate the advent of the modern retail gun store mean that modern firearms merchandising is unprotected by the Second Amendment.

**E.        There is no History and Tradition of Purposeless Waiting Periods.**

There is no "relevantly similar" history and tradition of purposeless waiting periods to which law-abiding and otherwise-qualified citizens must subject themselves in order to acquire a firearm. Historical evidence shows that at the Founding and throughout the nineteenth century, citizens were free to purchase and possess arms without delay. Early American laws restricted *who* could own or sell arms—such as prohibitions on sales to minors, slaves, or intoxicated persons. None imposed a fixed delay between purchase and possession. See David B. Kopel & Joseph G.S. Greenlee, *The "Sensitive Places" Doctrine: Locational Limits on the Right to Bear Arms*,

13 Charleston L. Rev. 205 (2018). The absence of any historical analogue is dispositive under *Bruen*.

The District Court cited only two laws it held were "relevantly similar" – both relating to intoxication – and neither bears even a passing resemblance to Vermont's blanket waiting period. SPA at 74. Indeed, sister courts have emphatically rejected the arguments the District Court embraced. *Ortega* 148 F.4th at 1155 ("the burden imposed by New Mexico's [waiting period] law is simply of a greater scale than historic sobriety laws and class-wide bans on possession."); *Beckwith*, 766 F. Supp. 3d at 133 ("The hows and whys of background checks and drunken-carry laws do not align with the how and why of the [waiting period] Act presently under review."); *Nguyen*, 140 F.4th at 1248 ("a barrier to entry is a different (and lesser) burden than prohibiting an individual from engaging in the regulated conduct all together for a 30-day period.").

## (1) The District Court's historical analysis was wrong.

The District Court was required to assess "relevantly similar" historical laws, in search of an analogue for Vermont's 72-hour waiting period. But relevant similarity is not open ended. After all, "a green truck and a green hat are relevantly similar if one's metric is 'things that are green.'... They are not relevantly similar if the applicable metric is 'things you can wear.'" *Bruen*,

597 U.S. at 29. For this reason, the District Court was required to look at two key factors of any historical law: "how and why the regulations burden a law-abiding citizen's right to armed self-defense." *Id*. It failed.

The District Court found only two historical firearms regulations that it held were "relevantly similar" to the waiting period. First, the District Court found that a 1655 Virginia law "making it illegal to 'shoot guns at drinking," was analytically similar to Vermont's waiting period. SPA at 74. This finding came despite the fact that even this already modestly restrictive law contained an exception, which permitted the drunken discharge of firearms at "marriages and funerals." *Id*. Second, the District Court cited a "Pennsylvania law which imposed fines on innkeepers that sold alcoholic beverages to 'any such persons so assembled on pretense of . . . shooting matches.'" *Id*. The District Court was forced to rely on only two colonial statutes, which are markedly different from the law at issue in this case, because, as Justice Thomas has observed "waiting periods do not have a long historical pedigree." *Silvester v. Becerra*, 138 S. Ct. 945, 948-49 (2018) (Thomas, J., dissenting from denial of certiorari).

Neither of the two temporally and intoxication-based statutes the District Court cited is at all similar to Vermont's statute. And even if the laws were similar in scope (they are not), the historical laws the District Court

relied on would not pass *Bruen's* "why" analysis because they targeted reckless intoxication, not ordinary citizens.

The District Court claimed Vermont's laws are relevantly similar to historic laws banning the intoxicated discharge of firearms because Vermont's law "restricts the right to purchase a firearm only while purchasers are potentially primed to make impulsive decisions." SPA at 76. The District Court offered no factual basis or explanation for what led it to conclude every firearms purchaser in Vermont was "potentially primed" to make impulsive decisions.[6] Nor did the District Court explain how all eligible firearms purchasers might share the same levels of impulsivity, or how that level of impulsivity might be on par with drunken revelers. But leaving aside the lack of any factual basis this factual finding, the District Court conducted the wrong analysis. *Bruen* held that historical laws must be analogous in two senses: they must "impose a comparable burden on the right of armed self-defense" as the challenged restriction, and also be "comparably justified." 597 U.S. at 3. In other words, how broad is the historical restriction, and what was its purpose?

---

[6] To the extent that the District Court's finding was a factual finding that every Vermonter or every Appellant was "potentially primed" to misbehavior, that factual finding is devoid of any evidentiary support whatsoever and would be clearly erroneous. *Zervos*, 252 F.3d at 169 .

Here, Vermont's waiting period is not relevantly similar to the colonial Pennsylvania and Virginia laws within the meaning of *Bruen*. Vermont's waiting period does not impose a comparable burden as was imposed in colonial Pennsylvania or Virginia. Those two laws imposed a burden on intoxicated persons, but were limited in application as to both time and place. Colonial settlers in Virginia were free to acquire, carry, and even discharge a firearm so long as they were sober, and could even do while drunk so long as they were attending a wedding or a funeral in Virginia (or were not attending a "shooting match" in Pennsylvania). These laws were thus limited in both duration (upon achieving sobriety, the restriction terminated automatically) and location (Pennsylvania's law applied at inns and taverns, Virginia's at locations other than weddings and funerals).[7]

By contrast, Vermont bans the acquisition of a firearm not only while purchasers are sober and wherever they might venture, but also regardless of what the law-abiding citizen's purpose might be for that firearm, including if it may be needed for self-defense. The Pennsylvania and Virginia laws have

---

[7] The District Court mentioned in passing a declaration that indicated more laws might have existed. SPA at 75. The District Court did not cite or analyze these laws with any degree of specificity, so any ruling as to those laws would be incapable of review. *Shackelton v. J. Kaufman Iron Works*, 689 F.2d 334, 337 (2d Cir. 1982) (district court's "cursory discussion... leaves us largely to guess at the process of inference that led to its findings."). Regardless, Appellants thoroughly addressed the declaration and its incorrect recitation of historical facts, including errors in the "how" and "why" analysis. JA at 1029 *et seq*. The District Court did not address, much less cast doubt upon, Appellants' analysis.

nothing in common with Vermont's and they differ vastly in the scope of activity they prohibit and therefore the extent to which they burden Second Amendment rights. They are not relevantly similar within the meaning of *Bruen*.

Sister courts agree. "Intoxication laws place an individualized burden on intoxicated individuals, which distinguishes those who 'pose a credible threat to the physical safety of others from those who have not.'" *Ortega*, 148 F.4th at 1152, *quoting United States v. Rahimi*, 602 U.S. at 700; *Nguyen*, 140 F.4th 1237, 1248 (9th Cir. 2025) (dissimilar "regulations prohibited only a specific group considered to be dangerous from acquiring or possessing firearms [such as] the intoxicated."); *Beckwith*, 766 F. Supp. 3d at 133 ("drunken-carry laws do not align with" waiting periods).

But even if this Court were to indulge the District Court's premise that the two historical laws from Pennsylvania and Virginia were relevantly similar to Vermont's blanket 72-hour waiting period in terms of the burdens they impose, they were enacted for a different purpose. Therefore, *Bruen*'s "why" test further dooms any effort to salvage Vermont's law.

The District Court took a different view, stating that Vermont's law follows the historical tradition of "disarming individuals when they are primed to make potentially unsafe decisions…" SPA at 76. *Rahimi*, however,

33

does not permit this generalized "potentially unsafe" analysis, and requires at a minimum a much stronger showing that there is a "special danger of misuse" such as that arising from a "credible threat to the physical safety of another." 602 U.S. at 682, *citing* 18 U.S.C. § §922(g)(8)(C)(i). Although "[a]n individual found by a court to pose a credible threat to the physical safety of another may be temporarily disarmed consistent with the Second Amendment," *Rahimi*, 602 U.S. at 702, the District Court had no factual basis to make such a finding as to the Appellants specifically or as to all Vermonters generally, and it cited to no record evidence at all showing any Appellant or any Vermonter at all was potentially primed for any sort of misbehavior. Indeed, Vermont did not even attempt to show that any of the Appellants pose a credible threat to anyone. Nor has Vermont put forth any evidence, as in *Rahimi*, that Appellants are part of some category or class of individuals who are more likely to pose a credible threat based on past behavior or otherwise. Indeed, because the statute applies facially to every Vermonter, the State would have to show that *every* otherwise eligible firearms purchaser is somehow a categorical threat. *Id.* at 713, (the Supreme Court does not "approve in advance other laws denying firearms on a categorical basis to any group of persons a legislature happens to deem… 'not responsible.'") (Gorsuch, J., concurring).

The "why" of historical intoxication laws was also applied far too expansively by the District Court. The District Court characterized historical regulations as impacting not drunks or those who had a chemically altered mental state, but individuals "primed" to make impulsive decisions. But the historical laws did not ban impulsivity, they banned drunken shooting. Historical laws prohibiting shooting while drunk sought to curb the use of firearms by individuals whose faculties were demonstrably impaired. These laws did not purport to reduce violence by disarming every individual in all of society. As the Tenth Circuit put it, "[w]hile the justification for both laws at the highest level of generality is the same—… who New Mexico treats as dangerous (everyone) is not comparable to who historic intoxication laws treated as dangerous (intoxicated individuals)." *Ortega*, 148 F.4th at 1152. "A near globally-applied waiting period detached from narrow and definite standards departs from [historical] approaches." *Beckwith*, 766 F. Supp. 3d at 134.

Although *Bruen* concedes that "unprecedented societal concerns or dramatic technological changes may require a more nuanced approach," 597 U.S. at 27, no nuance applies here because the routine purchase of a firearm at a retail store is neither unprecedented nor dramatic. And that is the only "unprecedented" development the District Court cited. SPA at 79.

35

The relative levels of industrialization and the impact of modernization on the convenience of retail sales are irrelevant because the Supreme Court has assessed technological change in the context of firearms development, not in terms of the progress of modern manufacturing and sales. Even then, the Supreme Court embraced modern technological achievements under the Second Amendment in the same manner as the First. Without conceding the premise that general advancement is relevant, however, Appellants elicited testimony below that the Founding generation could have immediately purchased a firearm, with even Vermont's own expert unable to point to a law prohibiting it. Hearing Tr. at 90:2-4, June 3, 2024. No colonial statute restricted private sales or imports, or even manufacture of a firearm at home. Vermont and its experts relied heavily upon the idea that the only way a member of the Founding generation could have obtained a firearm is by ordering one from afar using the primitive transportation methods of the day. But that premise was not proven and is not believable. The Founding Fathers would have bought and sold firearms second-hand and merchants would have stocked firearms on spec, just as they do today.

None of that matters, however, because Appellants prevail even if this Court finds an unprecedented societal concern or technological development that warrants a nuanced approach because no amount of nuance will save

this law. *Beckwith*, like the District Court below, embraced the irrelevant notion that "for most persons [in Colonial America], the immediate, impulsive purchase of a firearm was not an option given the lack of access to a seller or even the funds to make a purchase." 766 F. Supp. 3d at 133. For that reason, that court took the "nuanced approach." *Id.* at 132, *citing Ocean State Tactical, LLC v. Rhode Island*, 95 F.4th 38 (1st Cir. 2024). It still struck down Maine's functionally-identical waiting period law. 25 M.R.S. § 2016 (2) ("A seller may not knowingly deliver a firearm to a buyer pursuant to an agreement sooner than 72-hours after the agreement. The 72-hour waiting period must be concurrent with any waiting period imposed by any background check process required by federal or state law.").

Vermont's stated purpose for enacting its waiting period was to "reduce suicide and community violence." JA at 86. Yet community violence has been around since the beginning of humanity, and a citizen's right to self-defense against it is a core purpose of the Second Amendment. *Heller*, 554 U.S. at 559 ("self-defense was the central component of the right itself."); *Silvester v. Becerra*, 583 U.S. 1139, 1145 (Thomas, J., dissenting from denial of certiorari) (there is "no consensus among States that waiting periods are needed and no consensus among experts that they deter gun violence.").

Likewise, suicide is an ancient problem. So the State cannot claim that it is addressing any unprecedented concern with its unprecedented waiting period law.[8] To the extent suicide prevention was addressed in prior eras, it was ordinarily addressed through the criminal justice system (suicide was a crime at common law) or through institutionalization. There is no relevant historical evidence to support firearms waiting periods as a suicide or violence prevention measure, which means the state could not and did not carry its burden of proving a relevant tradition of analogous firearms regulation.

2.  **Appellants are irreparably harmed and public interest weighs in favor of preventing these constitutional violations.**

A.  **Irreparable harm is presumed, but it has also been supported by abundant testimony.**

This Court has long held that irreparable harm is presumed when a violation of constitutional rights is alleged. *Mitchell*, 748 F.2d at 806 (deprivation of a constitutional right is per se irreparable injury), and *Jolly*, 76 F.3d at 482 (there is a "presumption of irreparable injury that flows from a violation of constitutional rights."). Even absent that presumption, Appellants offered testimony below that they face irreparable harm because

---

[8] Ironically, during the same 2023 legislative session, Vermont expanded its assisted suicide law to allow non-Vermonters to kill themselves in the state. 18 V.S.A. § 5281 (removing residency requirement to become the first state to allow suicide tourism). Vermont simultaneously promotes suicide while claiming to want to prevent it.

they cannot replace implements of self-defense that they currently possess, which will inevitably degrade, and cannot even trade in firearms without being temporarily (and perhaps repeatedly) disarmed. Hearing Tr. at 21:10 *et seq.* and 76:18 *et seq.*, May 23, 2024. Additionally, many of Appellants' arguments relate to a fear of prosecution and a chilling effect on their conduct. JA at 67, 87. Fears of prosecution, and the related chilling effect on individual conduct, are non-monetary, and irreparable. *Bronx Household of Faith v. Bd. of Educ.*, 331 F.3d 342, 349 (2d Cir. 2003), *citing Tunick v. Safir*, 209 F.3d 67, 69 (2d Cir. 2000) (chilling effect from fear of prosecution arising from nude photography) and *Bery v. City of New York*, 97 F.3d 689 (2d Cir. 1996) (chilling effect from fear of prosecution for failure to obtain a vendor's license).

The Second Circuit presumes the government will enforce these challenged laws "in the absence of a disavowal by the government." *Antonyuk v. Chiumento*, 89 F.4th at 334 (collecting cases). But the Government has done nothing to assuage Appellants' fear of prosecution, or to prevent the inevitable loss of instruments of defense that testimony proves will happen with the passage of time and which the law prevents from being replaced without having to wait. Hearing Tr. at 38:23 *et seq.*, May 23, 2024. To the extent the government has instead mounted a vigorous defense in this

matter, Appellants continue to be chilled and deterred from exercising their rights each day that passes without an injunction. Indeed, forcing Appellants and all Vermonters to wait at least three days before buying or replacing firearms that are lost, damaged, or destroyed – despite proof that a purchaser is qualified – is the core purpose of Vermont's law, demonstrating the irreparable nature of the Appellants' Second Amendment injury.

This Court's recent precedents do not undermine the irreparable nature of Appellants' injuries. *Lamont*, 153 F.4th at 248, *citing Brewer*, 212 F.3d 738, 744 (2d Cir. 2000). Indeed, the challengers in *Lamont* were expressly permitted to defend themselves during the pendency of their challenge, albeit with the state's preferred weaponry rather than those firearms they would otherwise choose. But here, Appellants are and always will be entirely foreclosed from acquiring firearms, and cannot even trade one approved firearm for another without being temporarily disarmed by operation of law. This is an irreparable and ongoing constitutional injury. *Lamont* does not purport to overrule *McDonald,* 561 U.S. at 780 (holding that the Second Amendment is not "subject to an entirely different body of rules than the other Bill of Rights guarantees."), and could not have done so. Indeed, the Supreme Court has expressly held that "[t]he Second

Amendment is no different" from the First Amendment. *Heller*, 554 U.S. at 635.

**B.      The public interest and balance of equities favor an injunction.**

When the government is the opposing party, the public interest and balance of equities "factors merge." *Nken,* 556 U.S. 418, 435 (2009). Indeed, in one recent case the court declined to balance the equities at all because it held that the public interest analysis was itself sufficient. *Y.S. v. N.Y.C. Dep't of Educ.*, No. 1:21-cv-00711 (MKV), 2021 U.S. Dist. LEXIS 58361, at *7 (S.D.N.Y. Mar. 26, 2021) ("the Court inquires whether the injunction is in the public interest, rather than balancing the equities."), *citing Agudath Israel of Am. v. Cuomo*, 983 F.3d 620, 631 (2d Cir. 2020). The public interest favors issuance of a preliminary injunction "because the Government does not have an interest in the unconstitutional enforcement of a law." *Airbnb, Inc. v. City of N.Y.*, 373 F. Supp. 3d 467, 500 (S.D.N.Y. 2019) (cleaned up). "[T]he public interest lies with the enforcement of the Constitution." *Ligon v. City of N.Y.*, 925 F. Supp. 2d 478, 541 (S.D.N.Y. 2013).

The public interest supports a preliminary injunction in favor of Appellants because their right to relief is clear, as set forth above. Appellants concede that this Court has recently held that the public interest did not favor

issuing an injunction in a Second Amendment case, *Lamont*, 153 F.4th 213, contra. *McDonald*, 561 U.S. at 780. But that decision is distinguishable.

First, the facts of *Lamont* were different. *Lamont* dealt only with a magazine ban, not with a firearms waiting period. *Lamont* held that Connecticut had established a statistically significant decrease in the risk of death from its prohibition on certain magazines. *Lamont*, 153 F. 4th at 249. And *Lamont* expressly noted that during the pendency of litigation, the challengers could use weaponry to defend themselves, so long as that weaponry had fewer than ten rounds of ammunition. Here, Vermonters are banned from acquiring or even replacing any firearm *at all* for 72-hours, even the lower capacity types of firearms approved in *Lamont*. Vermonters are not similarly situated to the challengers in *Lamont*, because they are entirely deprived of their Second Amendment rights rather than having those rights restricted. And the deprivation of rights faced by these Appellants will repeat itself even as to those who already own firearms, as verified in testimony presented to the District Court, because they will repeatedly be subjected to the waiting period if any weapon is lost, stolen, or damaged and must be replaced. Hearing Tr. at 31:24-25, 35:23-36:3, 38;24 *et seq.*, 74:10 *et seq.*, May 23, 2024.

Second, unlike the State of Connecticut in *Lamont*, Vermont has failed to established any "statistically significant" decrease in adverse events because of its waiting period. Even if Vermont could conjure these statistics, such data is irrelevant in the context of Second Amendment Rights. *Bruen*, 597 U.S. at 72, (Alito, J, concurring) ("Why, for example, does the dissent think it is relevant to recount the mass shootings that have occurred in recent years?... What is the relevance of statistics about the use of guns to commit suicide?"); *McDonald*, 561 U.S. at 790, *quoting Heller*, 554 U.S. at 636. (Second Amendment "restricts experimentation and local variations," since "[t]he enshrinement of constitutional rights necessarily takes certain policy choices off the table.'").

Third, *Lamont* should not be considered to have held that statistical probabilities can ever justify a firearms regulation that is unsupported by the history and tradition test the Supreme Court adopted in *Bruen*. The Supreme Court expressly rejected, in an appeal from this Circuit, the notion that it should permit any "interest-balancing inquiry" that would compare the fit between a governmental regulation and the ends of lower crime. *Bruen*, 597 U.S. at 2. In other words, under binding Supreme Court precedent, in a case where Second Amendment rights have been violated, it would be improper

to use a preliminary injunction analysis to resurrect a prohibited interest balancing test.

## Conclusion

The District Court erred in its application of the post-*Bruen* test for Second Amendment rights in every way by finding that:

- the text of the Second Amendment did not protect the acquisition of firearms;

- modern weapons manufacturing and retail technology justified an expansive historical comparison to irrelevant and dissimilar laws;

- all citizens when purchasing a firearm are "primed" by "inflamed passions or fears" to commit violence on themselves or others and that historical laws limiting the use of firearms by inebriated people justified a blanket restriction on all citizens, regardless of sobriety; and

- delays made necessary to complete a background check justified a purposeless waiting period.

Appellants are indisputably eligible to purchase firearms, but Vermont has put a 72-hour roadblock in the way for no legitimate purpose. This Court's holdings recognize that the acquisition of firearms is protected by the Second Amendment, and the waiting period, which impacts Appellants and

all other eligible Vermonters before they can acquire a firearm is not a mere commercial regulation. Laws prohibiting the drunken discharge of firearms are not "relevantly similar" to Vermont's waiting period, because they were narrowly tailored both in terms of the circumstances in which they apply and the behaviors they sought to curtail. This Court should follow its own precedents and the Tenth Circuit's lead, and preliminarily enjoin Vermont from enforcing its purposeless waiting period.[9]

Respectfully submitted,

DIGENOVA & TOENSING, LLP

By: */s/ Brady C. Toensing*

Brady C. Toensing
1775 Eye Street NW, Suite 1150
Washington, DC 20006
Phone: (202) 289-7701
Email: brady@digtoe.com

*Attorneys for Appellants*

---

[9] Appellants also seek a reversal of the District Court's ruling as to Vermont's magazine ban. However, as stated *supra.*, under this Court's current precedent Appellants cannot prevail before a mere panel of this Court on their challenge to Vermont's magazine ban, which prevents Vermonters from acquiring, transferring, or replacing many of the most common arms in America in their most standard configurations. *Lamont*, 153 F.4th 213 (2025). That precedent is wrong, and *Lamont* should be overruled for the reasons set forth in the contemporaneously-filed Motion for Initial Hearing *En Banc*, which is incorporated by reference into this brief.

HARDIN LAW OFFICE

By: /s/ *Matthew D. Hardin*
    Matthew D. Hardin
101 Rainbow Drive #11506
Livingston, TX 77399
Phone: (202) 802-1948
Email: Matt@MatthewHardin.com

*Attorney for Appellants*

## CERTIFICATE OF COMPLIANCE

This document complies with the type-volume limit of Fed. R. App. P. 32(a)(7)(B), the word limit of Local Rule 32.1(a)(4) (A) because, excluding the parts of the document exempted by Fed. R. App. P. 32(f): this document contains 10,212 words.

This document complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and the type-style requirements of Fed. R. App. P. 32(a)(6) because: this document has been prepared in a proportionally spaced typeface using Microsoft Word in 14-point font Georgia.

Dated: New York, New York
      November 10, 2025

# SPECIAL APPENDIX

i

## TABLE OF CONTENTS

**Page**

Opinion and Order of the Honorable William
    K. Sessions III, dated July 18, 2024,
    Appealed From [ECF Doc No. 74]................... SPA-1

SPA-1

UNITED STATES DISTRICT COURT
FOR THE
DISTRICT OF VERMONT

VERMONT FEDERATION OF SPORTSMEN'S   :
CLUBS, ET AL.,                      :
                                    :
          Plaintiffs,               :
                                    :
v.                                  :   Case No. 2:23-cv-710
                                    :
MATTHEW BIRMINGHAM, ET AL.,         :
                                    :
          Defendants.               :

**OPINION AND ORDER**

**INTRODUCTION**

Plaintiffs Vermont Federation of Sportsmen's Clubs ("VFSC"), two for-profit gun sports organizations, and two Vermont residents bring this action against Defendants Matthew Birmingham, Charity Clark, and Sarah George, high-level officials in Vermont state and local government. Plaintiffs allege that 13 V.S.A. § 4021, which prohibits possession and sale of "large capacity ammunition feeding device[s]" ("large capacity magazines" or "LCMs"), and 13 V.S.A. § 4019a, which prohibits transfer of firearms without a designated waiting period, are unconstitutional under the Second Amendment. ECF No. 1 at 12, 25. On December 20, 2023, Plaintiffs moved for a preliminary injunction against enforcement of the Vermont laws. ECF No. 2. Pursuant to the textual and historical inquiry laid out by the Supreme Court in *New York State Rifle & Pistol Ass'n,*

*Inc. v. Bruen*, 597 U.S. 1 (2022), and refined in *United States v. Rahimi*, 602 U.S. __ (2024), the Court must consider whether the Second Amendment's plain text covers the restricted conduct, and if so, whether the challenged restriction "is consistent with the Nation's historical tradition of firearm regulation." *Bruen*, 597 U.S. at 24. For the reasons outlined in this opinion, Plaintiffs' motion for a preliminary injunction is denied.

<u>**BACKGROUND**</u>

### I.    The Parties

Plaintiff VFSC is a Vermont nonprofit association composed of organizations interested in gun-related sports. Plaintiffs Powderhorn Outdoor Sports Center, Inc. and JPM, Inc. (d/b/a Black Dog Shooting Supplies) are federally licensed Vermont firearms retailers that assert standing on behalf of themselves and their customers. Plaintiffs Paul Dame and Marsha Thompson are Vermont citizens. Thompson is a firearms instructor. Both Dame and Thompson state that they seek to acquire prohibited magazines and firearms without having to wait at least 72 hours. ECF No. 2-1 at 4 (collectively "Plaintiffs" or "VFSC"). Defendants are Vermont officials with authority to enforce Vermont gun laws ("Defendants" or "Vermont" or "the State").

### II.   The Challenged Statutes

Concern over the threat of mass shootings motivated the Vermont legislature to revise state laws governing gun

ownership. *See State v. Misch*, 2021 VT 10, ¶¶ 69-71 ("[T]he purpose of [one of the challenged laws] is to reduce the number of people who would be killed or injured in a mass shooting in Vermont. . . . The Legislature's aim was to prevent catastrophic harm to the people of Vermont."). It recently enacted the two provisions challenged in this lawsuit.

**A. Large-Capacity Magazines**

The first statute deals with "large capacity ammunition feeding device[s]." 13 V.S.A. § 4021(a). The term "large capacity ammunition feeding device" is defined to mean "a magazine, belt, drum, feed strip, or similar device that has a capacity of" more than 10 rounds of ammunition for a long gun or more than 15 rounds of ammunition for a handgun. *Id.* § 4021(e)(1). The statute states that a person shall not "manufacture, possess, transfer, offer for sale, purchase, or receive or import" an LCM into Vermont. *Id.* § 4021(a). The penalty for violating the statute is imprisonment for up to a year and a fine not to exceed $500. *Id.*

The statute contains a long list of exceptions to the general ban on LCMs. Most notably, it does not apply to LCMs lawfully possessed prior to July 1, 2022, the statute's effective date. *Id.* at § 4021 (c)(1). It also does not apply to LCMs lawfully possessed by a licensed dealer prior to April 11, 2018 and transferred by that dealer prior to October 1, 2018.

*Id.* at § 4021(c)(2). The law does not prohibit certain entities from owning LCMs, including state and federal governments, law enforcement officers, licensed manufacturers, and organized competitors. *Id.* § 4021(d)(1).[1]

Some background on magazines helps understand how they interact with firearms themselves. At the hearing on this motion, Plaintiffs called Christopher Bradley, the president and executive director of the Vermont Federation of Sportsmen's Clubs. Bradley testified that "[a] magazine is a mechanical device designed to hold cartridges and present those cartridges to the chamber for firing." ECF No. 59 at 10. He explained that magazines are made up of four components: a "body," which is essentially a rectangular box holding cartridges; a floor plate, which is a metal piece at the bottom of the body; a spring, which "provid[es] tension under the cartridges to" present them to the top of the magazine; and the "magazine follower," which ensures that the "bullets are properly aligned." *Id.* at 10-11. The magazine's body holds bullets, which are pressed down against the compressed spring and follower. After a round is fired, the spring pushes the next round into the chamber to facilitate rapid shooting. The size of the magazine impacts how

---

[1] The statute exempts several other categories of individuals from the LCM ban. *See* 13 V.S.A. § 4021(c), (d). Those exemptions are not relevant to this action.

many bullets can be rapidly loaded and therefore shot in a short period of time.

### B. Waiting Periods

The second challenged statute is 13 V.S.A. § 4019a, which prohibits transfer of a firearm without waiting period. The statute provides that a person "shall not transfer a firearm to another person until 72 hours after the licensed dealer facilitating the transfer is provided with a unique identification number for the transfer by the National Instant Criminal Background Check system (NICS) or seven business days have elapsed since the dealer contacted NICS to initiate the background check, whichever occurs first." *Id.* Violation of the statute is punishable by imprisonment for up to a year and a fine of up to $500. *Id.* at § 4019(b).

The statute does not apply to firearm transfers that are exempt from background check requirements under federal law, 18 U.S.C. § 922(t), or state law, 13 V.S.A. § 4019. It also exempted firearm transfers at gun shows, defined as functions sponsored by "national, state, or local organization[s] devoted to the collection, competitive use, or other sporting use of firearms," or organizations that "sponsor[] functions devoted to the collection, competitive use, or other sporting use of firearms." 13 V.S.A. § 4019a(e)(2). The gun show exception expired on July 1, 2024.

SPA-6

### III. Procedural History

Plaintiffs filed their complaint on December 18, 2023. ECF No. 1. They moved for a preliminary injunction two days later. ECF No. 2. On January 17, 2024, the State filed a motion requesting that the Court consolidate resolution of Plaintiffs' preliminary injunction motion with a merits determination and otherwise set deadlines consistent with an expedited trial schedule. ECF No. 14. The Court denied that motion and granted Defendants until February 21, 2024 to respond to Plaintiffs' preliminary injunction motion.

On February 28, 2024, Giffords Law Center to Prevent Gun Violence, Brady Center to Prevent Gun Violence, and March For Our Lives (collectively "Amici") – non-profits dedicated to gun violence prevention – moved for leave to appear as amici curiae. ECF No. 26. The Court granted that motion, ECF No. 27, and Amici filed a brief in opposition to the preliminary injunction on February 29, 2024. ECF No. 28. The Court later denied Plaintiffs' motion to exclude several of the State's experts based upon Federal Rule of Evidence 702. ECF No. 44.

The Court held a hearing on the preliminary injunction motion on May 23rd and June 3rd. ECF No. 59 (transcript from the May 23rd hearing); ECF No. 62 (transcript from the June 3rd hearing). It took the matter under advisement. This opinion follows.

## DISCUSSION

### I.   Legal Standard

A party seeking a preliminary injunction must show that it "is likely to succeed on the merits, that [it] is likely to suffer irreparable harm in the absence of preliminary relief, that the balance of equities tips in his favor, and that an injunction is in the public interest." *Winter v. Nat Res. Def. Council, Inc.*, 555 U.S. 7, 24 (2008). The Second Circuit has explained that when the government is a party to the suit, "the final two factors merge." *New York v. United States Dep't of Homeland Sec.*, 969 F.3d 42, 59 (2d Cir. 2020) (citing *Nken v. Holder*, 556 U.S. 418, 435 (2009)). In cases alleging constitutional injury, a "strong showing of a constitutional deprivation" ordinarily warrants a finding of irreparable harm. As a result, VFSC's likelihood of success on the merits is the "dominant" factor in evaluating Plaintiffs' motion for a preliminary injunction. *A.H. by & through Hester v. French*, 985 F.3d 165, 176 (2d Cir. 2021).

The Second Circuit has counseled that when plaintiffs seek a preliminary injunction that "will alter the status quo," they must "demonstrate a 'substantial' likelihood of success on the merits." *Pharaohs GC, Inc. v. United States Small Bus. Admin.*, 990 F.3d 217, 225 (2d Cir. 2021) (citing *N.Y. Progress & Prot. PAC v. Walsh*, 733 F.3d 483, 486 (2d Cir. 2013)). Preliminary

injunction determinations adopt burdens of proof from the underlying legal frameworks. So while Plaintiffs bear the burden of proof on most issues, the State must meet its evidentiary obligations on the relevant constitutional question in order to prevail. *Ashcroft v. ACLU*, 542 U.S. 656, 666 (2004).

## II.  Analysis

### A. Likelihood of Success on the Merits

1. Substantive Legal Standard

The Second Amendment states "[a] well regulated Militia, being necessary to the security of a free State, the right of the people to keep and bear Arms, shall not be infringed." U.S. Const. Amend. II. It is well-established that "[t]he right to keep and bear arms is among the 'fundamental rights necessary to our system of ordered liberty.'" *Rahimi*, 602 U.S. at 5 (quoting *McDonald v. City of Chicago, Ill.*, 561 U.S. 742, 778 (2010)).

The Supreme Court has interpreted the Second Amendment to protect "the right of an ordinary, law-abiding citizen[] to possess a handgun" both inside and outside of the home. *Bruen*, 597 U.S. at 10-11 (citing *D.C. v. Heller*, 554 U.S. 570, 626 (2008)). It recently explained that the "standard for applying the Second Amendment" involves two steps: first, a court must determine whether "the Second Amendment's plain text covers an individual's conduct." *Id.* at 24. If it does, the government must (second) justify its regulation "by demonstrating that [the

SPA-9

regulation] is consistent with the Nation's historical tradition of firearm regulation." *Id.* The First, Second, Fifth, Eighth, and Eleventh Circuits have explained that in this two-step framework, "the first step [is] based on text and the second step [is] based on history." *Antonyuk v. Chiumento*, 89 F.4th 271, 298 (2d Cir. 2023) *cert. granted, judgment vacated sub nom. Antonyuk v. James*, No. 23-910, 2024 WL 3259671 (U.S. July 2, 2024) (agreeing with the Fifth, Eighth, and Eleventh Circuits); *see also Ocean State Tactical, LLC v. Rhode Island*, 95 F.4th 38, 43 (1st Cir. 2024).

The Supreme Court's *Bruen* decision built upon several earlier Supreme Court cases.[2] The most significant of these is *District of Columbia v. Heller*, which outlined the analytical framework for determining whether a firearm is presumptively protected by the Second Amendment. *See Bruen*, 597 U.S. at 21 (citing *Heller*, 554 U.S. at 626). *Heller* explained that "the right [to bear arms] was not a right to keep and carry any weapon whatsoever." *Id.* (quoting *Heller*, 554 U.S. at 626). Instead, the term "arms" historically applied only to weapons "that were not specifically designed for military use and were not employed in a military capacity." *Heller*, 554 U.S. at 581.

---

[2] In *McDonald*, the Court held that the Due Process Clause of the Fourteenth Amendment incorporated the Second Amendment right recognized in *Heller* against the states. 561 U.S. at 791.

The *Heller* Court held that it is "fairly supported by the historical tradition of prohibiting the carrying of 'dangerous and unusual weapons'" that the Second Amendment protects only the possession and use of weapons that are "in common use at the time." *Id.* at 627 (citing *United States v. Miller*, 307 U.S. 174, 179 (1939)).

2. Common Use

The first issue is whether and how the question of a weapon's "common use" factors into the analysis. There is significant dispute over this issue. *See, e.g., Capen v. Campbell*, No. CV 22-11431-FDS, 2023 WL 8851005, at *7 (D. Mass. Dec. 21, 2023) (explaining that the Supreme Court's emphasis on the common use inquiry "has led to considerable confusion among courts and commentators."). The Court concludes that weapons "in common use for self-defense" are presumptively protected by the Second Amendment, but that they may nonetheless be regulated by analogy to historical regulations.

Plaintiffs argue that the Supreme Court's guidance in *Heller* and *Bruen* requires courts to ask first whether the restricted item is a firearm, and second whether it is in common use. In other words, they argue that the only way in which a ban of a firearm can fall within this nation's "historical tradition of firearm regulation," *Bruen*, 597 U.S. at 24, is if the weapon is not "in common use at the time." ECF No. 2-1 at 9-10

(asserting that governments may enact and enforce bans "only if the banned arms are not 'the sorts of weapons in common use at the time.'") (quoting *Heller*, 554 U.S. at 627).[3] This is because, according to Plaintiffs, the only relevant historical inquiry is whether the firearm may be regulated by virtue of the historical tradition of regulating "dangerous and unusual weapons." *Id.*

This argument is disproven by the Supreme Court's recent decision in *Rahimi*, which upheld a federal statute prohibiting individuals subject to domestic violence restraining orders from possessing firearms. *Rahimi*, 602 U.S. at 1. First, *Rahimi* involved a restriction on handgun ownership, a weapon which *Heller* and *Bruen* found to be "central" and "in common use." *See Heller*, 554 U.S. at 628 (noting that handguns are

---

[3] Courts have vigorously criticized this application of the "common use" framework. In *Bevis v. City of Naperville, Illinois*, for instance, the Seventh Circuit cautioned against such "circular reasoning:"

> Machine guns aren't commonly owned for lawful purposes today because they are illegal; semi-automatic weapons with large-capacity magazines are owned more commonly because, until recently (in some jurisdictions), they have been legal. Yet it would be absurd to say that the reason why a particular weapon can be banned is that there is a statute banning it, so that it isn't commonly owned. A law's existence can't be the source of its own constitutional validity.

85 F.4th 1175, 1190 (7th Cir. 2023) (quoting *Friedman v. City of Highland Park, Illinois*, 784 F.3d 406, 409 (7th Cir. 2015)); *see also Nat'l Ass'n for Gun Rts. v. Lamont* ("*Lamont*"), 685 F. Supp. 3d 63, 86 (D. Conn. 2023) (same). Another court noted that this approach would mean that "the constitutionality of the regulation of different firearms would ebb and flow with their sales receipts." *Capen*, 2023 WL 8851005, at *8.

"overwhelmingly" chosen by Americans for self-defense); *Bruen*, 597 U.S. at 32 (same). To be sure, *Rahimi* involved a restriction on the category of individuals that could own handguns – not a flat ban of those weapons – but the decision still reveals that weapons in common use for self-defense may be constitutionally regulated. Second, and perhaps more importantly, *Rahimi* upheld the government's restriction on handgun ownership with reference to historical analogues other than the tradition of regulating "dangerous and unusual weapons," showing that more comprehensive review of this country's historical firearm regulations is appropriate, even when the restricted item is in common use for self-defense. *See Rahimi*, 602 U.S. at 13 (noting that "surety" and "going armed" laws justified the regulation at issue in that case).

The State argues that the "common use" inquiry is relevant to the initial determination of whether conduct is entitled to presumptive Second Amendment protection. ECF No. 24 at 15-19. Courts have adopted this approach in two ways. Some courts hold that if a weapon is not in "common use," it is not an arm and is therefore altogether unprotected by the Second Amendment. *See, e.g., Bevis*, 85 F.4th at 1193 ("[T]he definition of 'bearable Arms' extends only to weapons in common use for a lawful purpose."); *Oregon Firearms Fed'n, Inc. v. Brown* ("*Brown*"), 644 F. Supp. 3d 782, 799 (D. Or. 2022) (same). Other courts decide

12

whether a weapon is an arm based on evaluation of the Second Amendment's plain text, but subsequently ask whether it is in "common use" to determine whether it is presumptively protected. *See, e.g.*, *Nat'l Ass'n for Gun Rts. v. Lamont* ("*Lamont*"), 685 F. Supp. 3d 63, 84-91 (D. Conn. 2023); *Capen*, 2023 WL 8851005, at *7. The State submits that this is the correct approach. ECF No. 24 at 17.

The Court agrees that the "common use" inquiry is relevant to the determination of whether firearms are presumptively protected. If a court concludes that the restricted weapons are not in common use, they do not gain "presumptively protected" status, *Bruen*, 597 U.S. at 17, because of the clear historical tradition of regulating dangerous and unusual weapons. *See id.* at 19 (stating that *Heller* "demands a test rooted in the Second Amendment's text, as informed by history"). In this sense, the first step of the *Bruen* analysis is imbued with the threshold historical inquiry of whether the restricted arm may be regulated as dangerous and unusual. *See Heller*, 554 U.S. at 581 ("The term ["arms"] was applied, then as now, to weapons that were not specifically designed for military use and were not employed in a military capacity."). If the weapons *are* in common use, they are presumptively protected; however, the government's regulation may still be justified with reference to a different

and more specific analogous historical tradition of regulation. *Cf. Rahimi*, 602 U.S. at 13.

This understanding of the common use analysis finds support in the Supreme Court's analysis in *Bruen* itself. In that case, the Court discussed the "common use" issue as part of its consideration of whether handguns were presumptively protected by the Second Amendment. *See Bruen*, 597 U.S. at 32. In fact, the Court asked the "common use" question before even getting to whether the plain text of the Second Amendment protects "carrying handguns publicly for self-defense." *Id.* While the Court did later juxtapose contemporary "common use" with the historical "dangerous and unusual" inquiry in its discussion of *Heller*, that analysis focused on whether the State had carried its responsive burden of showing that the regulation was justified by reference to history. *Id.* at 47. Because the *Bruen* Court had already concluded that handguns were "in common use" and therefore presumptively protected, the government's "historical analogy" to regulations restricting dangerous and unusual weapons failed to persuade. *Id.*

In sum, according to *Bruen*, a plaintiff must prove that the regulated weapons are in common use in order to qualify for presumptive protection under the Second Amendment. Once a plaintiff has done that, the State may justify its regulation by

demonstrating that the regulation "is consistent with the Nation's historical tradition of firearm regulation." *Id.* at 24.

The next issue is whether Plaintiffs must show that weapons are in common use for "lawful purposes," "self-defense," or whether mere common ownership is enough to satisfy "common use." The logic underlying the initial adoption of the Second Amendment sheds some light on this question. As the Supreme Court explained in *Heller*, the "right was codified" to "prevent elimination of the militia." *Heller*, 554 U.S. at 599. Because the "traditional militia was formed from a pool of men bringing arms 'in common use at the time' for lawful purposes like self-defense," those are the weapons that the Second Amendment protects. *Id.* at 624 (citing *Miller*, 307 U.S. at 179). Indeed, the Supreme Court has repeatedly reiterated that the Second Amendment "secures for Americans a means of self-defense." *Rahimi*, 602 U.S. at 5 (citing *Bruen*, 597 U.S. at 17); *Heller*, 554 U.S. at 599 (calling self-defense the "central component" of the right to bear arms). This historical tradition, along with the Supreme Court's guidance, makes clear that to presumptively qualify for Second Amendment protection, the relevant weapons must be commonly used for self-defense. [4] *See Bevis*, 85 F.4th at

---

[4] Nearly all the parties' briefing goes to the self-defense issue. Even if the Court were to conclude that weapons in common use for purposes other than self-defense qualify for presumptive

1192 ("[T]he Arms the Second Amendment is talking about are weapons in common use for self-defense.").

   3. Facial vs. As Applied Challenge

   The parties dispute whether this case involves a facial or as-applied challenge to the two Vermont gun regulations. In facial challenges, "the challenger must establish that no set of circumstances exists under which the Act would be valid." *United States v. Salerno*, 481 U.S. 739, 745 (1987). In as-applied challenges, Plaintiffs must simply prove that the statute is unconstitutional as applied to the litigant's actual conduct. *Copeland v. Vance*, 893 F.3d 101, 113 (2d Cir. 2018). Plaintiffs here have failed to allege that the statute is unconstitutional as applied to their specific conduct, so the Court need not resolve whether Plaintiffs' challenge is facial or as-applied. *Rahimi*, 602 U.S. at 8 ("[H]ere the provision is constitutional as applied to the facts of Rahimi's own case.").

   4. LCMs

      a. The plain text of the Second Amendment does not protect LCMs.

   The first question under *Bruen* is whether the restricted activity falls under the plain text of the Second Amendment. *Bruen*, 597 U.S. at 23-24. *Bruen* offers some guidance on how to

_____

Second Amendment protection, it would be unable to determine whether the restricted magazines are in such common use.

16

assess this question. It first asked whether petitioners were "part of 'the people' whom the Second Amendment protects," *Bruen*, 597 U.S. at 31-32, before assessing whether handguns were "weapons 'in common use for self-defense.'" *Id.* at 32. *Bruen* then proceeded to analyze whether the plain text of the Second Amendment protected petitioners' "proposed course of conduct." *Id.*

Like the Supreme Court in *Bruen*, this Court has "little difficulty" concluding that Plaintiffs are part of "the people" whom the Second Amendment protects. The harder question is the next one: whether large capacity magazines are weapons "in common use" for self-defense.[5] *Id.*

─────────────

[5] Plaintiffs submit that the Second Circuit resolved this issue in *Cuomo*, 804 F.3d at 255. ECF No. 2-1 at 9. The Court disagrees. "*Cuomo* interpreted the 'common use' analysis as a purely statistical inquiry into ownership," an understanding that has changed post-*Bruen*. *Lamont*, 685 F. Supp. 3d at 86 (noting, like this Court, that *Bruen* framed "the relevant inquiry as being whether the weapons are "in common use today for self-defense") (cleaned up). The *Bruen* Court focused on common use for self-defense, not mere ownership. Additionally, the ownership approach is analytically problematic for the reasons articulated in *Bevis*, 85 F.4th at 1190, and *Capen*, 2023 WL 8851005, at *8. *See supra* footnote 3. Finally, *Cuomo* ultimately concluded that it had insufficient evidence to evaluate whether "large-capacity magazines are 'typically possessed by law-abiding citizens for lawful purposes,'" highlighting that it does not even purport resolve the issue in this case. *Cuomo*, 804 F.3d at 256-57 (quoting *Heller*, 554 U.S. at 625). Plaintiffs also cite *Caetano v. Massachusetts*, 577 U.S. 411, 420 (2016) for the principle that common ownership is sufficient to show common use, but fail to indicate that their citation goes to a non-controlling concurrence. ECF No. 2-1 at 11.

Some courts have concluded that magazines are not arms –
and are therefore not entitled to the full protection of the
Second Amendment – because they are not "[w]eapons of offence,
or armour of defence," or "any thing that a man wears for his
defence, or takes into his hands, or useth in wrath to cast at
or strike another." *Heller*, 554 U.S. at 581 (citations omitted);
*see also Bevis*, 85 F.4th at 1197 (concluding that LCMs are not
"arms" and can be "lawfully reserved for military use"); *Capen*,
2023 WL 8851005, at *16 ("No magazine, regardless of capacity,
is itself an 'arm' within the plain meaning of that term.");
*Ocean State Tactical, LLC v. Rhode Island*, 646 F. Supp. 3d 368,
388 (D.R.I. 2022) ("[P]laintiffs have failed to meet their
burden of establishing that LCMs are "Arms" within the textual
meaning of the Second Amendment."). The Court need not answer
this threshold question because – even assuming magazines *are*
arms entitled to the full protection of the Second Amendment[6] –

_____

[6] This conclusion is not a given. While there is little question
that bullets – essential to the firing of a firearm – are
protected by the Second Amendment, the precise scope of that
protection is unclear. Neither the Supreme Court nor the Second
Circuit has directly addressed this question, but the Supreme
Court has stated that the right to bear arms implies taking
actions to "keep them ready for their efficient use." *Heller*,
554 U.S. at 617-18. The Ninth Circuit has directly ruled that
the Second Amendment protects "ancillary rights" such as the
ownership of bullets, without which "the right to bear arms
would be meaningless." *Brown*, 644 F. Supp. 3d at 798-99 (citing
*Jackson v. City and Cnty. of San Francisco*, 746 F.3d 953, 967
(9th Cir. 2014)). However, these courts have also explained that
these "ancillary rights" only cover items (and conduct) that are

LCMs, a narrow subset of magazines, are not in common use for self-defense – which they must be in order to qualify for presumptive Second Amendment protection.[7] *See Oregon Firearms Fed'n v. Kotek* ("*Kotek*"), 682 F. Supp. 3d 874, 912 (D. Or. 2023) (holding that LCMs are a "subset of magazines," and "while magazines may often be necessary to render a firearm operable, LCMs are not."); *Ocean State Tactical,* 646 F. Supp. 3d at 390 ("[T]he plaintiffs have failed to establish . . . that LCMs are weapons of self-defense.").

Because Plaintiffs bear the burden of showing that their conduct is presumptively protected by the Second Amendment, *Bruen*, 597 U.S. at 24; *Lamont*, 685 F. Supp. 3d at 89 ("Plaintiffs must bear the burden of producing evidence that the specific firearms they seek to use and possess are in common use for self-defense."), the Court will begin by assessing their evidence on the issue.

Plaintiffs first submit evidence indicating that weapons capable of firing multiple rounds are commonly used by

_____

"necessary to render certain firearms operable for self-defense and other lawful purposes." *Id.*

[7] In so doing, it keeps with several other courts – including the District of Connecticut – in concluding that even assuming that magazines are entitled to full Second Amendment protection, LCMs are not protected. *See Lamont*, 685 F. Supp. 3d at 94; 103 (concluding that magazines are "arms" but later finding that they are not in common use for self-defense); *Hanson v. D.C.*, 671 F. Supp. 3d 1, 10; 16 (D.D.C. 2023) (same).

19

Americans. ECF No. 2-1 at 11. They argue that the AR-15 is
America's "most popular semi-automatic rifle," ECF No. 2-1 at 11
(citing *Heller v. D.C.*, 670 F.3d 1244, 1287 (D.C. Cir. 2011)
(Kavanaugh, J., dissenting)), and that over 24 million AR-15s
(and comparable assault rifles) are currently in circulation.
*Id.* Plaintiffs also note that these "popular rifles come
standard with 20- or 30-round ammunition magazines," and submit
consumer reports indicating that "52% of recently acquired AR-
style and other modern sporting rifles came equipped with 30-
round magazines." *Id.* These statistics were bolstered by
testimony from Plaintiffs' witnesses at the hearing on this
motion. *See, e.g.*, ECF No. 59 at 11-12 (Bradley testifying that
his Glock pistol came standard with a 17-round magazine); 17
(the same pistol is "the most popular firearm out there as far
as pistols go"); 23 ("The AR-15 is the most popular long gun in
America."); 29 (stating that the AR-15 is sold with a 20- or 30-
round magazine); 56-57 (Bradley has never seen smaller than a
10-round magazine for a Glock 17 pistol); 64 (Plaintiffs'
witness William Cleary stating that gun purchasers want LCMs for
self-defense).

The Court finds that this category of evidence, which deals
with the popularity of weapons capable of using (or which
normally use) LCMs, is not directly relevant to the central
issue in this case which is whether LCMs are in common use for

20

self-defense. Vermont has not regulated the firearms themselves. Therefore, the various benefits of these firearms – which range from physical comfort, ECF No. 59 at 23, to accuracy, *id.* at 69, and rapidity of firing, *id.* at 24 – are not impeded by Vermont's regulation. Additionally, while these guns may be very popular (and commonly used for self-defense), that does not bear on the question of whether LCMs are similarly in common use for self-defense.

Plaintiffs' witnesses acknowledge that these popular firearms function with smaller-capacity magazines. As Bradley noted in his hearing testimony, "manufacturers can make magazines for [] a 17-round [gun] that are restricted for how many cartridges they can hold . . . it really has a great deal of flexibility." ECF No. 59 at 13. While guns like the AR-15 and Glock-17 may come "standard" with higher-capacity magazines, there is no design constraint that makes those popular weapons incapable of firing with a smaller magazine. *Id.* at 48; 51.

Both of Plaintiffs' witnesses testified specifically to the Glock-17, a very popular pistol. *Id.* at 17. It serves as a useful example for this point. According to Bradley, the Glock-17 comes standard with a "full-capacity" 17-round magazine. ECF No. 59 at 12. Plaintiffs' witness William Cleary, owner of the Powderhorn Outdoor Sports Center, also testified that his gun shop used to commonly sell the Glock 17 with a 17-round

magazine, but that the shop can now "only sell it with 10-round mags." *Id.* at 66. Cleary went on to explain that Glock does not typically manufacture pistols with default or standard 15-round magazines, because only Vermont and Colorado have "a 15-round law on pistols." *Id.* Nonetheless, he testified that after Vermont's LCM ban, his shop was able to sell Glock pistols with compliant 10-round magazines. He also testified that while "you can't order [a Glock] with three 15-round magazines . . . you can as an after-market product through Glock purchase 15-round mags, and they do cost about 29 bucks." *Id.* at 66. The upshot of this discussion is that the weapons designated by Plaintiffs as especially popular still come with standard compliant magazines. And gun enthusiasts can access magazines that hold as many rounds as the law permits for just $29 – less than the cost of entry to some gun shows. U.S. DEP'T OF JUSTICE, OFFICE OF THE INSPECTOR GEN., EVALUATION AND INSPECTIONS DIVISION, I-2007-007, THE BUREAU OF ALCOHOL, TOBACCO, FIREARMS AND EXPLOSIVES' INVESTIGATIVE OPERATIONS AT GUN SHOWS (2007) ("Public admittance fees for the shows range from $5 to $50."). Plaintiffs' concern that Vermont has effectively banned popular firearms is unfounded.

Plaintiffs nonetheless argue that LCMs are commonly owned and are therefore presumptively protected. Their evidence on this point consists primarily of a 2021 national firearms survey authored by Professor William English which found that Americans

22

own as many as 542 million rifle and handgun magazines "capable of holding more than 10 rounds" and 382 million magazines that hold more than 15 rounds. ECF No. 2-1 at 12 (citing ECF No. 2-7 at 23-25). That survey also concluded that roughly 39 million Americans own magazines that hold more than 10 rounds, and those individuals own an average of between 4.5 handgun magazines and 5.4 rifle magazines with capacity of more than 15 rounds. ECF No. 2-8 at 7, 16; *see also* ECF No. 2-1 at 12 (citing another study stating that 80 million 30+ round magazines are in circulation today). The 2021 survey also found that roughly 66% of gun owners reported that recreational target shooting was their reason for owning an assault rifle, followed by home defense (61.9%) and hunting (50.5%). ECF No. 2-7 at 33-34.

English's survey reports that roughly 1/3 of adults in the United States report owning a gun, *id.* at 7, and that roughly 1/3 of those individuals report having used a gun in self-defense. *Id.* at 9. This, extrapolated, means that 25.3 million adult Americans have used a gun in self-defense. *Id.* But English also notes that in 81.9% of those cases, the gun was not fired. *Id.* at 11. Additionally, English's study does not precisely reflect the number of shots typically fired in defensive situations. He nonetheless concludes that "[i]n 67.8% of these cases in which a gun was fired in self defense, multiple rounds were fired." *Id.* at 26. But again, according to English, shots

were fired in only 18.1% of defensive gun uses[8] – meaning that
multiple rounds were fired in only 12.27% of all defensive gun
uses (67.8% of 18.1%). English's study does not further
deconstruct the number of shots fired in self-defense, leaving a
reader with no way of knowing what "multiple rounds" means.
Ultimately, this data is largely consistent with the State's
expert's conclusion that large numbers of rounds are rarely
fired in self-defense situations (described in greater detail
below).[9]

    In sum, most of Plaintiffs' evidence goes to the common
ownership of guns and LCMs. But "common ownership" is different
from "common use for self-defense," which is what *Bruen*
mandates. *Bruen*, 597 U.S. at 32.

---

[8] The fact that Plaintiffs' declaration employs the undefined
phrase "used a gun in self-defense" substantially detracts from
their objection to the State's expert's use of the phrase
"defensive gun use." *See* ECF No. 67 at 2. It highlights that the
only way to measure how guns are used in self-defense is to
select a category of incidents in which guns are "used," which
is necessarily imprecise.

[9] English later departs from percentages to note that 550
respondents stated that they had been in situations in which "it
would have been useful for defensive purposes to have a firearm
with a magazine capacity in excess of 10 rounds." ECF No. 2-7 at
26-28. This is not helpful for two reasons: first, it does not
show that those individuals actually used LCMs for self-defense
(and therefore does not bear on the question of whether LCMs are
"in common use for self-defense"). Second, these individuals
comprise only 3.5% of survey respondents – a small enough figure
to conclude that gun-owning individuals rarely *desire* magazine
capacities of greater than 10 rounds for self-defense, much less
use them. *See* ECF No. 2-7 at 4 (noting that 15,450 respondents
completed the survey).

There is substantial evidence in the record indicating that LCMs are not commonly used for self-defense. Central to that conclusion is the written and oral testimony of the State's expert, Dr. Lucy P. Allen. Allen holds a bachelor's degree from Stanford, three graduate degrees from Yale (M.B.A., M.A., and M.Phil.), and is currently the Senior Managing Director of an economic consulting group. ECF No. 24-2 at 3. In order to assess how often guns are discharged in self-defense, Allen conducted three separate analyses using three different data sources. ECF No. 59 at 98. The first came from a National Rifle Association ("NRA") database; the second from a random sample of news stories from the aggregator Factiva; and the third from police data on shootings in Portland, Oregon. *Id.* at 98-99.

Allen first analyzed a "database of defensive gun use put together by the [NRA]." *Id.* at 99. This database aggregates stories "describing private citizens who have successfully defended themselves, or others, using a firearm." ECF No. 24-2 at 5. She assessed all of the incidents in the NRA database from January, 2011 until May, 2017 – a data set totaling 736 incidents. *Id.* 18% of those events involved no shots fired; roughly 80% involved between one and five; and roughly 2% involved between six and ten. Allen's research found only two incidents in the NRA database involving more than 10 shots fired. *Id.* On average, each incident involved 2.2 shots fired.

25

SPA-26

That trend was supported by Allen's second dataset, a collection of news stories aggregated from nearly 33,000 different sources by a platform called Factiva. ECF No. 59 at 102. Her search, which focused on specific keywords related to home invasion, used the same temporal parameters as the NRA survey and revealed approximately 4,800 relevant news stories. Allen reviewed a random sample of 200 of those news stories and catalogued the number of shots fired in each incident. She concluded that the average number of shots fired in each incident was 2.34. ECF No. 24-2 at 10.

Finally, Allen analyzed publicly available data from the Portland, Oregon Police Bureau to "identify any incidents of self-defense with a firearm where more than 10 rounds were fired by the defender." *Id.* at 13. Out of 2,632 shootings associated with a criminal offense between 2019 and 2022, she found only 398 in which the police encountered more than ten casings, ECF No. 59 at 107 – meaning that there were fewer than 400 incidents in which the aggressor and defender *combined* fired more than 10 shots. Allen then looked more closely at the reports from each of those 398 incidents and found just one incident involving a "potential situation of self-defense with a firearm." ECF No. 24-2 at 14. News stories covering that event revealed that the defender fired "only four or five shots." *Id.*

The thrust of Allen's research on the use of firearms on self-defense is that it is exceedingly rare for individuals to fire more than ten shots in self-defense, and that when guns *are* fired in self-defense, an average of between two and three shots are discharged. This leads to the conclusion that LCMs – which allow users to fire upwards of 10 rounds per magazine – are not "in common use for self-defense."

Plaintiffs take issue with several points of Allen's testimony. They note that Judge Benitez, in the Southern District of California, has criticized Allen's testimony in two opinions on similar issues. *Duncan v. Bonta*, No. 17-CV-1017-BEN (JLB), 2023 WL 6180472, at *12 (S.D. Cal. Sept. 22, 2023); *Miller v. Bonta*, No. 19CV01537BENJLB, 2023 WL 6929336, at *33 (S.D. Cal. Oct. 19, 2023), appeal held in abeyance, No. 23-2979, 2024 WL 1929016 (9th Cir. Jan. 26, 2024).[10] Because the Court

_____

[10] *Miller* evaluated the constitutionality of California laws that "ma[d]e it a crime to acquire and possess many common modern semiautomatic firearms." *Miller*, 2023 WL 6929336, at *1. Allen testified in that case – but because the issues were different, her declaration and oral testimony were also different. Plaintiffs' counsel in this case seeks to impute Judge Benitez' critiques in *Miller* onto Allen's testimony in this case, but misses the mark. For instance, at oral argument, Plaintiffs' counsel asked Allen about the *Miller* court's description of her "misleading" charts which – apparently – suggested that "rifles were used in just 2 to 4 percent of defensive gun uses." ECF No. 59 at 127. This might be relevant to a case involving laws restricting *rifles*, but is irrelevant here, as is most of the *Miller* court's discussion of Allen's testimony. Plaintiffs' counsel also asked Allen whether she had updated her testimony post-*Miller*, which (understandably) confused her because the two

finds that Allen's testimony is relevant, credible, and
methodologically sound, it will address each of those concerns
in turn.

Plaintiffs, echoing Judge Benitez, first criticize Allen's
data source for the NRA study. Plaintiffs' counsel suggested
that the source is a "column of individual stories" rather than
a "database." ECF No. 59 at 115-116; *see also Duncan*, 2023 WL
6180472, at *14 ("A database of news articles lacks the usual
indicia of accuracy and reliability of admissible evidence.").
Allen explains that she chose to analyze the NRA's Armed
Citizens Database for three separate reasons: first, because it
"was the largest collection of accounts of citizen self-defense
compiled by others that [she] was able to find;" second, because
the NRA compiled the listed incidents because they all describe
"the use of firearms by law-abiding citizens for self-defense;"
and third, because the database is "compiled by an entity that
actively opposes restrictions on magazine capacity and [firearms

_____

cases involve different issues. *Id.* at 127-29. And finally,
Plaintiffs' counsel asked Allen about data collected from the
Heritage Foundation. *Id.* at 130. Allen presented evidence from
the Heritage Foundation in *Miller*, *see* 2023 WL 6929336, at *33,
but did not do so here. *See generally* ECF No. 24-2 (mentioning
the Heritage Foundation only to note that it keeps a separate
database of defensive gun uses); see also ECF No. 59 at 130 (MR.
HARDIN: That's what it says in the [*Miller*] opinion is that she
testified as to the results of a database maintained by The
Heritage Foundation. THE COURT: Okay. MS. ALLEN: I just don't
recall that. I don't -- that's not something I've used here.").

in general]," leading her to believe that "any selection bias
would be in favor of stories that put use of guns in self-
defense the best possible light." ECF No. 24-2 at 6. Allen's
rationale thoroughly justifies her analysis of the Database. It
is a repository of effective uses of guns in self-defense,
reported by an organization that supports the use of guns,
allowing for the reasonable inference that the reported
incidents will paint defensive gun use in a positive light. *See
Kolbe v. O'Malley*, 42 F. Supp. 3d 768, 781 (D. Md. 2014) ("[T]he
database which Allen studied is maintained by the NRA,
suggesting, if anything, that her study may have a bias in favor
of finding more instances of the defensive use of firearms.").

Judge Benitez also distrusts Allen's research because it is
based on "anecdotal statements, often from bystanders, reported
in news media." *Duncan*, 2023 WL 6180472, at *13; *see also* ECF
No. 59 at 134. Allen has explained that the lack of reliable
data on the use of firearms in self-defense necessitates turning
to secondhand accounts of those incidents for research purposes.
ECF No. 24-2 at 5 (stating that there is no source that
systematically categorizes the number of gunshots fired in self-
defense, necessitating analysis of secondhand accounts). Judge
Benitez's methodological critique would hold more weight if
there was contrary empirical evidence relating to whether LCMs
are "in common use for self-defense." As discussed above, there

is no such evidence – and, in fact, Plaintiffs' declarations are largely consistent with Allen's findings. "[I]n light of the apparent dearth of other evidence demonstrating that the firearms at issue here are used for self-defense, Allen's use of the NRA database [and other supporting data] is appropriate and acceptable." *Kolbe*, 42 F. Supp. 3d at 781.

Judge Benitez expresses concern that "Allen does not list the 736 stories" analyzed in the NRA study. *Duncan*, 2023 WL 6180472 at *13. First, Allen does provide a link to the NRA Armed Citizen Database. *See* ECF No. 24-2 at 3 n.4. And second, to the extent that Judge Benitez' concern is that the analysis is non-confirmable, any other expert could conduct a comparable review of the same news stories on the same website. Indeed, in a similar case, plaintiffs were forced to backtrack after being confronted with evidence that their witness had conducted a similar study of the NRA database and reached a similar conclusion to Allen. *See Hanson*, 671 F. Supp. 3d at 14 (explaining that plaintiffs' expert in that case, a former U.S. army officer with experience in sport shooting, conducted a similar study and reached the same conclusion, and noting that several other appellate courts have relied on that study).

Plaintiffs and Judge Benitez also criticize Allen for "including situations in which no shots were fired" in her analysis. *Duncan,* 2023 WL 6180472, at *13; ECF No. 59 at 119.

This, they argue, drags the average number of shots fired in self-defense down. *Id.* First, brandishing a gun in self-defense could qualify as using that gun for self-defense. Therefore, inclusion of those incidents is important to the ultimate inquiry: how frequently LCMs are used when guns are involved in self-defense. Second, Allen's analysis of the NRA's database includes all of the NRA's reported incidents involving "law-abiding gun owners in America using their Second Amendment rights to defend self, home and family." ECF No. 24-2 at 5. As noted above, using the NRA's definition of defensive gun use comes with a potential pro-plaintiff bias. Finally, and most importantly, contrary to Plaintiffs' (and Judge Benitez') arguments, Allen actually does provide a data point for the number of shots fired excluding situations in which no shots were fired. *See* ECF No. 24-2 at 7 n.11 ("If one calculates the average excluding incidents of self-defense with a gun without firing shots, the average is still low, 2.6 shots when at least one shot is fired."). This number, 2.6 shots, is still well below Vermont's magazine limits of 10 or 15 rounds.[11]

---

[11] Plaintiffs point out that Allen has not updated her analysis of the NRA or Factiva datasets since 2022. ECF No. 24-2 at 123. They do not offer any reason why the Court should expect more recent results to be any different from Allen's designated time period.

Plaintiffs later criticize Allen for failing to include in her analysis situations in which "someone chooses not to break into a house because that house has a firearm in it." ECF No. 24-2 at 121. Plaintiffs seem to argue that this deterrent effect should be considered a defensive gun use. *Id.* Plaintiffs have put themselves in a catch-22: if Allen's study were to include situations in which intruders decide not to break into homes due to the threat of a gun, the average number of shots fired would be infinitesimally small – showing with even greater force that LCMs are not in common use for self-defense. If, on the other hand, Allen were to analyze only incidents in which shots were fired, the "average number of shots fired" would go up, but – as Plaintiffs argue – that analysis might not encompass the full "defensive" effect of guns, which includes both deterrence and active use. And, as noted above, excluding situations in which guns were not fired only raises the average number of shots fired to 2.6. Either way, the evidence reveals that LCMs are not commonly used in self-defense.

Judge Benitez next notes that Allen interposed figures when the analyzed Factiva and NRA news stories did not specify the number of shots fired. ECF No. 59 at 138; *Duncan*, 2023 WL 6180472, at 13-14. A complete reproduction of Allen's explanation of this practice aids understanding:

> When the exact number of shots fired was not specified, we used the average for the most relevant incidents with known number of shots. For example, if the story stated that "shots were fired" this would indicate that at least two shots were fired and thus we used the average number of shots fired in all incidents in which two or more shots were fired and the number of shots was specified.

ECF No. 24-2 at 6; 10. This method – while necessarily imprecise – allows for a greater sample. And contrary to Judge Benitez' conclusion, this practice does not "tend[] to bring the overall average of shots fired down towards 2.2." *Duncan*, 2023 WL 6180472, at *14. The 2.2 average figure includes incidents in which no shots were fired. ECF No. 24-2 at 11-12. Allen's imputed value for non-specified situations in which "shots were fired" used the "average number of shots fired in all incidents in which two or more shots were fired," which excludes incidents involving either zero or one shot fired. This assigned number will therefore be greater than the overall average, and will accordingly drag the overall average number of shots fired *upwards* rather than downwards.[12] Therefore, Allen's insertion of

_____

[12] To spell this out in greater detail, imagine a set of 100 incidents in which 15 involved zero shots; 20 involved one shot; 30 involved two shots; 20 involved three shots; 10 involved four shots; and 5 involved 10 shots. This would create an average of 2.3 shots fired per incident (and would roughly map onto the percentages correlation outlined by Allen's declaration, but with substantially more incidents involving 10+ shots. *See* ECF No. 24-2 at 6-7). If the 35 incidents involving zero or one shot are removed from the sample set, the average number of shots fired in the remaining 65 incidents goes up to 3.23. If that 3.23 figure were to be inserted for incidents in which "shots

a revised average for incidents in which the precise number of shots fired is not specified actually benefits Plaintiffs.

Judge Benitez moves on to criticize Allen's Factiva analysis. He states that the studied news stories are unavailable, and that Factiva is unreliable because it is behind a paywall. *Duncan*, 2023 WL 6180472, at *14. While the Court agrees that open accessibility of data would be helpful for analytical purposes, neither Judge Benitez nor Plaintiffs have offered any particular reason to doubt the results of Allen's research – especially given that the Factiva results are consistent with the NRA study's results, and the results of a prior study on the same subject. The Court is also conscious that Plaintiffs have not provided any evidence to the contrary (nor have they provided testimony from Dr. English or the data set for his study). Additionally, the fact that an expert's study is based on a dataset which requires payment to access is innocuous; data aggregation is time-consuming and expensive, warranting a fee.

The Court finds Allen's methodology for the Factiva study quite comprehensible. *Duncan*, 2023 WL 6180472, at *14 ("Allen's methodology for the Factiva study is incomprehensible."). She conducted a search for news stories from 2011 to 2017 reporting

_____

were fired" but a number was not specified, the overall average would go up.

on "the use of firearms for self-defense" by seeking to identify stories containing words relating to guns, break-ins, and burglars.[13] This returned 35,000 stories. ECF No. 24-2 at 9. She randomly selected 200 stories from each of the seven years, leading to a total sample of 1,400 stories. *Id.* Allen then reviewed those 1,400 stories to find only the stories describing "incidents of self-defense with a firearm in or near the home," *id.,* which led to 200 stories. This is a simple filtering process, using keyword searching and random sampling to alleviate the burden of reviewing 35,000 stories. After developing her 200-story set, Allen then analyzed each source for the number of shots described. ECF No. 24-2 at 10. She also recognized that each incident may result in multiple news stories, and accordingly reached two results: an average of 2.61 shots fired per story, and an average of 2.34 shots fired per incident. ECF No. 24-2 at 10-11. This discrepancy reflects the (logical) principle that events involving more gunshots will lead to more news coverage. *Id.* The Court does not find it difficult to understand Allen's methodology, finds the results credible, and notes that the conclusions are consistent with the findings of the NRA analysis.

---

[13] Allen explains that the study focused specifically on self-defense in the home, which was the type of self-defense at issue in *Heller*.

Allen's study does not compare the number of shots fired in defense with the number of shots fired by criminals. Judge Benitez (and Plaintiffs) take issue with that. ECF No. 59 at 137-38; *Duncan*, 2023 WL 6180472, at 13. The Court does not see this as a problem, given that the relevant question is whether LCMs are "in common use for self-defense," not whether they are in common use for crime.

Judge Benitez also does not understand why Allen selected limited time periods for research. ECF No. 59 at 135; *Duncan*, 2023 WL 6180472, at 13. The NRA study analyzes reports from 2011 to 2017; the Factiva study focuses on the same time period; and the police data covers events from 2019 to 2022. Meanwhile, Allen's analysis of mass shootings extends from 1982 until the present. The Court does not find this troubling. First, Plaintiffs have not offered a reason why data sets from different periods of time would be misrepresentative of general trends. Second, it is logical that an analysis of mass shooting events would require a larger temporal frame because of the relative infrequency of those events. It would be otherwise impossible to get a statistically significant sample size. ECF No. 24-2 at 20 (analyzing 179 mass shootings between 1982 and 2022). And because the Factiva analysis is essentially a control for the NRA analysis, it makes sense to use the same timeframe. These temporal differences are not methodological flaws.

Plaintiffs make several other points. They argue that Allen does not clearly define "defensive gun use" so as to determine the parameters of her dataset. ECF No. 67 at 2-3. But Allen's declaration uses "defensive gun use" as a shorthand for the events that were the subject of the various studies: that is, reported incidents of individuals using guns to actively ward off attacks, invasions, or other crimes. Plaintiffs highlight the difficulty of defining "defensive gun use" when they point out that any time a person decides not to break into a house could be considered a "defensive gun use;" the best an analyst can do is evaluate situations in which a gun is actively used to repel opponents, and the upshot of Allen's research is that those situations involve an average of 2.2 shots and very rarely more than 10.[14]

On a related note, Plaintiffs criticize Allen's analysis of the Portland, Oregon police data on shootings. They begin by emphasizing that this data is flawed because it only represents incidents in which there actually were shootings, and therefore fails to capture the "deterrent" manner in which LCMs are "used" for self-defense. ECF No. 59 at 124. The District Court for the District of Columbia recently issued a lucid analysis of the

_____

[14] Allen's declaration cites another study (referenced above), from 1997 to 2001, which *also* concluded that the average number of shots fired in self-defense is 2.2. *Id.* at 8 n.13; *see Hanson*, 671 F. Supp. 3d at 14 (referencing the same study).

word "use," explaining why the deterrent effect does not qualify as a "use." *Hanson*, 671 F. Supp. 3d at 15-16. But more importantly, it is a conceptual mistake to think that civilians "use" LCMs for self-defense because "the added benefit of a large-capacity magazine — being able to fire more than ten bullets in rapid succession — has [virtually n]ever been realized in self-defense." *Duncan v. Bonta*, 19 F.4th 1087, 1105 (9th Cir. 2021) (en banc); *see also ANJRPC*, 910 F.3d at 118 ("The record here demonstrates that LCMs are not well-suited for self-defense."); *Kolbe v. Hogan*, 849 F.3d 114, 138 (4th Cir. 2017) (noting "scant evidence" indicating that LCMs are used in self-defense). The data presented in this case uniformly supports this conclusion. *See* ECF No. 24-2 at 6-7; 12; 14 (finding, in each of the three studies, that individuals using guns in self-defense fire more than 10 shots less than 1% of the time).

There is additional evidence in the record indicating that LCMs are not used in self-defense. This includes a statement by the D.C. Chief of Police that "magazines holding over 10 rounds are more about firepower than self-defense," ECF No. 28 at 35 (cleaned up), and quotes from Rhode Island and Maryland law enforcement officials stating that they lacked knowledge of any self-defense incident in which it was "necessary to fire as many as 10 rounds in self-defense." *Id.* Finally, several gun

retailers and training officers also explained that most self-defense episodes do not require high numbers of shots fired. ECF No. 28 at 36.

The expected number of shots required for self-defense is easily allowed by Vermont's LCM limit, and it is exceedingly rare for an individual to need to use more than 10 rounds. Accordingly, pursuant to *Heller* and *Bruen*, Plaintiffs have not carried their burden in showing that LCMs are presumptively protected under the Second Amendment.[15]

---

[15] In so ruling, this Court joins with essentially every other court to have considered the issue. *See, e.g.*, *Misch*, 2021 VT 10, ¶ 82 ("Section 4021 does not prevent Vermonters from buying or using the gun of their choice — it restricts only the capacity to shoot more than ten or fifteen rounds at a time, and thus places minimal restriction on their ability to bear arms in self-defense."); *Capen*, 2023 WL 8851005, at *20 ("[T]he limit on magazine capacity imposes virtually no burden on self-defense."); *Kotek*, 682 F. Supp. 3d at 897 ("[T]his Court finds that the features unique to LCMs — the ability to shoot more than ten bullets without reloading — are not 'commonly used for self-defense.'") (citations omitted) (cleaned up); *Ocean State Tactical*, 646 F. Supp. 3d at 388 ("There is simply no credible evidence in the record to support the plaintiffs' assertion that LCMs are weapons of self-defense and there is ample evidence put forth by the State that they are not."); *Hanson*, 671 F. Supp. 3d at 16 ("LCMs fall outside of the Second Amendment's scope because they are most useful in military service and because they are not in fact commonly used for self-defense."); *Lamont*, 685 F. Supp. 3d at 98 (finding no persuasive evidence that LCMs "are commonly used or are particularly suitable for self-defense.").

b. This nation's history and tradition of gun regulation
justifies Vermont's regulation.

Because Plaintiffs have failed to carry their burden on
step one of the *Bruen* test, their likelihood of success on the
merits is low. However, some courts have declined to resolve the
threshold question of whether LCMs are presumptively protected
by the Second Amendment and instead proceeded directly to the
history and tradition inquiry. *See, e.g.*, *Ocean State Tactical*,
95 F.4th at 43. Others have concluded that LCMs are not entitled
to presumptive protection, but nonetheless proceeded to the
historical inquiry to "round out the analysis." *Hanson*, 671 F.
Supp. 3d at 16. This Court, like those, will assess the
country's history and tradition of gun regulation as an
analytical backstop.[16]

---

[16] As the Supreme Court noted in *Bruen*, and *Rahimi* "there is an
ongoing scholarly debate on whether courts should primarily rely
on the prevailing understanding of an individual right when the
Fourteenth Amendment was ratified in 1868 when defining its
scope" for purposes of constitutional analysis. *Bruen*, 597 U.S.
at 37; *Rahimi*, 602 U.S. at 8. Plaintiffs argue that the "key
period" for "understanding the Second Amendment is ratification
– 1791" – and go on to argue that "[t]he fact that there was not
any general ban on arms in common use until" 1927 ends the
analysis. ECF No. 2-1 at 16. This Court agrees that regulatory
history from the era of ratification is directly relevant to
constitutional understanding but is also mindful of the Supreme
Court's admonition that "the appropriate analysis involves
considering whether the challenged regulation is consistent with
the principles that underpin our regulatory tradition." *Rahimi*,
602 U.S. at 7. Statutory history from periods other than
ratification can also help reveal the "principles that underpin
our regulatory tradition." *Id.* The appropriate question is

Here, the State bears the burden of showing that its
regulation "is consistent with the Nation's historical tradition
of firearm regulation." *Bruen*, 597 U.S. at 24. The *Bruen* Court
offered some guidance on how courts should evaluate consistency
with historical tradition:

> [W]hen a challenged regulation addresses a general societal
> problem that has persisted since the 18th century, the lack
> of a distinctly similar historical regulation addressing
> that problem is relevant evidence that the challenged
> regulation is inconsistent with the Second Amendment.
> Likewise, if earlier generations addressed the societal
> problem, but did so through materially different means,
> that also could be evidence that a modern regulation is
> unconstitutional.

*Id.* at 26-27. Some cases require "a more nuanced approach." *Id.*
at 27. Cases involving "modern regulations that were
unimaginable at the founding" will require "a determination of
whether the two regulations are 'relevantly similar.'" *Id.* at 29
(quoting Cass Sunstein, *On Analogical Reasoning*, 106 Harv. L. Rev.
741, 773 (1993)). At least two metrics are significant: "how and
why the regulations burden a law-abiding citizen's right to
armed self-defense." *Id.*; *see also Rahimi*, 602 U.S. at 7 ("Why
and how the regulation burdens the right are central to this
inquiry."). The Court expounded upon this guidance in *Rahimi*,
explaining that "the Second Amendment permits more than just
those regulations identical to ones that could be found in

---

whether the analogous historical restrictions reveal useful
constitutional principles, not necessarily when they are from.

1791. . . . As we explained in *Bruen*, the appropriate analysis involves considering whether the challenged regulation is consistent with the principles that underpin our regulatory tradition." *Id.*

Plaintiffs state that "at the time of the Founding and for many decades thereafter, no State or jurisdiction enacted any general ban on any arm in common use." ECF No. 2-1 at 15. Plaintiffs' argument amounts to an assertion that if a weapon is owned by an undefined threshold percentage of the population, it may not be regulated. ECF No. 2-1 at 15. This is precisely the type of "regulatory straitjacket" that the Supreme Court intended to avoid in *Bruen*, 597 U.S. at 30. As explained above, the common use inquiry is relevant to step one, determining whether the arm is entitled to presumptive Second Amendment protection. If it is, the government may still regulate it if it shows that the regulation is consistent with the nation's historical tradition of firearm regulation.

i.  *How*

When assessing how a regulation burdens the right of armed self-defense, courts consider "the extent to which LCMs are actually used by civilians in self-defense." *Ocean State Tactical*, 95 F.4th at 45. As noted above, the Court concludes that LCMs are very rarely used in self-defense. Accordingly, "it

reasonably follows that banning them imposes no meaningful burden on the ability of [citizens] to defend themselves." *Id.*

The Court will evaluate whether the "how" underlying Vermont's regulation has a reasonable historical analogue. But first, a matter of framing: Plaintiffs construe Vermont's regulation as an "absolute ban on certain firearms." ECF No. 2-1 at 15. Any regulation can be construed as an "absolute ban." *Rahimi* could be considered an "absolute ban" on possession of firearms by individuals subject to domestic violence restraining owners. *Rahimi*, 602 U.S. at 5 (concluding that individuals who pose a credible threat to the physical safety of an intimate partner may "be banned from possessing firearms."). Restrictions on modifications of firearms – including sawed-off shotguns and silencers – could be considered "absolute bans" on those modified firearms. *See United States v. Comeaux*, No. 6:23-CR-00183, 2024 WL 115929, at *3 (W.D. La. Jan. 10, 2024) (upholding a federal statute restricting silencers and short-barreled shotguns). Like both of these examples, Vermont's restriction on LCMs is best considered a limitation on the ways in which firearms may be used, rather than as a flat ban. *See* ECF No. 66 at 2.

The way in which that limitation operates – that is, the "how" of the regulation – finds precedent in the annals of this country's history of firearm regulation. The State has shown

43

that founding-era legislatures were concerned with episodes of mass violence (such as explosions from consolidated gunpowder and public knifing) and imposed restrictions accordingly.

First, the State submits that founding-era legislatures were concerned with technologies that had the capacity to cause mass devastation and accordingly limited how those weapons could be used. Specifically, Bowie knives – long knives with a cross guard and clipped point – proliferated in the early 1830s and caused an increase in homicide rates. ECF No. 24-10 at 50-51. This led to a wave of state regulation throughout the nineteenth century. *Id.* at 56. The State's expert, Professor Robert Spitzer,[17] states that knives, clubs, and pistols "were considered so dangerous and inimical to public safety that [they were] subject to anti-carry laws and bundled together in

_____

[17] At the hearing on this motion the Court took Plaintiffs' renewed *Daubert* objection to Professor Spitzer's testimony under advisement. ECF No. 62 at 3. For the reasons outlined in its prior Order on the *Daubert* issue, ECF No. 44 at 16-18, Plaintiffs' renewed objection is denied. Spitzer is a professional historian and Plaintiffs have not argued that the historical gun regulations which he presented to the Court were illegitimate. Their point that Spitzer's declaration inaccurately represented certain local ordinances as coming from state governments is noted and addressed below. Additionally, Spitzer's inability to testify to the specifics of Vermont's waiting period detracts from the credibility of his testimony on the comparability of historical regulations. ECF No. 62 at 85. However, whether the historical laws are "relevantly similar" to the modern law is a legal determination to be made by the Court, *Bruen*, 697 U.S. at 29, and Spitzer's submission of allegedly comparable statutes is nonetheless helpful because it provides the Court with materials on which to base its decision.

legislative enactments." *Id.* at 58. He also cites several court cases from the early nineteenth century upholding convictions of individuals for possessing these weapons designated by legislatures as "dangerous to the peace and safety of the citizens." ECF No. 24-10 at 52 (citing *Aymette v. State*, 21 Tenn. 152, 157 (1840)).

Plaintiffs make essentially three arguments in response to the State's analogy to Bowie knives. None are persuasive. First, Plaintiffs point out that many of the states that regulated Bowie knives had not been granted statehood when the laws were passed. ECF No. 62 at 47-50. They therefore argue that these laws have no bearing on this country's tradition of firearm regulation. *Id.; see also Bruen*, 597 U.S. at 66-70 (holding that carry regulations in Western Territories did not "justify New York's proper-cause requirement"). But the territorial carry regulations at issue in *Bruen* were largely limited to the Western Territories. *Bruen*, 597 U.S. at 66 ("The vast majority of the statutes that respondents invoke come from the Western Territories."). The restrictions set forth by the State in this case were part of a broad national pattern of knife regulation in response to a public safety threat. *See* ECF No. 24-19 (noting nineteenth-century Bowie knife restrictions in eastern states such as Maryland, New Jersey, Pennsylvania, Rhode Island, and Vermont). Plaintiffs here have not submitted any of the other

criticisms levied against the territorial restrictions in *Bruen,* which involved judicial review and repeal of statutes, and the Court has no reason to think that they would apply here. *See Bruen*, 597 U.S. at 66-70.

Second, Plaintiffs suggest that Spitzer miscategorizes several restrictions as "no carry" laws when they are better considered "no concealed carry" or "sensitive places" laws. ECF No. 42 at 39; s*ee also, e.g.*, ECF No. 62 at 51; 62. They argue that historical prohibitions on carrying such knives in public places served to protect the public, not regulate private conduct. *Id.* at 41. This is a specious distinction. Like historical carry restrictions limiting how and where Bowie knives could be used, Vermont's law protects the public by limiting how citizens may use firearms. Just as Bowie knife restrictions did not ban knives altogether, Vermont does not ban firearms altogether. Both regulatory schemes limit how the dangerous weapons may be used. Also like these historical restrictions, Vermont's law imposes limits on weapons correlated with an increase in public violence. *See* ECF No. 24-10 at 56 ("The ubiquity of the concern about the criminological consequences of carrying Bowie knives and other, similar long-bladed knives is seen in the widespread adoption of laws barring or restricting these weapons."); c*f. Rahimi*, 602 U.S. at 7-8 ("The law must comport with the principles underlying the Second

46

Amendment, but it need not be a 'dead ringer' or a 'historical twin.'").

Finally, Plaintiffs state that many of Spitzer's example regulations are municipal regulations rather than state laws. *See, e.g.*, ECF No. 62 at 53. As the Court noted at argument on this motion, Spitzer simply suggests that "there are laws in that particular state which restrict carrying." ECF No. 62 at 59-60. And regardless, municipalities operate as state actors for constitutional purposes. *United Bldg. & Const. Trades Council of Camden Caty. & Vicinity v. Mayor & Council of City of Camden*, 465 U.S. 208, 215 (1984) ("[A] municipality is merely a political subdivision of the State from which its authority derives. . . . [W]hat would be unconstitutional if done directly by the State can no more readily be accomplished by a city deriving its authority from the State."). The Court sees no reason why these local regulations should not be considered part of this Nation's history and tradition of arm regulation for purposes of the *Bruen* analysis. If anything, the fact that localities exercised this power indicates that historical federalism practices militate towards allowing local actors to resolve public health crises arising from proliferation of unsafe weapons by regulating how those weapons may be used.

The point of Spitzer's analysis is that while states dealt with the public health problem of Bowie knives in different

ways, *see* ECF No. 24-19, there is no constitutional history prohibiting such restrictions. The Court further finds that the burden on self-defense of a law prohibiting the carry of knives in public is substantial, and greater than the minimal burden imposed by a law prohibiting the possession of an LCM (which does not restrict the carry of a firearm at all).

Spitzer also notes that "every state in the country enacted one or more gunpowder laws from the seventeenth century through the start of the twentieth century." ECF No. 24-10 at 92. These laws regulated the transportation and storage of gunpowder, which was unstable and "could lead to explosions and fires if stored improperly." *Kotek*, 682 F. Supp. 3d at 903. Gunpowder laws "did not severely restrict the right to armed self-defense because an individual could still purchase gunpowder," albeit only in amounts that would not "place the public at risk by leading to a catastrophic explosive event." *Id.* at 929.

Plaintiffs respond that these laws are poor historical analogues because they did not deal with the "discharge" of a firearm." ECF No. 42 at 44. They construe gunpowder laws as "fire prevention laws." *Id.* The Court finds that historical gunpowder laws burden the right to armed self-defense in a way substantially comparable to Vermont's LCM regulation. Gunpowder, like modern magazines, was necessary for the discharge of a firearm. Accumulation of a massive amount of gunpowder was not

48

necessary for the discharge of a firearm, just like storage of many rounds in an LCM is not necessary for the discharge of a firearm. Both regulations impose modest restrictions on a citizen's ability to possess unlimited materials associated with self-defense, and negligible restrictions on the ability to discharge that weapon in self-defense. Both also mitigate the possibility of mass death: in the case of gunpowder laws stemming from accidental explosions, and in the case of LCMs stemming from misuse for insidious purposes. *See Kotek*, 682 F. Supp. 3d at 929 ("The gunpowder laws did not severely restrict the right to armed self-defense because an individual could still purchase gunpowder but could not store that gunpowder in amounts that would place the public at risk by leading to a catastrophic explosive event. . . . Similarly, [an LCM statute] restricts the ability of an individual to amass a level of firepower deemed to be a threat to public safety.").

Plaintiffs note that the Supreme Court declined to adopt gunpowder laws as a comparator for the handgun ban at issue in *Heller,* 554 U.S. at 632. In that case, the Supreme Court explained that restrictions on storage of excess gunpowder did not "burden the right of self-defense as much as an absolute ban on handguns." *Id.* The Court agrees: an absolute ban on handguns certainly imposes a greater burden on the right of self-defense than a regulation on storage of gunpowder. But for the reasons

detailed above, Vermont's LCM law does not impose anywhere near as substantial a burden on self-defense as a ban on handguns, and accordingly, the laws regulating gunpowder storage are much more comparable here. Both adopt a gradated approach to ammunition regulation – allowing gunpowder, but not too much gunpowder at one time; or bullets in magazines, but not too many bullets in a magazine at any one time – which supports the LCM regulation.

Amici submit several other historical regulations that match the "how" underlying Vermont's law: specifically, laws that restricted the manner in which firearms could be used so as to limit the risk of catastrophic injury to the public. First, they argue that the LCM regulation is justified by the history of gun regulation in sensitive places. ECF No. 28 at 25. They note that "[c]olonial Philadelphia, New York, and Boston prohibited the discharge of firearms within their cities," ECF No. 28 at 25, that courts have long allowed legislatures to regulate weapons that "will naturally cause a terror to the people," *id.* at 26 (citing *State v. Langford*, 10 N.C. 381, 383-84 (1824)), and cite historical laws regulating the concealed carry of firearms.[18] *Id.* The Court finds that the sensitive

_____

[18] Plaintiffs respond that the Court should not consider these laws and the rationale underlying them because to do so would be to "engage in independent means-end scrutiny under the guise of an analogical inquiry." ECF No. 42 at 35. The Court is conscious

places regulations pose an inexact analogue to the LCM
restriction because they focus on location rather than method of
use or carry. But for the reasons outlined above, carry
regulations and restrictions on weapons that cause "terror to
the people" provide evidence that legislatures in this country
have long restricted the ways in which individuals can use arms
in order to protect the public. While Plaintiffs are correct
that gun violence is an historical issue that early legislatures
did not address by banning firearms, they did attempt to limit
damage by imposing restrictions like the ones submitted by the
State and Amici.

  *ii.  Why*

    The next issue is "why the regulation[] burden[s] a law-
abiding citizen's right to armed self-defense." *Bruen*, 597 U.S.
at 29. Assessing the rationale underlying the challenged
regulation requires first discerning the legislative intent of
the law. Here, the purpose is clear: "the purpose of [the LCM
restriction] is to reduce the number of people who would be
killed or injured in a mass shooting in Vermont." *Misch*, 2021
VT, ¶ 71. As the Vermont Supreme Court noted, the statute was
enacted in the "wake of a threatened mass shooting in Fair

---

of its obligation to avoid means-end scrutiny, but also must
follow the Supreme Court's mandate to consider "how and why"
modern regulations burden self-defense.

Haven, Vermont," where police received a report about an eighteen-year-old suspect threatening to commit a mass shooting at a high school. *Id* ¶ 69. The individual told police that "he wanted to exceed the body count from the Virginia Tech shooting and that he had chosen his ammunition accordingly." *Id.* (quoting *State v. Sawyer*, 2018 VT 43, ¶ 5). Pursuant to this factual record, the Court finds that the reason – or answer to the "why" question – for Vermont's LCM regulation is to regulate highly dangerous repeating rifles that did not exist at the founding and which are commonly used to commit mass shootings, causing unthinkable loss of life. The Court will place this rationale in historical context below, concluding that founding-era legislatures had little reason to issue similar regulations – militating in favor of the statute's constitutionality.

First, repeating firearms are relatively new. The State and Amici both submit evidence indicating that "the lethality of semi-automatic firearms equipped with LCMs did not exist until the 20th century." ECF No. 24 at 23. Spitzer's declaration states that single shot weapons were the "ubiquitous firearm" until after the Civil War. ECF No. 24-10 at 21.

The evidence submitted in this case indicates that early repeater weapons were "experimental, fraught with problems, and proven unfeasible." ECF No. 24 at 23 (cleaned up) (citing ECF No. 24-10 at 10-20). Spitzer describes one "repeating" firearm

52

from the 1500s detailed in a book called *Firearms Curiosa* which superimposed bullets vertically and fired when gunpowder exploded "like lighting the fuse of a string of firecrackers." ECF No. 24-10 at 11. Unsurprisingly, Spitzer adds that this method had "potentially catastrophic results should a charge go off before it was supposed to." ECF No. 24-10 at 12.[19]

The *Curiosa* firearm is representative of the type of repeating firearm available in the early years of American government. At the time, it was "not possible to manufacture with precision and in any quantity firearms with closely fitting parts that could contain the destructive potential associated with the use of" gunpowder. ECF No. 24-10 at 13. This meant that many firearms – including the Lorenzoni, an early repeater mentioned in Plaintiffs' Complaint, ECF No. 1 at 14 – ran the risk of flame leaking back and "explod[ing] the black powder stored in the gun's butt." ECF No. 24-10 at 12-13. Other repeating weapons faced similar problems. *See* ECF No. 24-10 at 14 ("[T]he flintlock mechanisms that ignited the cartridges [of the Puckle gun] were unreliable."); *id.* at 15 (the Belton

---

[19] Plaintiffs submit that this firearm proves that repeating firearms existed, were unregulated, and indicate that restrictions on such repeating weapons are unconstitutional. ECF No. 42 at 27 (citing *Duncan v. Becerra*, 970 F.3d 1133, 1147 (9th Cir. 2020)). The Court finds that this weapon was not sophisticated or mainstream enough to warrant regulation, and the absence of regulation holds no significance.

flintlock relied on discredited "superposed loads" technology);
16 (the Jennings multi-shot flintlock rifle used "fatally
defective" superposed firing); 19 (the 1854 Volcanic repeating
pistol was noted to have "radical defects"); 20 (the Pepperbox
pistol frequently discharged "all [its] barrels at once,"
creating a risk that the shooter might hit "two or three
innocent bystanders, as well as his intended victim").

The State and Amici explain that other early repeating
weapons were similarly impractical, unreliable, and used only
occasionally in military contexts. ECF No. 24-10 at 10 (early
repeating weapons did not "actually circulate in civil
society."). The Girandoni air rifle is a useful example. It was
fueled by a water pump, which meant that "[l]eather gaskets
needed to be constantly maintained and swelled with water to
sustain pressure." ECF No. 24-10 at 18. Soldiers either had to
manually re-pump the gaskets or bring a wagon with a pump to
resupply. *Id.* Amici add that the reliance on water pressure made
the rifle well-suited to the Lewis and Clark expedition but
poorly suited to ordinary self-defense. ECF No. 42 at 28
(Plaintiffs arguing that the Girandoni rifle's use on the Lewis
and Clark expedition shows that repeater firearms were available
in the early 19th century); ECF No. 28 at 28-29 (explaining its
limitations). The Girandoni never became common in military use
for these reasons, as well as the fact that it was "delicate"

and broke easily. *Id.*; *see also id.* at 14 (the Puckle gun was "an experimental weapon designed for military use" that was "likely never even manufactured beyond perhaps a prototype").

Amici further support this discussion. They outline the evolution of various firearms capable of firing repeatedly without reloading, ECF No. 28 at 28, and state that none were safe, effective, and available until the late nineteenth century. Plaintiffs also reference the pepperbox pistol, the Volcanic Arms lever-action rifle, the Henry Rifle, and the Winchester Model 66, all of which became available to the public between 1855 and 1867. ECF No. 42 at 27-28. Amici articulate reasons why none of these weapons were wieldy, reliable, or accessible. *See* ECF No. 28 at 29 (pepperbox pistol typically fired just five or six rounds, could fire up to 24 but was "monstrously unwieldy," inaccurate beyond the width of a poker table, limited in power, and frequently at risk of firing all of its barrels simultaneously); 31 (volcanic rifle had design defects such as gas discharge around the breech, misfires, was grossly underpowered, and without sufficient force to be a "man stopper"); 31 (Henry Rifle was underpowered for a military firearm, frequently jammed, suffered from broken firing pins, and was sparsely used in the Civil War); 32 (Winchester repeating rifle frequently jammed, was inaccurate, and did not

achieve mass-market success until after the ratification of the Fourteenth Amendment).

Multishot weapons like the Colt revolver achieved limited military success during the Civil War. For instance, the Winchester 1873 repeating rifle[20] (which could fire up to fifteen rounds without reloading) was "designed for sale to the government as a military arm." ECF No. 24-10 at 23. It then expanded to the civilian community in a limited capacity (mostly in Western territories) shortly after the war. ECF No. 24-10 at 25-26. But these firearms also came with associated crime problems and were commonly regulated. *Id* at 26 ("By the end of the nineteenth century, virtually every state in the country prohibited or severely restricted concealed gun and other weapons carrying.").

As multi-shot technology continued to evolve and expand, so too did regulation. In the post-World War I era, "multi-shot semi-automatic and fully automatic long guns began to circulate appreciably in society." *Id.* at 26. But they also came to be associated with criminal use, making them a "regulatory and public policy concern." *Id.* This led "to the enactment of anti-machine gun laws in at least 32 states, [with] between eight and

---

[20] Spitzer notes that the Winchester "was not a semi-automatic firearm." It was a lever-action rifle that required manual reloading, "one round at a time." ECF No. 24-10 at 24.

eleven state laws restricting semi-automatic firearms, and the
first significant national gun regulatory law in 1934."[21] *Id.* at
26-27. As the District Court for the District of Columbia
explained, the prohibition era came with criminal organizations
using LCMs to facilitate their enterprises. "In response,
numerous states enacted sweeping bans on high-capacity semi-
automatic and automatic weapons during this era that applied to
all individuals, not just a certain subset of the population
such as gangsters or criminals." *Hanson*, 671 F. Supp. 3d at 22.

This regulatory tradition is reflected in Vermont law.
Amici point out that in 1923, Vermont banned hunters from using
a "machine gun . . . or an automatic rifle of military type with
a magazine capacity of over six cartridges." *Id.* at 27 (citing
1923 Vt. Acts and Resolves 130). Similarly, in 1912, it banned
gun silencers. *Id.* (citing 1912 Vt. Acts and Resolves No. 237);
*see also* 13 V.S.A. § 4010).[22] This regulatory evolution reveals

---

[21] Plaintiffs state that there is no direct history of
restriction on weapons based on firing capacity and state that
"speculative explanations for why legislative action did not
occur cannot justify Vermont's restriction." ECF No. 42 at 29.
There is no history of restriction of weapons based on firing
capacity only before weapons capable of firing multiple shots
were commonly available to the public. As this discussion shows,
public availability of repeating firearms came with rapid
regulation.

[22] These regulations – specifically the repeating firearms
restriction – align with the State's expert's testimony that
repeating firearms did not become widely available after World
War I.

that the Vermont Legislature has a tradition of addressing firearm developments that pose threats to public safety (specifically including multi-shot weapon restrictions).

Plaintiffs argue that early military-readiness statutes prove the statute's unconstitutionality. ECF No. 42 at 55. They note that certain founding-era laws required citizens to "acquire a firearm and be equipped to fire at least 20 to 24 shots." *Id.* at 44 (citing 1 Stat. 271, 2 Cong. Ch. 33). However, "a duty to possess guns in a militia or National Guard setting is distinguishable from a right to bear arms unconnected to such service." *Lara v. Comm'r Pennsylvania State Police*, 91 F.4th 122, 137 (3d Cir. 2024). If anything, these laws show that the only reason why individuals would possess large amounts of ammunition would be for military purposes. As noted above, the Second Amendment only protects weapons in common use for self-defense, not weapons typically reserved for the military. *Heller*, 554 U.S. at 581-82 ("The term was applied, then as now, to weapons that were not specifically designed for military use and were not employed in a military capacity.").

The Court agrees with the State that the absence of LCMs at the founding explains the lack of contemporaneous regulation. ECF No. 24 at 24 ("Late 1700s legislators had no reason to pass laws governing multishot weapons that were very rare, experimental, and barely functional."). It is impossible to

regulate something that is incomprehensible. As the State notes,
most early firearms were single-shot weapons that were kept
unloaded to prevent risk of "corrosion or misfire." ECF No. 24
(citing ECF No. 24-8 at 16). The Framers "could not have
conceived of the weaponry and firepower that allowed . . . a
single shooter to kill 59 people and injure hundreds more in Las
Vegas in 2017." *Id.* (citing ECF No. 24-8 at 10-11). Today's
legislators can, all too well.

This segues to the second point. While Vermont's modern
regulation finds backing in the historical absence of multi-
shot, repeating firearms, the prevalence of those firearms has
come with a dramatic increase in serious violence and mass
shooting events – warranting regulatory advances designed to
curb such loss of life.

The specific problem presented by LCMs is mass shootings,
not gun violence. The State's expert on the issue, Dr. Allen,
defines an event as a mass shooting if "four or more people were
killed in a public place in one incident," excluding incidents
involving other criminal activity. ECF No. 24-2 at 18. Four
other entities that keep mass shooting data define the term
similarly. *Id.* So does the FBI. ECF No. 24-8 at 40.

This definition is important because, as Plaintiffs note,
"firearm violence" is far from new. ECF No. 42 at 26. Plaintiffs
state that the "peacetime murder rate for adult colonists ranged

from . . . ten to fifty times the rate in the United States in 2009," ECF No. 42 at 26 (cleaned up) (citing Randolph A. Roth, American Homicide 209 (2009)). This may be true, but homicide rates are substantially different from mass killing sprees (which are the target of Vermont's regulation). *See Capen*, 2023 WL 8851005, at *12 (explaining that during the founding era "as a practical matter individuals could not go on killing sprees."). Plaintiffs argue that mass public killings were a familiar social problem at the founding, and point to Indian raids as evidence. *Id.* But territorial conflict in the farmland of colonial New England[23] is substantially different from a single individual using eight

---

[23] Plaintiffs do not provide the death tolls related to these events, which makes it difficult to evaluate the magnitude of the problem. ECF No. 42 at 26-27. Additionally, even if these Indian raids created comparable injuries (which the Court doubts), modern mass shootings are different in kind. Plaintiffs describe war, essentially: rival groups sparring over territory. Today's mass shootings typically involve individuals or small groups inflicting incredible and senseless violence upon their own communities. Additionally, the speed of commission and harm inflicted by these contemporary events is unparalleled by historical comparators. *See Lamont*, 685 F. Supp. 3d at 105 ("The only way to kill a large number of people was to . . . go on a rampage with clubs, knives, nooses, pistols, shotguns, or rifles—weapons that were certainly lethal but did not provide individuals or small groups of people the means to inflict mass casualties on their own."). The Court finds that Indian raids did not pose the same regulatory problem (and are really not in the same ballpark) as events like the Parkland or Sandy Hook massacres. *See Ocean State Tactical*, 95 F.4th at 44 ("[W]e find in the record no direct precedent for the contemporary and growing societal concern that such weapons have become the preferred tool for murderous individuals intent on killing as many people as possible, as quickly as possible.").

LCMs to murder 17 people in Parkland, Florida, or marching into Sandy Hook Elementary School to kill 20 children. ECF No. 28 at 41.

Neither party has submitted evidence on the prevalence of mass shootings at the founding. But other courts have found that "between 1776 and 1949, or for about 70 percent of American history, there was no example of a mass shooting event that resulted in double digit fatalities. The first known mass shooting involving more than ten fatalities, not including the perpetrator, occurred in 1949." *Kotek*, 682 F. Supp. 3d at 897 (record citations omitted); *see also Ocean state Tactical*, 95 F.4th at 44. And the State submits an expert declaration asserting that "mass shootings carried out by individuals are 'a criminological problem that did not exist in the Founding era, nor during the first century of the nation's existence.'" ECF No. 24 at 26 (citing ECF No. 24-8 at 43).

The evidence also shows that mass shootings are a modern problem that has worsened in recent years. As the *Kotek* court concluded, "[t]he annual incidence of high-fatality mass shootings has increased along a linear trend line from 1990 to 2022. The number of fatalities in mass shooting events has also increased along a linear trend line from 1990 to 2022." *Id.* at 899 (record citations omitted). Evidence presented in this case supports the same conclusion. Allen explains that the

Congressional Research Service reported an average of 2.7 public mass shooting events per year in the 1980s, increasing to 4.5 from 2010 to 2013. ECF No. 24-6 at 9. She also notes that mass shootings *and* mass shootings committed with LCMs have increased in a relatively linear fashion from 1982 to 2020. ECF No. 24-2 at 23-26.

The Court finds that high-fatality mass shooting violence is "on the rise" and poses a "significant—and growing—threat to American public safety." *Lamont*, 685 F. Supp. 3d at 106. Allen's research found that, of the mass shootings with known magazine capacity, 63% used magazines with a capacity to hold more than 10 rounds of ammunition. ECF No. 24-2 at 20; *see also* ECF No. 24-8 at 39 (finding that "with extended magazines, semiautomatic rifles cause an average of 299 percent more deaths and injuries than regular firearms, 185 percent more than semiautomatic rifles without extended magazines."). She also found that "casualties were higher in the mass shootings that involved weapons with [LCMs]" than in those that did not: specifically, the average number of casualties (deaths and injuries) was 25 in shootings with LCMs and 9 in shootings without. *Id.* As of July 2020, LCMs "were used in the ten deadliest mass shootings of the prior decade." ECF No. 24 at 33.[24]

───────────────────

[24] Allen notes that these conclusions "are consistent with those of other studies that have analyzed mass shootings," including

The reason why LCMs contribute to mass shootings – and mass death – is intuitive: "[T]he use of [LCMs] leads to more bullet wounds for victims (thereby substantially increasing the death toll of those who are shot), results in more shots fired (thus increasing the number of individuals who are shot) and reduces the capacity of potential victims to flee to safety or take effective defensive action." ECF No. 24-6 at 51. As the First Circuit explained, "[s]emiautomatic firearms fitted with LCMs are highly effective weapons of mass slaughter. They are designed to shoot multiple human targets very rapidly, and to allow the shooter to spray-fire from the hip position." *Ocean State Tactical*, 95 F.4th at 46 (quotations omitted). The data backs this up. The federal assault weapons ban – which also included a ban on large-capacity magazines – expired in 2004, and research reveals that mass shooting incidents and average fatality numbers "fell during the decade in which the [ban] was in place and then rebounded when the ban was lifted." *Id.* at 21. Because the federal law banned both LCMs and assault weapons, it is difficult to assess the "independent benefit" from each ban. ECF No. 24-6 at 28. But other research has revealed that mass

---

one that found an average of "11.8 [fatalities] per mass shooting with a large-capacity magazine versus 7.3 for those without." ECF No. 24-1 at 21. Another study found "21 average fatalities or injuries in mass shootings involving large-capacity magazines versus 8 for those without." *Id.*

shootings involving LCMs "resulted in a 62% higher mean average death toll," suggesting that the independent benefit from regulating LCMs is substantial. ECF No. 24-6 at 30.[25]

In sum, "mass shootings carried out with assault weapons and LCMs that result in mass fatalities are a modern societal problem; the development of semiautomatic fire has led to a level of casualties and injuries from firearm violence previously unseen in American history and has been spurred by factors and advances in technology that would have been unimaginable to the Founding Fathers." *Lamont*, 685 F. Supp. 3d at 107. Because Vermont's LCM regulation was implemented in response to a modern problem without an historical analogue (yet is nonetheless consistent with historical regulatory principles), the Court concludes that it is justified by America's history and tradition of firearm regulation.

---

[25] This conclusion is bolstered by data analyzed by other courts. *See, e.g.*, *Duncan*, 19 F.4th at 1096 ("In the past half-century, large-capacity magazines have been used in about three-quarters of gun massacres with 10 or more deaths and in 100 percent of gun massacres with 20 or more deaths, and more than twice as many people have been killed or injured in mass shootings that involved a large-capacity magazine as compared with mass shootings that involved a smaller-capacity magazine.").

5. Waiting Periods

    a. The plain text of the Second Amendment does not prohibit short waiting periods.

As noted above, the first question under *Bruen* is whether the restricted activity falls under the plain text of the Second Amendment. *Bruen*, 597 U.S. at 23-24. The Court concludes that the "right of the people to keep and bear Arms," U.S. Const. Amend. II, does not facially include a right to immediately obtain a firearm through a commercial sale.

The Supreme Court interpreted the relevant verbs – "keep and bear" – in *Heller*. That case expounded upon the "normal and ordinary" meaning of the Second Amendment. *Heller*, 554 U.S. at 576. The Court explained that founding-era dictionaries defined the word "keep" as "to retain; not to lose," and "to have in custody;" in short, "to have weapons." *Id.* at 582. The word "bear" meant "to carry," but in the context of arms, specifically "carrying for a particular purpose – confrontation." *Id.* at 584. Putting the pieces of the textual puzzle together, the *Heller* Court concluded that the Second Amendment guarantees "the individual right to possess and carry weapons in case of confrontation." *Id.* at 592.

Notably absent from the Supreme Court's guidance in *Heller* is any discussion of an ancillary, non-textual right to acquire firearms. To be sure, rights exist that are not directly

65

enumerated in the Constitution's text. *See Dobbs v. Jackson Women's Health Org.*, 597 U.S. 215, 345-46 (2022) (Kavanaugh, J., concurring) (stating that "[o]verruling *Roe* does not mean the overruling of [precedents on contraception and marriage], and does not threaten or cast doubt on those precedents" and that "a State [may not] bar a resident of that State from traveling to another State to obtain an abortion" because of "the constitutional right to interstate travel."). But absent textual enumeration, courts like this one must determine the parameters of the right.

As Plaintiffs note, the Second Circuit offered guidance on this question in *Gazzola v. Hochul*, 88 F.4th 186 (2d Cir. 2023) (per curiam).[26] In that decision, the Second Circuit held that gun vendors may bring Second Amendment claims on behalf of firearm purchasers. *Id.* at 194. In reaching that conclusion, it noted that while states may impose conditions and qualifications on the commercial sale of arms, they may not outright ban "the sale or transfer of common-use weapons and necessary ammunition." *Id.* at 195. The court overtly declined to "set out

---

[26] The State represents that *Gazzola* and related law governing commercial transfer of firearms is not part of the *Bruen* analysis. ECF No. 66 at 3-4. The Court disagrees, because the question is whether the plain text of the Second Amendment protects a right to acquire firearms. Accordingly, it will discuss *Gazzola* and related cases as part of its analysis of the Second Amendment's presumptive coverage.

specific guidance as to how a trial court must assess evidence that a commercial regulation is stifling the individual right of access to firearms." *Id.* at 196 n.6. However, it noted that the law at issue in that case – which, among other things, required gun dealers to secure firearms in a vault outside of business hours, install security alarms, provide employees with State Police-developed training, and prohibit minors from entering without a parent or guardian – did not "restrict protections conferred by the Second Amendment." *Id.* at 197. It also reiterated that gun buyers "have no right to have a gun store in a particular location," nor a right to proximity to a convenient gun store. *Id.*

The Second Circuit's *Gazzola* decision is consistent with dicta from *Bruen* itself. In *Bruen*, the Supreme Court struck down New York's "may issue" permitting system, which allowed magistrates to issue firearm licenses only if the applicant had "good moral character and proper cause." 597 U.S. at 12 (cleaned up). The Court explained that the permitting system was unconstitutional because it required plaintiffs to justify their exercise of a constitutional right. *Id.* at 46. However, it noted that its decision should not be "interpreted to suggest the unconstitutionality of" shall-issue licensing regimes, under which "a general desire for self-defense is sufficient to obtain a permit." *Id.* at 38 n.9 (cleaned up) (citing *Drake v. Filko*,

724 F.3d 426, 442 (3d Cir. 2013) (Hardiman, J., dissenting)).

The Court explained that these licensing schemes, "which often

require applicants to undergo a background check or pass a

firearms safety course, are designed to ensure only that those

bearing arms in the jurisdiction are, in fact, 'law-abiding,

responsible citizens.'" *Id.* (quoting *Heller*, 554 U.S. at 635).

They also contain "narrow, objective, and definite standards"

guiding licensing officials. *Id.* (quoting *Shuttlesworth v.

Birmingham*, 394 U.S. 147, 151 (1969)). While the Court noted

that "lengthy wait times" or "exorbitant fees" may make a shall-

issue licensing scheme unconstitutional, it acknowledged that

objective licensing criteria which may delay acquisition of a

firearm (or firearm permit) survive constitutional scrutiny.

    One other case warrants discussion: *Antonyuk v. Chiumento*,

89 F.4th 271, 312 (2d Cir. 2023).[27] There, the Second Circuit

_____

[27] The Supreme Court vacated this decision for further
consideration in light of *Rahimi*. *Antonyuk v. James*, No. 23-910,
2024 WL 3259671 (U.S. July 2, 2024). It is settled that vacated
decisions are not "technically binding." *Brown v. Kelly*, 609
F.3d 467, 476 (2d Cir. 2010) (citing *O'Connor v. Donaldson*, 422
U.S. 563, 577 n. 12 (1975) ("Of necessity our decision vacating
the judgment of the Court of Appeals deprives that court's
opinion of precedential effect, leaving this Court's opinion and
judgment as the sole law of the case.")). However, courts may
still treat vacated decisions as persuasive authority. *See,
e.g., id.* (treating a prior appellate ruling as "persuasive
authority" despite vacatur). *Antonyuk* serves as persuasive
authority for its discussion of shall-issue licensing regimes
and the constitutionality of waiting periods because *Rahimi* –
which caused the vacatur – did not address those subjects. *See
generally Rahimi*, 602 U.S. at 5-18.

explained that New York's "shall-issue" licensing regime, which denies firearms licenses to individuals who are "not law-abiding and responsible," survives Second Amendment scrutiny. *Id.* at 314-15. In a footnote of that discussion, the court expressed disapproval of a Fourth Circuit decision striking down a thirty-day review period. *Id.* at 315 n.4. ("We find it especially difficult to square the [Fourth Circuit's] conclusion that a thirty-day review period is per se an unconstitutional temporary deprivation of Second Amendment rights with *Bruen*'s contrasting statements that '*lengthy* wait times ... [would] deny ordinary citizens their right to public carry.'" *Id.* at 315 (quoting *Bruen*, 597 U.S. at 38 n.9) (emphasis added by the Second Circuit) (citing *Maryland Shall Issue, Inc. v. Moore*, 86 F.4th 1038, 1044 (4th Cir. 2023), *reh'g en banc granted*, No. 21-2017 (L), 2024 WL 124290 (4th Cir. Jan. 11, 2024)). By contrasting a thirty-day review period with a "lengthy" waiting period, the Second Circuit implied that - in its view - thirty-day waiting periods are not unconstitutionally long.

In sum, *Bruen* and *Gazzola* stand for the principle that a state may impose "objective standards" on commercial firearm transactions that delay the acquisition of a firearm without violating the Second Amendment. And *Antonyuk* suggests that even a thirty-day waiting period is constitutionally acceptable.

The Court finds that the relevant conduct – acquiring a firearm through a commercial transaction on-demand – is not covered by the plain text of the Second Amendment. Plaintiffs may keep and bear arms without immediately acquiring them. The objective nature of Vermont's law, combined with its relatively short period of delay, reveals that it does not unduly burden the protected right, pursuant to *Bruen*, *Gazzola*, and *Antonyuk*.

Plaintiffs seek to differentiate both *Bruen* and *Antonyuk*, arguing that both condone waiting periods for the limited purpose of "ascertaining whether the prospective weapon carrier is a 'law-abiding, responsible citizen.'" ECF No. 42 at 48 (quoting *Heller*, 554 U.S. at 635). They argue that the Vermont law, on the other hand, delays acquisition of firearms without serving any "governmental function."[28] *Id.* But neither *Bruen* nor

_____

[28] This is the type of "judge-empowering 'interest balancing inquiry' that 'asks whether the statute burdens a protected interest in a way or to an extent that is out of proportion to the statue's salutary effects upon other governmental interests'" that the Supreme Court declared unconstitutional in *Bruen*. 597 U.S. at 23 (citing *Heller*, 554 U.S. at 634); *see also* ECF No. 42 at 50 (reminding the Court that it may not consider "public policy arguments"). This Court is not tasked with evaluating whether Vermont's waiting period law is a good fit for its intended purpose of preventing impulsive violence. However, if it were to undertake this inquiry, the Court would find that the State's waiting period does facilitate review for whether the purchaser is law-abiding. The statute imposes a 72-hour waiting period on firearm acquisition after the dealer is provided with a unique identification number by the National Instant Criminal Background Check System (NICS). Regardless of whether the transfer has been approved, the statute allows the transaction to proceed no more than seven days after the dealer

*Antonyuk* focused on governmental function. *Bruen* disavowed of regulatory discretion and condoned short waiting periods for objective determinations. *See Bruen*, 597 U.S. at 38 n.9. And as mentioned above, *Antonyuk* disapproved of the Fourth Circuit's decision in *Maryland Shall Issue, Inc. v. Moore*, which struck down a Maryland law requiring a wait of "up to thirty days for approval" for a "handgun qualification license." 86 F.4th at 1040. The Fourth Circuit's decision in that case focused on the fact that the licensing process "can take thirty days," not on the rationale underlying that delay period. *Id.* at 1045. The Second Circuit's disagreement with that decision serves as further persuasive authority supporting the constitutionality of short, non-discretionary waiting periods.

Plaintiffs specifically argue that the waiting period infringes on their ability to "possess and carry weapons in case of confrontation." ECF No. 2-1 at 19. They state that because the law requires gun sellers to wait 72 hours after the seller is provided with a background check identification number to complete the sale, buyers cannot immediately acquire firearms if they need them for self-defense. ECF No. 42 at 49. The Court

---

"contacted NICS to initiate the background check." 13 V.S.A. § 4019a(a). The statute can be understood as imposing a backstop, preventing rapid acquisition of a gun without NICS approval, along with a short waiting period even if NICS approval happens quickly.

disagrees that Plaintiffs have an absolute, unfettered right to immediately acquire firearms for self-defense based on the Supreme Court's guidance in *Bruen*, which – as noted above – expressed approval for shall-issue licensing regimes which inevitably include some delay. *See Bruen*, 597 U.S. at 38 n.9 (approving of licensing regimes which contain "narrow, objective and definite standards" guiding licensing officials) (quoting *Shuttlesworth*, 394 U.S. at 151 (1969)). Indeed, Vermont's law is perhaps the best version of a shall-issue licensing regime post-*Bruen* because it imposes *no* administrative discretion. Further, Vermont's law does not impede Plaintiffs' abilities to "possess and carry weapons in case of confrontation," *Heller*, 554 U.S. at 592, because they can bear weapons in their possession without limitation.[29]

   b. This nation's history and tradition of gun regulation justifies Vermont's waiting period.

     As with the LCM regulation, Plaintiffs have failed to carry their burden on step one of the *Bruen* test, and their likelihood of success on the merits is accordingly low. Again, though, the Court will proceed to the history and tradition inquiry for

---

[29] The State and Amici also argue that there is no historical right to "immediate acquisition of a firearm without any delay." ECF No. 24 at 32 (citing *Rocky Mountain Gun Owners*, 2023 WL 8446495, at *8–9); ECF No. 28 at 18. This argument is better considered under the "history and tradition" prong.

purposes of analytical thoroughness. Here, the question is whether the waiting period "is consistent with the Nation's historical tradition of firearm regulation." *Bruen*, 597 U.S. at 10.

Plaintiffs argue that there is no tradition of firearm regulation that supports delaying acquisition of firearms. ECF No. 2-1 at 19. They note that permit-to-purchase schemes, which effectively impose waiting periods, are creatures of the twentieth century. *Id.* at 21. The State does not contest this history, but contends that immediate availability of firearms is a modern development that requires modern regulation. *See generally* ECF No. 24 at 32-39. As explained below, the Court agrees; and due to this substantial evolution in firearm availability, it must undertake a "nuanced approach" to the historical analysis, asking "how and why the regulation[] burden[s] a law-abiding citizen's right to armed self-defense." *Bruen*, 597 U.S. at 29.

   *i. How*

First, the Court will assess how Vermont's waiting period burdens the right of law-abiding citizens to "possess and carry weapons in case of confrontation." *Heller*, 554 U.S. at 592. As a threshold matter, as noted above, the law's burden on the right is relatively small because the law does not prohibit individuals from purchasing and keeping firearms for the

unlikely event that they need to bear them in self-defense. *See, e.g.*, ECF No. 59 at 40 (Plaintiffs' witness stating "I already have lethal means."). Additionally, background checks required under federal law can take up to seven days, so the marginal added burden imposed by Vermont's law is small. *Id.* at 51-52. While Vermont's waiting period may require individuals to wait up to three days when they otherwise would be approved rapidly under the NICS system, there is no guarantee that NICS will instantaneously approve any individual buyer – meaning that any purchaser could find him or herself waiting longer than the time required by Vermont's waiting period.

Vermont analogizes its regulation to ostensibly comparable historical statutes that restrict the carry or use of firearms by intoxicated people, as well as the distribution of alcohol in settings "where firearms were present." ECF No. 24 at 35. The State cites a 1655 Virginia statute making it illegal to "shoot guns at drinking," with an exception for "marriages and funerals," i*d.* (quoting 1655 Va. Acts 401, Acts of March 10, 1655, Act XII), and a similar Pennsylvania law which imposed fines on innkeepers that sold alcoholic beverages to "any such persons so assembled on pretense of . . . shooting matches." *Id.* (quoting 1750 Pa. Laws 208, An Act For The More Effectual Preventing Accidents Which May Happen By Fire, And For Suppressing Idleness, Drunkenness, And Other Debaucheries, §

II). Spitzer's declaration attests that "[f]rom the 1600s through the early 1900s, at least 30 states regulated, restricted, and punished inebriation in connection with the ownership or use of weapons. These regulations included at least 20 states that criminalized the carrying or use of firearms when intoxicated." *See* ECF No. 24-10 at 71; *see also Rocky Mountain Gun Owners v. Polis*, No. 23-CV-02563-JLK, 2023 WL 8446495, at *17-*18 (D. Colo. Nov. 13, 2023) (listing the relevant states and their laws in greater detail). The State submits that these restrictions are comparable because – like the Vermont statute – "they imposed temporary intervals during which a person was not allowed to use or carry a firearm." ECF No. 24 at 37.

These restrictions on firearm use associated with alcohol are an apt historical analogue for Vermont's waiting period. In both cases, the relevant legislature identifies a period during which it believes that firearms pose an extreme risk to public safety. It then mandates that individuals refrain from carrying or using firearms until those people can exercise their Second Amendment rights safely and effectively. Vermont's statute operates in a manner that finds precedence in our nation's history and tradition of gun regulation.

Plaintiffs respond that the alcohol-related restrictions are insufficiently related because they "disarmed the populace[30] only while intoxicated or while at a tavern," ECF No. 42 at 50, making it so that an individual could avoid the restriction – and thereby maintain his right to use a firearm – by avoiding alcohol. Plaintiffs argue that there is no way to opt-out of Vermont's restriction. This conclusion is not quite right: the easiest way to "opt out" of the waiting period is to purchase a firearm before the instant in which it is needed. Like alcohol restrictions which disarmed the populace "only while intoxicated or while at a tavern," the waiting period restricts the right to purchase a firearm only while purchasers are potentially primed to make impulsive decisions. This is a minimal inhibition on the right to armed self-defense.

Relatedly, Plaintiffs argue that intoxication law ensured that people carrying firearms were unimpaired, which Vermont's law does not do. ECF No. 42 at 47. This is not true; like past intoxication-related laws, the waiting period works to ensure that individuals in temporarily impulsive states will not make reckless decisions with a firearm. The only difference between

---

[30] Notably, the waiting period does not "disarm the populace" because it does not impact an individual's right to use a previously-purchased firearm. In this sense, the intoxication laws are *more* restrictive than Vermont's waiting period because they eliminated an individual's right to use *any* firearm.

the two laws is the reason why the individual might make a reckless decision: one based upon alcohol, and one based upon inflamed passions or fears.

The State's second proposed historical analogue comes in the form of weapons licensing laws. ECF No. 24 at 37. As noted above, the *Bruen* Court condoned shall-issue licensing regimes. *Bruen*, 597 U.S. at 38 n.9. It explained that under those frameworks, citizens seeking to exercise their right to self-defense can receive firearm permits after undergoing a "background check or firearms safety course." *Id.* Because the Supreme Court has already expressed that these restrictions – which, by their nature, impose a modest waiting period on the acquisition of firearms for self-defense – satisfy Second Amendment scrutiny, the Court need not thoroughly detail the history of these regulations.[31] It concludes that the "how" of those regulations also matches the "how" of Vermont's waiting period. Both allow for background checks and mandate delay so the government can ensure that the individuals acquiring firearms are, in fact, law-abiding and responsible citizens.

------

[31] Spitzer's declaration provides a thorough history of historical weapons licensing laws. *See* ECF No. 24-10 at 78-92. Amici similarly submit that colonial governments "substantially controlled" commercial firearms transactions. ECF No. 28 at 20 (quoting *Teixeira v. Cnty. Of Alameda*, 873 F.3d 670, 685 (9th Cir. 2017)).

*ii.  Why*

At the "why" stage of the analysis the Court makes two findings. First, it finds that the specific problem addressed by Vermont's law – immediate acquisition of highly lethal firearms – was not present at the founding. Second, it concludes that the rationale underlying Vermont's law nonetheless maps onto the reasoning behind comparable historical regulations.

First, the State and Amici argue that an historical understanding of the Second Amendment does not include a right to acquire a firearm immediately. ECF No. 24 at 32. They note that "[w]aiting for delivery of goods, including firearms, was an accepted part of American life in the 18th and 19th century," and cite literature explaining how long travel took during the founding era. ECF No. 28 at 18-19. They also contend that the founders would not have expected "instant, widespread availability" of a large menu of firearms. ECF No. 28 at 19 (quoting *Rocky Mountain Gun Owners*, 2023 WL 8446495, at *8).

The Court agrees. There is substantial evidence in the record highlighting that instant availability of a wide variety of guns would not have been anticipated at the founding. The State cites expert declarations from professors Roth, Spitzer, and Donohue to this effect. ECF No. 24 at 34-35. Roth and Spitzer emphasize that rash and impulsive decisions to buy firearms and shoot others or the self were not a problem at the

founding for two reasons: first, because guns were infrequently
used for violence (and when they were, the muzzle-loading nature
of the weapons made it difficult to use them impulsively), ECF
No. 24 at 34; and second, because there were no "Guns-R-Us"
outlets in early American history. ECF No. 24 at 33-35 (quoting
*Rocky Mountain Gun Owners*, 2023 WL 8446495, at *9). In
particular, Spitzer's declaration explains that rapid,
convenient gun-sale processes were not available until the end
of the nineteenth century. ECF No. 24-10 at 66.

This leads to several subsequent points. First, it
undergirds the Court's above conclusion that the rapid
availability of guns presents an "unprecedented social concern"
that requires a "more nuanced approach" to historical analogy.
*Bruen*, 597 U.S. at 28. The Vermont legislature seeks to address
a problem that the founders could not anticipate; accordingly,
this Court must use analogous history – such as that of
intoxication laws and licensing regimes – to "guide [its]
consideration of modern regulations that were unimaginable at
the founding." *Id.*

Plaintiffs urge that consideration of the relative
availability of firearms at the founding versus today is
inappropriate because "there is no law to analyze." ECF No. 42
at 51. This argument is analytically off-target. The point is
not to directly analogize Vermont's regulation to founding-era

factual circumstances or argue that the regulation is acceptable because it regresses our country's system of firearm regulation to that present at the founding. Instead, the State's (and, indeed, the Legislature's) point is that there are features of the modern gun market that are substantially novel. Vermont must be able to respond accordingly.

Modern technology has facilitated speedy and unprecedented exercise of many constitutional rights, including (for instance) instantaneous distribution of protected speech on the internet. ECF No. 42 at 51. Plaintiffs suggest that the novel rapidity of speech publication does not justify waiting periods on Facebook posts, so the comparable modern rapidity of firearm acquisition should not justify waiting periods in this case. But this Court's mandate – to consider the country's history of gun regulation – does not require it to find a modern law to be an exact replica of a founding-era statute in order for that regulation to be constitutional. See Rahimi, 602 U.S. at 7 (clarifying that the Court's precedents "were not meant to suggest a law trapped in amber. . . . [T]he Second Amendment permits more than just those regulations identical to ones that could be found in 1791."). Technological changes warrant regulatory innovations, just like (to borrow Plaintiffs' example) ease of access to the internet may require regulation unimaginable at the founding, such as mandating that certain

websites verify the age of their viewers or provide certain health warnings. *Cf. Free Speech Coal., Inc. v. Paxton*, 95 F.4th 263, 268 (5th Cir. 2024).

Finally, as noted above, the rationale for Vermont's law is to prevent impulsive violence to the self and to the community. Plaintiffs state that suicide and community violence "have been around since the beginning of humanity," so Vermont's law does not address a novel problem and is therefore an unconstitutional legislative innovation. *Id.* at 22. Plaintiffs are right that violence is an age-old problem. But disarming individuals when they are primed to make potentially unsafe decisions is an age-old solution. As the Court also noted above, intoxication laws and licensing restrictions historically limited the right to self-defense in circumstances in which citizens might take illegal or unsafe actions.

Evidence submitted to the Court requires the conclusion that Vermont's law does the same. Amici cite a study indicating that "waiting period laws may reduce firearm suicide rates by 7-11" percent. ECF No. 28 at 23-24 (citing Michael Luca et al., *Handgun Waiting Periods Reduce Gun Deaths*, 114 PROCEEDINGS OF THE NATIONAL ACADEMY OF SCIENCES no. 46, 12162–12165 (2017). That same study concluded that waiting periods reduce gun suicides but have no impact on non-gun suicides. ECF No. 24-6 at 49. Another study – cited by the Vermont legislature in support of this

measure – found that waiting periods may reduce "gun homicides
by roughly 17 percent." ECF No. 28 at 24 (citing 2023 Vt. Acts
& Resolves No. 45, General Assembly findings). Several
additional pieces of academic research have reached the same
conclusion. *Id.* at 50. Professor Donohue's own research
estimates that "waiting period laws reduce suicides by 21-34
year-olds by 6.1 percent." ECF No. 24-6 at 49-50. Amici further
support this point, adding psychological literature suggesting
that many suicide attempts are impulsive, singular acts. ECF No.
28 at 23. Plaintiffs have submitted no empirical evidence
speaking to the impact of waiting periods on impulsive firearm
use.[32]

The Court concludes that modern developments impacting
firearm acquisition render Vermont's waiting period law, 13
V.S.A. § 4019a, a novel solution to a novel problem. The Court
also concludes, however, that the principle underlying the law –
that individuals who might be likely to make rash decisions with
a firearm should be disarmed – has precedent in this country's
history of firearm regulation. *See Rocky Mountain Gun Owners,*
2023 WL 8446495, at *18 ([T]he Waiting-Period Act and the
intoxication laws both work to prevent individuals in a

---

[32] This is not a "means-end" analysis; it is simply an assessment
of whether the State's method of regulation saves lives in the
same way as the relevant historical analogue.

temporary impulsive state from irresponsibly using a firearm.”).
Accordingly, Plaintiffs are unlikely to succeed on the merits of
their challenge to Vermont's waiting period law.

**B. Irreparable Harm**

Because Plaintiffs are unlikely to succeed on the merits,
they are also unlikely to suffer irreparable harm from violation
of their constitutional rights. *French*, 985 F.3d 165 at 176 (in
constitutional cases, likelihood of success is a harbinger for
irreparable harm). Several courts evaluating similar issues have
held that if a plaintiff is unlikely to succeed on the merits,
the rest of the preliminary injunction analysis is unnecessary.
*Lamont*, 685 F. Supp. 3d at 113 (“Plaintiffs have failed to show
their likelihood of success on the merits, and so the Court need
not reach the remaining preliminary injunction factors.”);
*Capen*, 2023 WL 8851005, at *20. However, individual plaintiffs
also assert specific harms, and the Court will proceed to
address those.

Plaintiffs state that the waiting period “may force
[Plaintiff Dame] to buy a firearm before a threat has arisen so
he can ensure his ability to defend himself and his family
against an immediate threat,” which comes with harms such as
“unnecessary purchase” and the cost associated with “the need to
responsibly store the firearms in a house with young children.”
ECF No. 2-1 at 23 (citing 13 V.S.A. § 4024). First, this harm is

speculative – Dame does not state with certainty that he wishes to buy a firearm for self-defense. *City of Los Angeles v. Lyons*, 461 U.S. 95, 111 (1983) (showing of irreparable injury "cannot be met where there is no showing of any real or immediate threat that the plaintiff will be wronged.").

Further, Dame may purchase a firearm whenever he wants, to later use in self-defense. Costs associated with safe-storage laws do not constitute irreparable harm for two reasons. First, these minor financial costs are clearly reparable. Second, compliance with legitimate regulatory standards (such as protecting children from loose firearms) is part of responsible gun ownership and is not traceable to the challenged statute.

Plaintiffs next argue that Plaintiff Thompson can no longer buy firearms in their "most popular and common configuration, cannot purchase replacements for her grandfathered magazines, and must wait at least 72 hours before obtaining new firearms." ECF No. 2-1 at 24. This also does not state a claim for irreparable harm. The law does not ban repairing grandfathered magazines, and Thompson may continue to possess LCMs that she had prior to the statute's effective date. Thompson also does not state why she is harmed by the 72-hour waiting period, especially given that she already owns several firearms.

The for-profit plaintiffs state that they are prevented from selling some of the most common firearms in America, and

are accordingly forced to forego sales. First, they have not
stated with specificity how much business they will lose due to
the LCM ban. Further, as the State notes, monetary harm
generally does not constitute irreparable harm. ECF No. 24 at 41
(citing *Ocean State Tactical*, 646 F. Supp. 3d at 400). VFSC also
asserts that it will lose revenue when it can no longer offer
firearms to winners of raffles at gun shows. ECF No. 2-1 at 24.
It states that this restriction will reduce the incentive for
individuals to attend the gun shows. But Plaintiffs have
presented no evidence on this point. While they may, at trial,
show that their inability to raffle will substantially impact
their business, the conclusory nature of this assertion is
difficult to credit at this stage of the litigation.

Finally, pursuant to the evidence described above, the
Court concludes that Plaintiffs' right to engage in self-defense
is not burdened by the LCM regulation. They are still capable of
using firearms and 10- or 15-round magazines in self-defense,
which is empirically adequate.

C. **Balance of Equities and Public Interest**

The Second Circuit has explained that when the government
is a party to the suit, the "balance of the equities" and
"public interest" factors of the preliminary injunction analysis
merge. *New York v. United States Dep't of Homeland Sec.*, 969

F.3d 42, 59 (2d Cir. 2020) (citing *Nken v. Holder*, 556 U.S. 418, 435 (2009)).

Plaintiffs argue that the public interest is best served by injunction of unconstitutional laws. For the reasons outlined above, Plaintiffs are unlikely to succeed on the merits, and this argument therefore holds little weight. Additionally, the Supreme Court has noted that "[a]ny time a State is enjoined by a court from effectuating statutes enacted by representatives of its people, it suffers a form of irreparable injury." *Maryland v. King*, 567 U.S. 1301, 1303 (2012).

The State will be harmed by injunction of the two statutes. It has a legitimate interest in (1) preventing mass shootings, which motivated the LCM ban, and (2) reducing impulse-based violence both to the self and to others. *Rocky Mountain Gun Owners*, 2023 WL 8446495, at *22 (considering "statistically rigorous studies" on the effect of waiting periods and concluding that "saving approximately one hundred people in Colorado this year outweighs the aggregate harm of minimal expenditures of time and sacrificed business opportunities.").

For the reasons outlined above, the harm to plaintiffs (including, most importantly, the burden on their rights to self-defense) is minimal.[33] The State's interest in enforcing the

---

[33] Plaintiffs state that this analysis constitutes "forbidden interest balancing." ECF No. 42 at 53. This is difficult to

laws is substantial. The balance of equities and public interest favors the State.

**CONCLUSION**

For the foregoing reasons, Plaintiffs' motion for a preliminary injunction (ECF No. 2) against enforcement of Vermont's LCM ban, 13 V.S.A. § 4021, and waiting period, 13 V.S.A. § 4019a, is **denied**. Plaintiffs have failed to show a likelihood of success on the merits with regard to LCMs because those magazines are not in common use for self-defense. But regardless of whether LCMs are in common use for self-defense, the State's restriction is justified by the nation's history of regulating mass threats to public safety. Plaintiffs are also unlikely to succeed on the merits of their challenge to the waiting period because the plain text of the Second Amendment does not protect a right to immediately acquire a firearm. Additionally, the State's law imposes a reasonable commercial restriction on firearm sales to ensure that gun purchasers use the firearms for law-abiding purposes, an approach deemed acceptable by the Supreme Court. Finally, Plaintiffs have not demonstrated that they will be irreparably harmed by enforcement

---

square with the Court's explicit mandate to consider the "balance of the equities" and the "public interest." *Winter*, 555 U.S. at 24. Interest balancing may be forbidden when considering the merits of Plaintiffs' Second Amendment claim, but it is required at this stage of the preliminary injunction analysis.

of the law, or that the balance of equities or public interest favors an injunction.

Plaintiffs' renewed *Daubert* motion as to Professor Spitzer's testimony (ECF No. 30) is also **denied**.

DATED at Burlington, in the District of Vermont, this 18th day of July, 2024.

/s/ William K. Sessions III
Hon. William K. Sessions III
U.S. District Court Judge
