# 24-2026

## UNITED STATES COURT OF APPEALS
## FOR THE SECOND CIRCUIT

VERMONT FEDERATION OF SPORTSMEN'S CLUBS, INC., JPC, INC., dba BLACK DOG
SHOOTING SUPPLIES, PAUL DAME, MARSHA J. THOMPSON,

*Plaintiffs-Appellants*,

v.

MATTHEW BIRMINGHAM, Director of the Vermont State Police,
in his official and personal capacities, CHARITY CLARK, Attorney General of the
State of Vermont, in her official and personal capacities, SARAH GEORGE, State's
Attorney for Chittenden County, in her official and personal capacities,

*Defendants-Appellees*.

On Appeal from the United States District Court for the
District of Vermont, No. 2:23-cv-00710-wks

## BRIEF FOR *AMICUS CURIAE*
## NATIONAL SHOOTING SPORTS FOUNDATION, INC.,
## IN SUPPORT OF PLAINTIFFS-APPELLANTS

ERIN E. MURPHY
  *Counsel of Record*
MATHEW D. ROWEN
BARRETT L. ANDERSON
CLEMENT & MURPHY, PLLC
706 Duke Street
Alexandria, VA 22314
(202) 742-8900
erin.murphy@clementmurphy.com

*Counsel for* Amicus Curiae *National
Shooting Sports Foundation, Inc.*

November 17, 2025

**CORPORATE DISCLOSURE STATEMENT**

Pursuant to Federal Rule of Appellate Procedure 26.1(a), *amicus curiae* National Shooting Sports Foundation, Inc., certifies that has no parent corporation and no publicly held company owns ten percent or more of its stock.

## TABLE OF CONTENTS

CORPORATE DISCLOSURE STATEMENT ......................................... i

TABLE OF AUTHORITIES...................................................... iii

STATEMENT OF INTEREST.................................................... 1

INTRODUCTION .............................................................. 2

BACKGROUND ............................................................... 5

ARGUMENT ................................................................. 7

I.    Section 4019a Regulates Conduct That The Second Amendment
      Presumptively Covers ................................................. 8

      A.    Section 4019a Impedes Plaintiffs' Ability to Keep and Bear
            Arms ........................................................... 8

      B.    Section 4019a Is Not "Presumptively Lawful," but Any Such
            Presumption Would Be Rebutted in All Events ................... 13

II.   Section 4019a Is Inconsistent With This Nation's Historical
      Tradition of Firearm Regulation .................................... 18

CONCLUSION ............................................................... 25

CERTIFICATE OF COMPLIANCE

CERTIFICATE OF SERVICE

# TABLE OF AUTHORITIES

## Cases

*Andrews v. State*,
  50 Tenn. 165 (1871) ............................................................12

*Antonyuk v. James*,
  120 F.4th 941 (2d Cir. 2024) .............................. 7, 8, 10, 15

*Antonyuk v. James*,
  144 S.Ct. 2709 (2024) .......................................................15

*Beckwith v. Frey*,
  766 F.Supp.3d 123 (D. Me. 2025) ........................... 3, 12, 14

*District of Columbia v. Heller*,
  554 U.S. 570 (2008) ..................................................9, 10, 20

*Gazzola v. Hochul*,
  88 F.4th 186 (2d Cir. 2023) ..............................................16

*McDonald v. City of Chicago*,
  561 U.S. 742 (2010) ....................................................11, 17

*N.Y. State Firearms Ass'n v. James*,
  --- F.4th ----, 2025 WL 2921746 (2d Cir. Oct. 15, 2025) ............................ 12, 13

*N.Y. State Rifle & Pistol Ass'n, Inc. v. Bruen*,
  597 U.S. 1 (2022) ..................................................... *passim*

*Nguyen v. Bonta*,
  140 F.4th 1237 (9th Cir. 2025) .........................................13

*Ortega v. Grisham*,
  148 F.4th 1134 (10th Cir. 2025) ................................. *passim*

*Reese v. ATF*,
  127 F.4th 583 (5th Cir. 2025) ...........................................12

*Rocky Mt. Gun Owners v. Polis*,
  701 F.Supp.3d 1121 (D. Colo. 2023) ........................... 19, 20

*Silvester v. Harris*,
41 F.Supp.3d 927 (E.D. Cal. 2014) .................................................19

*Silvester v. Harris*,
843 F.3d 816 (9th Cir. 2016)...........................................................19

*United States v. Daniels*,
101 F.4th 770 (10th Cir. 2024)........................................ 17, 21, 24

*United States v. Knipp*,
138 F.4th 429 (6th Cir. 2025)..........................................................12

*United States v. Perez-Garcia*,
96 F.4th 1166 (9th Cir. 2024) ..........................................................10

*United States v. Rahimi*,
602 U.S. 680 (2024) ................................................... *passim*

*United States v. Vereen*,
152 F.4th 89 (2d Cir. 2025) ........................................... 10, 12

*Vt. Fed'n of Sportsmen's Clubs v. Birmingham*,
741 F.Supp.3d 172 (D.Vt. 2024) ................................... *passim*

*Zherka v. Bondi*,
140 F.4th 68 (2d Cir. 2025) .............................................................23

## Constitutional Provisions

U.S. Const. amend. II ........................................................... 8, 10

## Statutes

13 V.S.A. §4017(d)(1) ......................................................................10

13 V.S.A. §4019a(a) ........................................................................7, 9

13 V.S.A. §4019a(d)..........................................................................10

## Other Authorities

Black's Law Dictionary (12th ed. 2024)...........................................14

Everytown for Gun Safety, *Which states require a waiting period before gun purchases?* (last updated Jan. 15, 2025), https://tinyurl.com/6zpcnpkr ...................................................................6

David B. Kopel, *Background Checks for Firearms Sales and Loans: Law, History, and Policy*, 53 Harv. J. Legis. 303 (2016)..................................... 6

NSSF, *FixNICS*, https://fixnics.org/ (last visited Nov. 14, 2025) ............................2

Oxford English Dictionary (3d ed. 2015) ..............................................................10

U.S. Dep't of Just., *Identifying Persons, Other Than Felons, Ineligible to Purchase Firearms* (May 1990), https://tinyurl.com/2s3tpz8x .......................6

U.S. Dep't of Just., *NICS 2023 Operational Report*, https://tinyurl.com/587ke5h9 .................................................................................6

## STATEMENT OF INTEREST[1]

The National Shooting Sports Foundation, Inc. ("NSSF") is the trade association of the firearm, ammunition, hunting, and shooting-sports industries. NSSF has approximately 10,000 members, including federally licensed manufacturers, distributors, and retailers of firearm and ammunition; manufacturers, distributors, and retailers of numerous other products for the hunting, shooting, and self-defense markets; public and private shooting ranges; gun clubs; sportsmen's organizations; and endemic media. To further its mission to promote, protect, and preserve America's shooting sports and hunting tradition, NSSF often submits amicus briefs in cases involving laws implicating Second Amendment freedoms. The law at issue here amply fits the bill: 13 V.S.A. §4019a prohibits Vermonters from purchasing a firearm without first "cooling off" for 72 hours, even if they pass a background check instantly establishing that they are law-abiding citizens exercising their Second Amendment rights.

To be clear, NSSF and its members enthusiastically support the goal of identifying and stopping firearm purchases by criminals and others prohibited by law from possessing firearms. For well over a decade, NSSF has supported more efficient background checks through its "FixNICS" campaign encouraging states to

---

[1] No party's counsel authored any part of this brief, and no one other than amicus contributed to its preparation or submission. All parties have consented to this filing.

report all records to the National Instant Criminal Background Check System ("NICS") that establish someone is prohibited from owning a firearm under current law. *See* NSSF, *FixNICS*, https://fixnics.org/ (last visited Nov. 14, 2025). But NSSF and its members also have a vested interest in protecting the Second Amendment rights of law-abiding citizens, and in ensuring sound development of the historical approach to the Second Amendment announced in *New York State Rifle & Pistol Association, Inc. v. Bruen*, 597 U.S. 1 (2022). And the decision below cannot be squared with that precedent.

## INTRODUCTION

In most of the country, once a law-abiding citizen passes a background check and confirms that she may lawfully possess a firearm, she can take possession and begin exercising her fundamental constitutional right to keep and bear arms without delay. That is no small matter. When it comes to defending oneself and one's loved ones, time is often of the essence. Yet Vermont now mandates a 72-hour "cooling-off period" on nearly all firearm sales. It makes no difference why a Vermonter seeks to buy a firearm or if she has a concealed carry permit or a hunting license. It does not even matter if she faces an imminent threat and needs a firearm for self-defense. Everyone must wait at least three days *after* passing a background check before they can take possession of a new firearm, on the theory that even people who have proven themselves law-abiding are likely to have "inflamed passions or fears" that

2

need to "cool" before they can be entrusted with the exercise of a fundamental constitutional right. As the Tenth Circuit recently held vis-à-vis New Mexico's similar law, nothing in our Nation's tradition supports that kind of unadorned "cooling-off" measure, which is at odds with the very premise of the Second Amendment: that the people *can* be trusted to keep and bear arms unless and until there is a reason to think otherwise for a particular individual. *Ortega v. Grisham*, 148 F.4th 1134 (10th Cir. 2025); *see also, e.g.*, *Beckwith v. Frey*, 766 F.Supp.3d 123, 131 (D. Me. 2025) (preliminarily enjoining Maine's 72-hour "cooling-off" law).

To be sure, "our Nation's tradition of firearm regulation" recognizes that the government may keep firearms out of the hands of "citizens who have been found to pose a credible threat to the physical safety of others." *United States v. Rahimi*, 602 U.S. 680, 700 (2024). That is why laws "designed to ensure only that those bearing arms in the jurisdiction are, in fact, 'law abiding, responsible citizens'" typically will pass muster. *Bruen*, 597 U.S. at 38 n.9. But our Nation's tradition has never endorsed efforts to "broadly restrict arms use by the public generally." *Rahimi*, 602 U.S. at 698. And §4019a falls decidedly in that latter camp. Making nearly everyone "cool off" before they can use firearms is a classic "broad[] restrict[ion] [on] arms use by the public generally," *id.*, without analogue in our Nation's historical tradition. A law that requires nearly everyone to "cool off" for days, even after they have passed a background check, before they can keep or carry a firearm,

is instead the very model of an unconstitutional effort to "deny ordinary citizens" the fundamental right the Second Amendment secures. *Bruen*, 597 U.S. at 38 n.9.

The district court badly misunderstood all of this, holding that §4019a does not implicate the Second Amendment's plain text and, even if it did, states' historical regulation of firearm possession by intoxicated individuals and licensing regimes showed a historical tradition of temporarily restraining citizens from obtaining weapons. That was plain wrong. Section 4019a self-evidently regulates conduct covered by the Second Amendment's plain text: Vermont does not (and could not) deny that §4019a temporarily bans keeping, bearing, and carrying activity that would otherwise occur but for its proscription. That is why courts across the country have held that such "cooling off" laws implicate the Second Amendment's text. And the state's meager and irrelevant historical evidence confirms that §4019a is far out of step with the tradition *Rahimi* recognized but Vermont and the district court pointedly ignored.

Section 4019a also has little to recommend it. For individuals facing credible threats, §4019a eliminates any real possibility of defending themselves and their loved ones. The district court's only "response" to that reality was to deny it by claiming that individuals should just buy their guns before the need arises. That response is contrary to the record evidence, which shows that the first few days are the most critical for someone facing a credible threat of violence from an intimate

partner. Allowing §4019a to continue in effect would deny victims facing imminent threats a critical measure of safety precisely when they need it most.

If Vermont enacted a 72-hour "cooling-off period" on inflammatory speech, this Court would doubtless enter a preliminary injunction on First Amendment grounds. There is simply no reason to tolerate a 72-hour "cooling-off period" in the Second Amendment context. In short, the district court abused its discretion by misapplying governing Supreme Court precedent. This Court should reverse.

## BACKGROUND

Since the Founding, states have limited firearm access for those thought to be predisposed to violence. Sometimes, these laws were rooted in an individualized assessment of whether someone had engaged or threatened to engage in violent or other dangerous conduct; other times, they were rooted in virulent racism or other class-based prejudices. But what ties these laws together is that they at least endeavored to distinguish (1) individuals determined (either on a class basis or via past misconduct) to "pose a credible threat to the physical safety of others" if armed from (2) everyone who wants a firearm. *Rahimi*, 602 U.S. at 700. The Supreme Court has been explicit about this: Laws "distinguish[ing] citizens who have been found to pose a credible threat to the physical safety of others from those who have not" are consistent with "our Nation's tradition of firearm regulation," but laws "broadly restrict[ing] arms use by the public generally" are not. *Id.* at 698, 700.

Cooling-off laws fall decidedly in the latter camp. The most that can be said of them from a historical perspective is that they are vestiges of waiting-period laws, which began to emerge in the 1920s and 1930s alongside early background-check laws. Because it took much longer in that era to run a background check, waiting periods were a necessary concomitant guaranteeing time for sellers to forward the purchaser's information to law enforcement and for law enforcement to conduct a rudimentary background check. *See* David B. Kopel, *Background Checks for Firearms Sales and Loans: Law, History, and Policy*, 53 Harv. J. Legis. 303, 309 (2016). Waiting periods continued to fulfill that role of identifying potentially dangerous individuals in other states (though never a majority) throughout the pre-Internet era. But with the advent of instant background-check technology, many states with waiting-period laws acknowledged that they no longer served their individualized-investigation purpose. *See* U.S. Dep't of Just., *NICS 2023 Operational Report* 6, https://tinyurl.com/587ke5h9 (over 90% of background checks are resolved within minutes). So, starting in the 1990s, many states abandoned waiting periods as they adopted instant background-check requirements.[2]

---

[2] At least 14 states that used to have waiting periods have abandoned them since NICS came online. *Compare* U.S. Dep't of Just., *Identifying Persons, Other Than Felons, Ineligible to Purchase Firearms* 23, 107 (May 1990), https://tinyurl.com/2s3tpz8x, *with* Everytown for Gun Safety, *Which states require a waiting period before gun purchases?* (last updated Jan. 15, 2025), https://tinyurl.com/6zpcnpkr.

Recently, however, Vermont went in the opposite direction, imposing an across-the-board 72-hour "cooling-off" period between when someone agrees to purchase a firearm and when she can keep and bear it. 13 V.S.A. §4019a(a). Under §4019a, a seller "shall not transfer a firearm to another person until 72 hours after" the NICS check "or seven business days have elapsed since the dealer contacted NICS to initiate the background check, whichever occurs first." *Id.*

## ARGUMENT

As this Court recognized in *Antonyuk v. James*, 120 F.4th 941 (2d Cir. 2024), the Supreme Court's recent Second Amendment cases obligate lower courts to follow a "framework" that eschews means-ends balancing and instead focuses on "text" and "history." *Id.* at 964. First, "a court must … consider whether 'the Second Amendment's plain text covers an individual's conduct,'" "interpreting the plain text of the Amendment as historically understood." *Id.* at 964, 968 (quoting *Bruen*, 597 U.S. at 24). "If so," then "[t]he government must … justify its regulation by demonstrating that it is consistent with the Nation's historical tradition of firearm regulation." *Id.* at 964. The answer to the first question here is plainly yes. And the answer to the second question here is a resounding no. This Court should reverse.

7

I.     **Section 4019a Regulates Conduct That The Second Amendment Presumptively Covers.**

    A.     **Section 4019a Impedes Plaintiffs' Ability to Keep and Bear Arms.**

The first question under *Bruen* and *Rahimi* is whether "the Second Amendment's plain text"—securing "the right of the people to keep and bear Arms," U.S. Const. amend. II—"covers an individual's conduct." *Bruen*, 597 U.S. at 24. If it does, then the state must "justify its regulation" of that conduct by showing it "is 'relevantly similar' to laws that our tradition is understood to permit." *Rahimi*, 602 U.S. at 691-92 (quoting *Bruen*, 597 U.S. at 24, 29). Section 4019a plainly restricts conduct covered by the Second Amendment's plain text: It prevents everyone in the state from taking possession of—and thus "keep[ing] and "bear[ing]"—a firearm for 72 hours minimum, even if they pass a background check instantly (as Plaintiffs did).

This Court's caselaw confirms the point. In *Antonyuk*, the Court held that *Bruen* and *Rahimi*'s "threshold inquiry" turns on "three issues": (1) "whether the affected individuals are 'ordinary, law-abiding, adult citizens' and thus 'part of "the people" whom the Second Amendment protects'"; (2) "whether the conduct at issue is protected" by the "plain text," i.e., whether the conduct in which a plaintiff wishes to engage involves "keeping" and "bearing" "Arms"; and (3) "whether the weapon concerned is 'in common use.'" 120 F.4th at 981 (quoting *Bruen*, 597 U.S. at 17,

31-32).[3]  If the answer to all three is yes, then the government has "regulate[d] arms-bearing conduct," and it bears the burden to "justify its regulation" by showing that it is consistent with historical tradition.  *Rahimi*, 602 U.S. at 691-92.

Section 4019a plainly restricts rights of "the people":  The statute makes it unlawful for *any* "*person*" *in Vermont* to "transfer a firearm to another person until 72 hours after" receiving an NICS background check or if "seven business days have elapsed since the dealer contacted NICS to initiate the background check, whichever occurs first."  13 V.S.A. §4019a(a) (emphasis added).  Section 4019a also plainly applies to "Arms" as the Second Amendment uses that term, including arms in "common use."  *See Heller*, 554 U.S. at 581, 624.  After all, §4019a applies to *all* "firearm[s]," 13 V.S.A. §4019a(a), which the statute defines broadly to include "any weapon (including a starter gun) that will or is designed to or may readily be

---

[3] NSSF disagrees that common use is a plain-text consideration.  Just as "[n]othing in the Second Amendment's text draws a home/public distinction with respect to the right to keep and bear arms," *Bruen*, 597 U.S. at 32, nothing in the text draws a common/uncommon distinction.  What is more, both *Bruen* and *Heller* explicitly and repeatedly described the common-use rule as intertwined with "the historical tradition of prohibiting the carrying of 'dangerous and unusual weapons.'" *Id.* at 21 (quoting *District of Columbia v. Heller*, 554 U.S. 570, 627 (2008)). Properly understood, common use matters at the historical-tradition stage, where the state must prove that its law is consistent with the dangerous-and-unusual tradition, not when asking the threshold question whether a law restricts the keeping or bearing of "Arms" at all.  In all events, NSSF takes this Court's caselaw as it finds it for purposes of this appeal.

converted to expel a projectile by the action of an explosive," *id.* §4017(d)(1)(A); *see id.* §4019a(d) (incorporating §4017(d) by reference).

The only question at the threshold, then, is "whether the conduct at issue is protected" by the "plain text," *Antonyuk*, 120 F.4th at 981, i.e., whether §4019a restricts Plaintiffs' ability to "keep" and "bear" arms, *see* U.S. Const. amend. II. The answer is plainly yes. "In *Heller*, the Supreme Court explained that 'the most natural reading of "keep Arms" … is to "have weapons,"' and that 'bear arms' means to 'wear, bear, or carry … for the purpose of … 'offensive or defensive action.'" *United States v. Vereen*, 152 F.4th 89, 95 (2d Cir. 2025) (quoting *Heller*, 554 U.S. at 582-83). Plaintiffs ("the people") would like to take possession of firearms ("Arms") so that they may have ("keep") and carry ("bear") them in case of confrontation. Section 4019a restricts their ability to do so. By criminalizing the "transfer [of] a firearm to another person" for at least three days (and as many as seven days), §4019a(a) constrains the buyer's ability to have or carry arms for an arbitrary period of time. *See have*, Oxford English Dictionary (3d ed. 2015) ("to be in possession of (something received, acquired, earned, etc.); to possess"). The plain-text inquiry here is thus quite simple: Because "the challenged condition restricts [Plaintiffs'] ability to bear or keep [a] firearm—even those [they] would lawfully store at home for self-defense—[it] unquestionably implicates [their] Second Amendment rights." *United States v. Perez-Garcia*, 96 F.4th 1166, 1181 (9th Cir. 2024).

The district court nonetheless concluded that because the Second Amendment does not explicitly confer a right to "acquire" or "take possession of" a firearm, state laws that temporarily restrict the people's ability to take possession of arms do not even implicate the Second Amendment. *Vt. Fed'n of Sportsmen's Clubs v. Birmingham* (*VFSC*), 741 F.Supp.3d 172, 208-10 (D.Vt. 2024). That is not an application of Supreme Court precedent so much as a nullification of it. Plaintiffs seek to keep and bear firearms—conduct Vermont could not seriously deny the Amendment's plain text covers. And Vermont has undeniably restricted that conduct by preventing Plaintiffs from taking possession of the firearms they wish to keep and bear for at least three days (and as many as seven). Just as a law that forced people to wait three days before they could attend a church service would plainly restrict conduct the First Amendment's text covers, a restriction on acquiring an arm plainly restricts the ability to keep and bear that arm. Any other conclusion would turn the Second Amendment into "'a second-class right, subject to an entirely different body of rules than the other Bill of Rights guarantees.'" *Bruen*, 597 U.S. at 70 (quoting *McDonald v. City of Chicago*, 561 U.S. 742, 780 (2010) (plurality op.)).

That is why courts across the country have rejected the district court's miserly approach. For instance, in invalidating New Mexico's seven-day "cooling-off" period, the Tenth Circuit recently rejected as "wrong" any argument "that limitations on firearm sales or transfers do not implicate the Second Amendment's plain text."

11

*Ortega*, 148 F.4th at 1144.  That court is not alone in so holding.  *See, e.g.*, *Beckwith*, 766 F.Supp.3d at 131, 136 (preliminarily enjoining Maine's 72-hour "cooling-off" law).  Indeed, the commonsense conclusion that "th[e] right of keeping arms" "necessarily involves the right to purchase and use them" has been a feature of judicial opinions for at least 150 years running.  *Andrews v. State*, 50 Tenn. 165, 178 (1871).  And rightly so, as "[t]he baleful implications of limiting the right at the outset by means of narrowing regulations not implied in the text are obvious; step by step, other limitations on sales could easily displace the right altogether."  *Reese v. ATF*, 127 F.4th 583, 590 (5th Cir. 2025).  In short, "although the Second Amendment's text does not spell out the right to obtain firearms, it nonetheless 'covers' that right," and restrictions on it must be historically justified.  *United States v. Knipp*, 138 F.4th 429, 434 (6th Cir. 2025).

To be sure, this Court has taken the view that "regulations on the means of acquiring … firearms only implicate the text of the Second Amendment if they meaningfully constrain the right to possess and carry arms."  *N.Y. State Firearms Ass'n v. James*, --- F.4th ----, 2025 WL 2921746, at *5 (2d Cir. Oct. 15, 2025) (quoting *Vereen*, 152 F.4th at 94).  But the Court has been clear that, even in the context of so-called "ancillary right[s]" like the right to acquire a firearm, "the threshold question" under *Bruen* and *Rahimi* remains whether the challenged regulation "pertain[s] to the right to 'keep' and 'bear' arms."  *Vereen*, 152 F.4th at

12

96. And as the Tenth Circuit recently held, "[a] blanket waiting period" like §4019a "prevents a citizen from possessing a firearm for a flat period and is an infringement on the right to bear arms." *Ortega*, 148 F.4th at 1144-45; *see also Nguyen v. Bonta*, 140 F.4th 1237 (9th Cir. 2025) (holding that a California law that made citizens wait for 30 days after a firearm purchase before they could take possession of a new firearm imposed such a "meaningful constraint[]"). Indeed, this Court recently cited *Nguyen* favorably for the proposition that "'banning the purchase of more than one firearm in a 30-day period' meaningfully constrains the ability to purchase, and thereby to keep, arms." *N.Y. State Firearms Ass'n*, 2025 WL 2921746, at *6 (quoting 140 F.4th at 1242). The same is true here. Section 4019a "must be scrutinized" by reference to historical tradition. *Ortega*, 148 F.4th at 1145.

## B. Section 4019a Is Not "Presumptively Lawful," but Any Such Presumption Would Be Rebutted in All Events.

This Court has held that "'laws imposing conditions and qualifications on the commercial sale of arms' are 'presumptively lawful'" and that "modest administrative burdens" "that are part and parcel of ordinary regulatory measures," "such as reasonable processing times and the hassle of filling out paperwork," "will not ordinarily be sufficient to overcome that presumption." *N.Y. State Firearm Ass'n*, 2025 WL 2921746, at *6. While NSSF disagrees with that conclusion, that disagreement is ultimately academic here, for two reasons. First, §4019a does not

13

impose a condition or qualification on the commercial sale of arms. Second, any presumption of validity here is rebutted by the abusive nature of this restriction.

First, a cooling-off period like §4019a imposes no qualification or condition. "Qualifications," as the Tenth Circuit has explained, are "qualities or properties (such as fitness or capacity)" that are "legally necessary to make one eligible for [something]." *Ortega*, 148 F.4th at 1147 (quoting *qualification*, Black's Law Dictionary (12th ed. 2024)). Section 4019a does not impose qualifications in any meaningful sense; it just makes people wait, no matter their "qualities or properties." Indeed, holding that §4019a imposes a qualification on arms purchases "would imply that a buyer who has not waited [three] days is somehow presumptively unqualified to purchase a firearm—an obviously unconstitutional implication." *Id.*; *see also, e.g.*, *Beckwith*, 766 F.Supp.3d at 129-30.

Nor does §4019a impose conditions on commercial sales. A "condition" is something "*other than a lapse of time*[] that must exist or occur before a duty to perform something promised arises." *Ortega*, 148 F.4th at 1147 (quoting *condition*, Black's Law Dictionary (12th ed. 2024)). Section 4019a does nothing *but* impose a state-mandated lapse of time. Furthermore, even if one could (mis)conceptualize §4019a as imposing a "condition" (Thou shalt wait), that "condition" is still not a condition *of sale*. Under §4019a, "[t]he sale happens regardless, and the waiting

14

period is just an artificial delay on possession." *Id.*  In short, §4019a "does not fit with other known conditions and qualifications in this category." *Id.* at 1146.

Second, §4019a is "put toward an end that is justified only by assuming that citizens cannot be trusted with their own rights." *Id.* at 1149 n.7; *see Bruen*, 597 U.S. at 38 n.9.  The district court seemed to think that §4019a could not be "abusive" because a three-day forced wait is relatively modest.  According to the district court, because *Antonyuk* (pre-GVR) contrasted a 30-day waiting period against the unconstitutional "lengthy wait times" discussed in *Bruen*, it must have meant that "thirty-day waiting periods are not unconstitutionally long." *VFSC*, 741 F.Supp.3d at 209.  That is both wrong and irrelevant.  For starters, the Supreme Court vacated and remanded *Antonyuk* in light of *Rahimi*.  *See Antonyuk v. James*, 144 S.Ct. 2709 (2024).  And, on remand, this Court dropped the 30-day language and instead agreed with the Fourth Circuit's conclusion that "some delay" caused by "shall issue permit processes" was permissible *because* those laws "operate[] merely to ensure that individuals seeking to exercise their Second Amendment rights are 'law-abiding' persons." *Antonyuk*, 120 F.4th at 985 n.32.  The key consideration was thus *the purpose for the delay*, not necessarily its length.  The same can hardly be said about §4019a which deprives *every* Vermonter of the Second Amendment right to acquire a firearm for three days *even after they have passed a background check* and shown that they pose no criminal threat.

15

Said otherwise, how long a firearm restriction leaves people unable to keep and bear arms is not the relevant metric when it comes to determining whether a law is put to abusive ends. Rather, under this Court's caselaw, when it comes to rebutting the presumption of validity, what matters are the *ends* to which the law is put. And on that score, §4019a is categorically different from the sort of law this Court upheld in *Gazzola v. Hochul*, 88 F.4th 186 (2d Cir. 2023) (per curiam), which required retailers to secure firearms in a vault outside business hours, install security alarms, and prohibit minors from entering the store without a guardian.[4] *Id.* at 192. That kind of security law at least serves to ensure that firearms do not wind up in the hands of criminals or children—"categories of persons" long "thought by … legislature[s] to present a special danger of misuse." *Rahimi*, 602 U.S. at 698. But §4019a does not distinguish from the general public *either* people found to pose a threat based on individualized conduct (i.e., criminals) *or* a subset of people who as a class are thought particularly likely to act or impulsively (i.e., minors). It instead just "broadly restrict[s] arms use by the public generally," *id.*, which is exactly what *Bruen* meant by "abusive ends."

---

[4] The law in *Gazzola* also did not prevent anyone from keeping or bearing anything for any period of time. 88 F.4th at 197. The opposite is true here. Vermont cannot dispute that §4019a will constrain every Vermonter from exercising their core Second Amendment right to keep and bear a firearm for at least three days.

16

Nor does §4019a set "'narrow, objective, and definite standards' guiding licensing officials." *Contra VFSC*, 741 F.Supp.3d at 209 (quoting *Bruen*, 597 U.S. at 38 n.9). In fact, §4019a does not set a "standard" for determining who is and is not "a law-abiding, responsible individual." It just makes everyone wait three days. No investigation happens during that "cooling-off" period (which, for Plaintiffs and for most everyone else, runs for 72 hours *after* they pass a background check). That gives the lie to the notion that §4019a does anything to ensure that firearms are held only by law-abiding, responsible persons. As the Tenth Circuit has explained, "[t]o say that a desire to purchase a firearm renders one dangerous or presumptively not law-abiding for a time would … penalize someone for exercising a constitutional right, which is obviously unconstitutional." *Ortega*, 148 F.4th at 1151 n.10.

At bottom, §4019a "look[s] with suspicion on citizens" just because they want to exercise their Second Amendment rights. *But see United States v. Daniels*, 101 F.4th 770, 778 (10th Cir. 2024) ("[I]f we are to take seriously the normative thrust of the Supreme Court's recent decision[s] …, then we cannot look with suspicion on citizens presumably exercising their Second Amendment rights in a lawful way."). If that is not an "abusive end[]," then it is hard to see what is. In reaching a contrary result, the district court impermissibly treated the Second Amendment "as a second-class right, subject to an entirely different body of rules than the other Bill of Rights guarantees." *McDonald*, 561 U.S. at 780.

17

## II.     Section 4019a Is Inconsistent With This Nation's Historical Tradition of Firearm Regulation.

Because Plaintiffs' proposed conduct is covered by the Second Amendment's plain text, it is "presumptively protect[ed]" by the Constitution and the state must "affirmatively prove" that its restriction is "consistent with this Nation's historical tradition of firearm regulation." *Bruen*, 597 U.S. at 17, 19, 28, 33-34.  A restriction on "arms-bearing conduct" fits within our historical tradition of firearm regulation if it "impos[es] similar restrictions" on the arms-bearing right "for similar reasons" as a historical analogue. *Rahimi*, 602 U.S. at 690-92.  "[C]entral to this inquiry" are two questions:  the "[w]hy" and the "how." *Id.* at 692; *see Bruen*, 597 U.S. at 29. As to the former, "if laws at the founding regulated firearm use to address particular problems, that will be a strong indicator that contemporary laws imposing similar restrictions for similar reasons fall within a permissible category of regulations." *Rahimi*, 602 U.S. at 692.  As to the latter, "[e]ven when a law regulates arms-bearing for a permissible reason, … it may not be compatible with the [Second Amendment] right if it does so to an extent beyond what was done at the founding." *Id.*

The Supreme Court has provided several guidelines for this historical journey. First and foremost, the government bears the burden to justify a modern restriction on arms-bearing conduct by pointing to a "relevantly similar" historical regulation— a historical regulation with a similar "[w]hy" and "how" as the challenged restriction. *Id.*  But not all historical regulations are created equal.  "[P]ost–Civil

18

War discussions of the right to keep and bear arms … do not provide as much insight into [the Second Amendment's] original meaning." *Bruen*, 597 U.S. at 36. Although "belated innovations of the mid- to late-19th-century" can "confirm[]" original meaning, "to the extent [this] later history contradicts" earlier understandings of the pre-existing right, the earlier understanding "controls." *Id.* at 36-37.

With those guidelines in mind, the district court's missteps are clear. For 200 years no state has forced law-abiding citizens to wait out an unadorned "cooling off" period before they could acquire a firearm. In "the early days of the Republic," there was no "open, widespread, and unchallenged" practice, *Bruen*, 597 U.S. at 36, of imposing a "cooling-off" period before someone could take possession of a firearm, *see, e.g.*, *Silvester v. Harris*, 41 F.Supp.3d 927, 962 (E.D. Cal. 2014) ("[T]here is no evidence to suggest that waiting periods imposed by the government would have been accepted and understood to be permissible under the Second Amendment."), *rev'd and remanded on other grounds*, 843 F.3d 816 (9th Cir. 2016).

Waiting-period provisions first came onto the scene in the twentieth century, around the same time that some states started adopting various types of background checks. *See Silvester v. Harris*, 843 F.3d 816, 831 (9th Cir. 2016) (Thomas, C.J., concurring); *Rocky Mt. Gun Owners v. Polis*, 701 F.Supp.3d 1121, 1137 (D. Colo. 2023) ("[N]o law requiring a waiting period was enacted in the United States until

1923.").  Unlike §4019a, however, these early waiting periods were not motivated by a suspicion that all people who want to purchase a firearm to exercise their Second Amendment rights are at risk of impulsive violence.  On the contrary, they were designed to facilitate the burgeoning background-check process, which was a much more time-consuming endeavor back then.  It was not until after the Berlin Wall had fallen that the first state saw fit to make people wait to take possession of a firearm *even after they passed a background check* and demonstrated that they are indeed "law-abiding, responsible citizens."  *See Heller*, 554 U.S. at 635.  "Cooling-off" laws like §4019a are thus a thoroughly modern innovation—one that would have been "unimaginable at the founding."  *Rocky Mt. Gun Owners*, 701 F.Supp.3d at 1142.

That is plainly *not* because the problem Vermont claims its law is intended to solve—"preventing impulsive violence," *VFSC*, 741 F.Supp.3d at 210 n.28—arose only recently.  To state the obvious, there have always been people who want to get their hands on a weapon to cause immediate harm to others or themselves.  Yet there was no tradition—not at the founding, not in the Reconstruction era, and not even for the better part of the twentieth century—of making people "cool off" for a set number of days before they could take possession of a firearm, let alone of imposing a "cooling-off" period on people who have already passed a background check.

Despite all this, the district court concluded otherwise.  It held that the "immediate availability of firearms is a modern development that requires modern

20

regulation" such that the court had to "undertake a 'nuanced approach' to the historical analysis." *VFSC*, 741 F.Supp.3d at 211. Taking this approach, the court held that historical laws restricting intoxicated individuals' ability to possess or use firearms while drunk and licensing schemes showed a historical tradition of requiring "that individuals who might be likely to make rash decisions with a firearm should be disarmed." *Id.* at 214. That was patently wrong.

Start with laws restricting the right of the currently intoxicated. If one pitches things at a high-enough level of generality, as the district court did, *see id.*, perhaps the "why" animating such laws could be seen to faintly resemble the motivation behind cooling-off period laws: Both are nominally designed to prevent dangerous, impulsive behavior. But that is where any similarities end. Regulations on intoxicated individuals are narrowly tailored to burden the arms-bearing rights of only a narrow slice of the population—people in a temporary state of inebriation that predisposes them to dangerous or impulsive behavior. And those who wish to avoid that constraint can easily do so by refraining from getting intoxicated. Section 4019a, by contrast, imposes a blunderbuss burden on nearly everyone's arms-bearing right, on the theory that anyone looking to acquire guns might be disposed to impulsive acts of violence. In other words, §4019a simply "look[s] with suspicion on citizens" who wish to "exercis[e] their Second Amendment rights," *Daniels*, 101 F.4th at 778, even when they—unlike the inebriated—have done nothing to deserve

it.  Indeed, §4019a continues to look with suspicion on individuals who want to exercise Second Amendment rights *even after a background check has already dispelled any individualized basis for such suspicion*.  That radical overbreadth sunders the historical analogy and completely fails *Bruen*'s "how" requirement.

*Rahimi* confirms the point.  The Court there recognized, of course, that America's "tradition of firearm regulation" allows "the Second Amendment right" to "be burdened once a defendant has been found to pose a credible threat to the physical safety of others" (as one could certainly say is the case for intoxicated individuals).  602 U.S. at 700.  But the Court made sure to underscore that laws (such as §4019a) that "broadly restrict arms use by the public generally" typically do *not* fit within our Nation's historical tradition, which has always "distinguishe[d] citizens who have been found to pose a credible threat to the physical safety of others from those who have not."  *Id.* at 698, 700.  So, properly understood, the historical regulations on intoxicated individuals actually underscore the problem with modern day laws imposing unallayed "cooling-off" requirements on every law-abiding citizen.

Licensing schemes are even further afield.  *Contra VFSC*, 741 F.Supp.3d at 212-14.  Licensing schemes give the government time to ensure that the purchaser *is a law-abiding citizen*.  In stark contrast, "cooling-off" laws like §4019a eschew any administrative process designed to ensure that the individual purchaser is a law-

22

abiding citizen; their sole purpose and effect is to prevent someone who has *already* passed a background check from keeping and carrying a firearm.  Once again, that runs head-on into Supreme Court precedent, as *Bruen* expressly distinguished (1) state-imposed delays "designed to ensure only that those bearing arms in the jurisdiction are, in fact, 'law-abiding, responsible citizens'" (*e.g.*, licensing schemes) from (2) state-imposed delays designed to "prevent 'law-abiding, responsible citizens' from exercising their Second Amendment right to public carry" (*e.g.*, "cooling-off" laws).  *Bruen*, 597 U.S. at 38 n.9.  Whatever our Nation's historical tradition may have to say about the former, it decidedly does not support the latter. That should have been the end of the road for Vermont's ahistoric law.

Ultimately, both Vermont and the district court made the same basic mistake of assuming that if the government may delay the exercise of Second Amendment rights for *some* reasons, then it may delay them for *any*.  That (il)logic ignores the Supreme Court's repeated admonitions that courts must focus on both "how" and "why" a law restricts Second Amendment rights.  *Rahimi*, 602 U.S. at 692; *see also Bruen*, 597 U.S. at 29-30.  It is one thing to delay the exercise of Second Amendment rights in service of accomplishing some other permissible regulatory purpose, like verifying that someone is not legally disqualified from keeping and bearing firearms. *See Zherka v. Bondi*, 140 F.4th 68, 94 (2d Cir. 2025) (recognizing that "it is permissible for a state to decline an applicant a firearms license based on information

23

discovered in a background check").  But it is another thing entirely to delay the exercise of a fundamental right on the theory that anyone who wants to exercise that right—even a law-abiding citizen who promptly passes a background check and satisfies any other criteria the state may impose—may be inflamed by violent passions that may subside if they are forced to wait a few days.  To ignore that commonsense distinction is to eliminate the "why" component of the test entirely—and to ignore this Court's recent admonition that "tak[ing]" the Supreme Court's decisions "seriously" means not "look[ing] with suspicion on citizens presumably exercising their Second Amendment rights in a lawful way."  *Daniels*, 101 F.4th at 778.  Nothing in our Nation's historical tradition supports such "cooling off" periods.

24

## CONCLUSION

For the foregoing reasons, this Court should reverse the district court.

Respectfully submitted,

s/Erin E. Murphy
ERIN E. MURPHY
 *Counsel of Record*
MATTHEW D. ROWEN
BARRETT L. ANDERSON
CLEMENT & MURPHY, PLLC
706 Duke Street
Alexandria, VA 22314
(202) 742-8900
erin.murphy@clementmurphy.com

*Counsel for* Amicus National
*Shooting Sports Foundation, Inc.*

November 17, 2025

## CERTIFICATE OF COMPLIANCE

I hereby certify that:

1. This brief complies with the type-volume limitation of Local R. 32.1(a)(4)(A) because it contains 5,875 words, excluding the parts of the brief exempted by Fed. R. App. P. 32(f), as determined by the word counting feature of Microsoft Word 2016.

2. This brief complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and the typestyle requirements of Fed. R. App. P. 32(a)(6) because it has been prepared in a proportionally spaced typeface using Microsoft Word 2016 in 14-point font.

November 17, 2025

<u>s/Erin E. Murphy</u>
Erin E. Murphy

## CERTIFICATE OF SERVICE

I hereby certify that, on November 17, 2025, an electronic copy of the foregoing brief was filed with the Clerk of Court using the ACMS system and thereby served upon all counsel appearing in this case.


<u>s/Erin E. Murphy</u>
Erin E. Murphy